UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE ADAM CORPORATION/GROUP, | ) | |
| Petitioner/Plaintiff, | ) | |
| | ) | |
| - AND - | ) | |
| | ) | |
| Citibank, N.A., | ) | No. 1:08-cv-0753 RMU |
| Nominal Petitioner/Nominal Plaintiff, | ) | |
| | ) | |
| - AGAINST - | ) | |
| | ) | |
| FEDERAL DEPOSIT INSURANCE | ) | |
| CORPORATION, Solely in its Capacity as | ) | |
| Manager of the FSLIC Resolution Fund, | ) | |
| | ) | |
| Respondent/Defendant. | ) | |

## FDIC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO TACG's RENEWED MOTION TO COMPEL ARBITRATION, OR, IN THE ALTERNATIVE, TO RETURN THIS CASE TO THE DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS

Claire L. McGuire (D.C. Bar No. 247924)
Larry L. Goodman (D.C. Bar No. 421980)
Leslie A. Conover (D.C. Bar No. 366826)
Bruce C. Taylor
John A. Davidovich
FEDERAL DEPOSIT
INSURANCE CORPORATION
3501 Fairfax Drive
Arlington, VA 22226
Tel: (703) 562-2390
Fax: (703) 562-2481

Kirk K. Van Tine (D.C. Bar No. 257139)
David A. Super (D.C. Bar No. 429359)
Samuel J. Waldon (D.C. Bar No. 441885)
Ryan E. Bull (D.C. Bar No. 481743)
Sheila J. Kadagathur (D.C. Bar No. 500647)
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Tel.: (202) 639-7700
Fax: (202) 639-7890

Attorneys for Defendant
Federal Deposit Insurance Corporation

## <u>TABLE OF CONTENTS</u>

I. BACKGROUND......................................................................................................2

   A. The Nature Of The Dispute ...............................................................................2
      1. Tax benefit sharing under Section 9 of the Assistance Agreement......................2
      2. The Termination Agreement ..........................................................................3
      3. The basis for the FDIC's claim against TACG .................................................4
      4. The basis for TACG's claim against the FDIC .................................................5

   B. Procedural Status .............................................................................................5

II. ARGUMENT ........................................................................................................8

   A. TACG's "Renewed" Motion to Compel Arbitration Must Be Denied.....................8
      1. Standards governing TACG's motion to compel ................................................8
      2. The narrow arbitration clause applies only to specifically defined
         categories of disputes, and disputes over tax benefit sharing are not
         among those subject to arbitration..................................................................9
      3. The limited scope of arbitrable disputes under Section 6.1 is confirmed
         by the entirety of the contract......................................................................13
         a. TACG's interpretation of the arbitration clause renders the forum
            selection clause meaningless ................................................................14
         b. Each of the provisions of the Termination Agreement that defines a
            "Dispute Item" contains an express reference to arbitration, while
            the tax benefit sharing provisions contain no such arbitration language.......15
         c. The Dispute Items subject to arbitration under Section 6.1 relate to
            the process of winding up the FDIC's assistance payment obligations
            to TACG and were to be (and in fact were) resolved eleven years ago ........16
      4. The FDIC's interpretation is based on the plain language of the contract,
         not parole evidence....................................................................................18

   B. There Is No Basis To Transfer This Case Back To Texas.........................................19
      1. This case should proceed in this Court because the forum selection
         clause contemplates that the first-filed suit should proceed ...............................20
      2. The Section 1404(a) factors favor suit in this District..........................................23
         a. TACG has not shown that the private interest factors weigh in
            favor of transferring to the Northern District of Texas ..................................23
         b. Other private interest factors do not weigh in favor of re-transferring
            this case back to Texas ......................................................................25
         c. TACG has not shown that the public interests weigh in favor of
            re-transferring this case to Texas...........................................................26
         d. The public interest in a consolidated proceeding compels maintaining
            this case in this District......................................................................28

III. CONCLUSION .................................................................................................28

# TABLE OF AUTHORITIES

## CASES

*Cont'l Grain Co. v. Barge FBL-585,*
364 U.S. 19 (1960) .................................................................28

*Cummings v. FedEx Ground Package Sys., Inc.,*
404 F.3d 1258 (10th Cir. 2005) ...............................................10

*\*Dowley v. Dewey Ballantine, LLP,*
No. 05-622, 2006 WL 1102768 (D.D.C. Apr. 26, 2006) .............9, 11

*\*Ferens v. John Deere Co.,*
494 U.S. 516 (1990) .................................................................28

*Green Tree Fin. Corp. v. Bazzle,*
539 U.S. 444 (2003) .................................................................11

*\*Gundle Lining Constr. Corp. v. Fireman's Fund Ins. Co.,*
844 F. Supp. 1163 (S.D. Tex. 1994) .........................................27

*Hyatt Int'l Corp. v. Coco,*
302 F.3d 707 (7th Cir. 2002) ...................................................24

*\*In re Volkswagen A.G.,*
371 F.3d 201 (5th Cir. 2004) ...................................................26

*Intervet, Inc. v. Merial Ltd.,*
535 F. Supp. 2d 112 (D.D.C. 2008) ..........................................21

*Kotan v. Pizza Outlet, Inc.,*
400 F. Supp. 2d 44 (D.D.C. 2005) ............................................24

*Local 827, Intn'l. Bhd. of Elec. Workers, AFL-CIO v. Verizon N.J., Inc.,*
458 F.3d 305 (3rd Cir. 2006) ...................................................10

*\*Madison Hotel v. Hotel & Rest. Employees, Local 25, AFL-CIO,*
128 F.3d 743 (D.C. Cir. 1997) ...................................................8

*\*Marra v. Papandreou,*
216 F.3d 1119 (D.C. Cir. 2000) ...............................................20

*Montgomery v. STG Intn'l., Inc.,*
532 F. Supp. 2d 29 (D.D.C. 2008) .........................................7, 27

*Scarborough v. Nat'l Ass'n of Sur. Bond Producers,
    474 F. Supp. 2d 64 (D.D.C. 2007)...........................................................19

Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co.,
    767 F.2d 1140 (5th Cir. 1985) ..............................................................11

Seeberger Enter., Inc. v. Mike Thompson Recreational Vehicles, Inc.,
    502 F. Supp 2d 531 (W.D. Tex. 2007) .............................................24, 28

Shapiro, Lifschitz & Schram, P.C. v. Hazard,
    24 F. Supp. 2d 66 (D.D.C. 1998)...........................................................23

Stewart Org., Inc. v. Ricoh Corp.,
    487 U.S. 22 (1988) ...............................................................................21

Stromberg Sheet Metal Works, Inc. v. Washington Energy Systems, Inc.,
    448 F. Supp. 2d 64 (D.D.C. 2006) ..........................................................9

Thayer/Patricof Educ. Funding, L.L.C. v. Pryor Res., Inc.,
    196 F. Supp. 2d 21 (D.D.C. 2002)..........................................................23

The Rice Co. (Suisse), S.A. v. Precious Flowers Ltd.,
    No. 07-20063, 2008 WL 861096 (5th Cir., Apr. 2, 2008).............................9, 10

*Tittle v. Enron Corp.,
    463 F.3d 410 (5th Cir. 2006) ..........................................................13, 14

*Toledano v. O'Connor,
    501 F. Supp. 2d 127 (D.D.C. 2007)........................................................23

Twin City Monorail, Inc. v. Robbins & Myers, Inc.,
    728 F.2d 1069 (8th Cir. 1984) ..............................................................10

W. Gulf Maritime Ass'n. v. ILA Deep Sea Local 24, AFL-CIO,
    751 F.2d 721 (5th Cir. 1985) ................................................................28

Wash. State Dept. of Social & Health Servs. v. Guardianship Estate of Keffeler,
    537 U.S. 371 (2003) .............................................................................12

Welborn Clinic v. Medquist, Inc.,
    301 F.3d 634 (7th Cir. 2002) ................................................................10

Williams v. E.F. Hutton & Co.,
    753 F.2d 117 (D.C. Cir. 1985)................................................................8

*Wolff v. Westwood Mgmt., LLC,*
   503 F. Supp. 2d 274 (D.D.C. 2007)...........................................................................8, 10

**STATUTES**

9 U.S.C. § 4   .........................................................................................................................20

**OTHER AUTHORITIES**

1 Larry E. Edmonson, <u>Domke on Commercial Arbitration</u>, § 15.6 (3d ed. 2007).........................11

11 Richard A. Lord, <u>Williston on Contracts</u>, §§ 32:6, 32:10 (4th ed. 1999)................................12

15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, <u>Federal Practice & Procedure</u>, § 3854 ............................................................................................................27

The Federal Deposit Insurance Corporation, in its capacity as manager of the FSLIC Resolution Fund ("FDIC") files this opposition to the "renewed" motion to compel arbitration filed by The Adam Corporation/Group ("TACG") on May 6, 2008, as well as TACG's alternative request to "re-transfer" this case (the "TACG Action") back to the Northern District of Texas. In demanding arbitration, TACG seeks to "shoe horn" the parties' dispute over tax benefit sharing obligations into a narrow arbitration clause that, by its plain language, applies only to discrete categories of disputes. TACG's misreading of the arbitration clause to cover *all* disputes between the parties renders superfluous four sub-clauses of the arbitration clause, as well as a separate forum selection clause in the Termination Agreement that specifies two courts (one of which is this Court) to hear the types of disputes at issue. At bottom, TACG and the FDIC did not agree to arbitrate the tax benefit sharing disputes at issue here. For that reason, TACG's motion to compel arbitration should be denied.

TACG's alternative request to re-transfer this case back to the Northern District of Texas is equally baseless because no clear error, manifest injustice or change of circumstances justifies such a re-transfer. In its Order dated April 30, 2008, the Northern District of Texas transferred this action to this Court because the FDIC, as the natural plaintiff with the largest monetary claim, was the first party to initiate a legal action relating to the pending disputes, and did so in this Court (the "FDIC Action"). The Northern District of Texas recognized that a consolidated resolution of the parties' respective claims will be most efficient for the parties, witnesses and judicial system. That decision is correct, and should not be disturbed. As the Northern District of Texas found, the parties agreed in the Termination Agreement (i) that suits like this one could be brought only in the federal courts of the District of Columbia or Texas and (ii) that neither party would challenge the other party's choice of forum on convenience grounds or for any other

reason. Thus, by definition, the parties agreed that whichever party sued first in one of the two agreed-upon forums would prevail in its choice of that forum. The FDIC sued in this Court first. There is no inequity in requiring TACG to litigate the related TACG Action and FDIC Action in a forum that it contractually agreed to *ex ante*.

## I.     BACKGROUND

A.     The Nature Of The Dispute.

Both the TACG Action and the FDIC Action arise from a 1988 transaction between TACG and the FDIC's predecessor, the Federal Savings and Loan Insurance Corporation ("FSLIC"). In that transaction, TACG purchased the assets and assumed certain liabilities of eleven failed savings and loan associations in Texas, which were consolidated into a new savings and loan association. The new savings and loan association came to be known as First American Bank ("FAB"). TACG owned the stock of FAB.

The terms of the 1988 acquisition by TACG were set forth in a contract called an Assistance Agreement. Both the FDIC Action and the TACG Action relate to a dispute over the proper interpretation of one provision of the Assistance Agreement, as well as provisions of the 1996 Termination Agreement between the FDIC and TACG.

1.     Tax benefit sharing under Section 9 of the Assistance Agreement.

In the 1988 Assistance Agreement, FSLIC agreed to provide FAB with certain financial assistance in connection with the assets and liabilities of the Acquired Associations. Section 9 of the Assistance Agreement — the provision at issue in both actions — required TACG to share with FSLIC any federal and state net tax savings that TACG and its subsidiaries actually realized as a result of certain types of tax deductions, exclusions, and other tax attributes set forth in

Section 9.  Specifically, FSLIC (now the FDIC) was entitled to 60 percent of those tax savings and TACG retained 40 percent.

    2.       The Termination Agreement.

On July 31, 1996, TACG and the FDIC terminated the Assistance Agreement by entering into the Termination Agreement.  Under the Termination Agreement, the FDIC made a lump sum payment to TACG in the amount of $9 million and, in return, the FDIC's obligation to make any further assistance payments to TACG was extinguished.  However, the Termination Agreement provided that the tax benefit sharing obligations defined in Section 9 of the Assistance Agreement, and certain other specified provisions, survived termination and remained binding on the parties.  *See* Termination Agreement §§ 2.2, 7.2(b).  As TACG explained in its complaint filed in the TACG Action, "[t]he purpose of the Termination Agreement was to resolve all payments due on FAB's covered asset losses, to terminate the Assistance Agreement, and to preserve the parties' tax benefit sharing payment arrangement."[1]

Because TACG and the FDIC wanted to close out the FDIC's assistance payment obligations as quickly as possible, the Termination Agreement established a process for quickly resolving assistance obligations that were outstanding at the time of the 1996 Termination Agreement or that arose shortly after the termination.  Significantly, this process for winding up the assistance payment obligations was designed to be concluded promptly after the July 1996 closing of the Termination Agreement.  *See infra* at 16-18.  Disputes over assistance payment

---

[1]  Petition To Compel Arbitration, Or, In The Alternative, Complaint For Declaratory Judgment That Dispute Is Arbitrable, Or, In The Alternative, Complaint For Money Damages ¶ 68, Docket No. 1, Case No. 3-07-CV-1993-L (N.D. Tex Nov. 30, 2007) ("TACG Compl.").

matters that could not be resolved through the winding up process were subject to mandatory arbitration. Termination Agreement § 6.1.

In demanding arbitration of the tax benefit sharing disputes at issue here, TACG relies on Section 6.1 of the Termination Agreement. However, as explained fully in Part A below, Section 6.1 defines narrow categories of disputes arising out of the process for winding up the FDIC's assistance payment obligations. The arbitration clause does not now, nor did it ever, apply to disputes over tax benefit sharing under Section 9 of the Assistance Agreement. To the contrary, disputes over the parties' continuing obligations, including tax benefit sharing obligations under Section 9, are governed by a venue provision in Section 13.4 of the Termination Agreement:

> This Agreement and the rights and obligations hereunder shall be governed by and construed in accordance with the Federal law of the United States of America and, in the absence of controlling Federal law, in accordance with the law of the State of Texas. <u>Any legal action or proceedings with respect to this Agreement shall be brought in the Federal courts of the United States of America located in either the District of Columbia or the State of Texas and each party hereto submits to the jurisdiction of such courts and hereby waives any objections on the grounds of venue, forum non conveniens, or any similar grounds.</u>

Termination Agreement § 13.4 (emphasis added).

3.    <u>The basis for the FDIC's claim against TACG.</u>

The FDIC's claim against TACG is based on TACG's sale of all of its FAB shares to Citibank, Texas ("Citibank") in March 2005 for $972 million (the "Sale"). As part of the Sale, TACG retained the continuing obligation to provide to the FDIC 60 percent of any federal and state net tax savings realized by TACG under Section 9. On its federal income tax return covering the period when the Sale occurred, TACG reported a capital loss of approximately $314 million resulting from the Sale. TACG generated this $314 million capital loss — instead of incurring a taxable capital gain — because TACG's basis in the stock of FAB was approximately

$1 billion higher than it would have been without the Section 9 tax benefits.  As a direct result of the increase basis created by the tax benefits, TACG paid $257.8 million less in federal income tax than it would have paid if it had not utilized the tax benefits.  Accordingly, under Section 9, TACG owes the FDIC 60 percent of those tax savings, or $154.7 million ($257.8 million in tax savings x 60 percent share to the FDIC = $154.7 million).  TACG has refused to pay the FDIC the $154.7 million it owes, as well as $2.6 million in additional tax savings under Section 9 of the Assistance Agreement, for a total of $157.3 million owed to the FDIC.

    4.    <u>The basis for TACG's claim against the FDIC</u>

TACG bases its claim against the FDIC on a statute enacted by Congress in 1993 known as the "Guarini Amendment."  TACG alleges that the Guarini Amendment had the effect of prohibiting TACG from claiming certain tax deductions.  Although TACG was well aware of the Guarini Amendment and its effects when the statute was enacted fifteen years ago, only now does TACG allege that, as a result of the Guarini Amendment, TACG overpaid tax benefit sharing obligations to the FDIC by approximately $41 million.  That sum is nearly *all* of the tax benefit sharing amounts that TACG has *ever* paid the FDIC.

B.    <u>Procedural Status.</u>

Between August 2006 and November 2007, TACG and the FDIC negotiated their respective differences.  To facilitate those negotiations, the parties entered into standstill agreements that ensured neither party would initiate litigation pending settlement discussions. The last of these agreements expired on November 30, 2007.

On November 30, 2007, at 12:01 Eastern Standard Time, the FDIC filed its Complaint in this Court.  *See* Complaint, Docket No. 1, Case No. 1:07-cv-2163 (RMU) (D.D.C. Nov. 30, 2007).  Approximately one hour later (midnight Central Standard Time), TACG filed a

complaint in the Northern District of Texas. *See* TACG Compl. Also on November 30, TACG filed an identical claim with the American Arbitration Association ("AAA") in Dallas, Texas and a motion in the Northern District of Texas to compel arbitration of its claim. TACG's motion to compel arbitration has been fully briefed since January 8, 2008.

In addition to opposing TACG's motion to compel arbitration in the Northern District of Texas, the FDIC moved to transfer the TACG Action to this Court. On March 24, 2008, the Magistrate Judge in the Northern District of Texas issued "Findings, Conclusions, and Recommendations" on the FDIC's motion to transfer. *See* Findings, Conclusions, and Recommendations, Docket No. 39, Case No. 07-cv-1993 (N.D. Tex Mar. 24, 2008) (attached as Exhibit A). The Magistrate Judge found that "[b]oth parties consented and waived objection to jurisdiction in the federal courts of either the District of Columbia or the State of Texas for all legal actions arising from the [agreement]." Ex. A at 8. The Magistrate Judge further found that the FDIC's complaint was filed in this Court before TACG filed its complaint in the Northern District of Texas, and that the two actions substantially overlap. *Id.* at 6. Accordingly, the Magistrate Judge recommended that the TACG Action be transferred to this Court. *Id.* at 8.

On April 21, 2008, U.S. District Judge Sam A. Lindsay accepted the findings, conclusions and recommendations of the Magistrate Judge, and transferred the TACG Action to this Court. *See* Transfer Order, Docket No. 43, Case No. 07-cv-1993 (N.D. Tex. Apr. 21, 2008) (attached as Exhibit B). Judge Lindsay granted the FDIC's motion to transfer "because the District of Columbia action was filed first, there is substantial overlap between the two cases, and TACG has not shown compelling evidence justifying an exception to the first-to-file rule." *Id.* at 2-3. The Court "decline[d] to address [TACG's] Motion to Compel Arbitration," indicating that, in light of the transfer, the issue of arbitrability should be decided by this Court.

*Id.* at 2 n.*.[2]  On May 5, 2008 the Clerk of this Court docketed the TACG Action under case number 1:08-CV-00753, and pursuant to Local Civil Rule 40.5, designated it as related to the case that the FDIC had filed in this Court.  *See* U.S. Dist. Ct. Rules D.C., Civil Rule 40.5(c) (2008).

On April 30, 2008, the FDIC filed a motion in the FDIC Action to consolidate the FDIC Action and the transferred TACG Action.  *See* FDIC Motion to Consolidate and Request for Expedited Ruling on Pending Motion to Compel Arbitration, Docket No. 12, Case No. 1:07-cv-2163 (D.D.C. Apr. 30, 2008).  In addition, the FDIC requested expedited consideration of TACG's pending motion to compel arbitration.  Although TACG did not consent to that motion prior to the FDIC filing it, TACG has subsequently confirmed that it agrees that the FDIC Action and the TACG Action should be consolidated in this Court.  *See* Defendant's Response to Plaintiff's Motion to Consolidate and Request for Expedited Ruling on Pending Motion to Compel Arbitration, Docket No. 14, Case No. 1:07-cv-2163 (D.D.C. May 14, 2008).  TACG also joined the FDIC's request for expedited consideration of TACG's motion to compel arbitration.  *Id.*

---

[2]  TACG's motion to compel arbitration was transferred to this Court fully briefed and ready for decision.  Accordingly, no "renewed" motion was necessary. *See, e.g., Montgomery v. STG Intn'l., Inc.,* 532 F. Supp. 2d 29, 36 (D.D.C. 2008).  In fact, the need to brief the renewed motion has had the effect of delaying resolution of the arbitrability question, although both the FDIC and TACG agree that a decision on that threshold issue should be expedited.  Rather than move to strike TACG's renewed motion, however, the FDIC has chosen to address the substance of TACG's renewed motion in the interest of resolving the arbitrability issue as quickly as possible.  For the Court's convenience, the briefing on TACG's original motion to compel is attached as Exhibit C.

## II.  ARGUMENT

A.    TACG's "Renewed" Motion to Compel Arbitration Must Be Denied.

Under its plain language, the arbitration clause in the Termination Agreement is limited to specific and narrow categories of disputes.  TACG cannot fit this dispute over tax benefit sharing into one of the categories enumerated in the arbitration clause.  For that reason, TACG attempts to stretch the arbitration clause to reach any and all disputes remotely connected with the Termination Agreement.  That attempt should be rejected.  Black letter contract law requires that the terms of a contract be read as a whole, and that each term be given meaning.  TACG would have the Court ignore these fundamental principles and construe the arbitration clause nonsensically, such that the first four sub-clauses of the arbitration clause (and the forum selection clause in the Termination Agreement) lose all meaning and purpose.

1.    Standards governing TACG's motion to compel.

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *Madison Hotel v. Hotel & Rest. Employees, Local 25, AFL-CIO*, 128 F.3d 743, 746 (D.C. Cir. 1997) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)).  The Federal Arbitration Act (the "FAA") reflects a policy that favors enforcing arbitration agreements where two parties *have agreed* to arbitrate a dispute. *See* Renewed Motion to Compel at 4-5.  "[W]hile mindful of the federal policy favoring arbitration, it is the court's task to determine the parties' intent [to arbitrate]." *Wolff v. Westwood Mgmt., LLC*, 503 F. Supp. 2d 274, 279 (D.D.C. 2007) (citing *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 850 F.2d 756, 760-61 (D.C. Cir. 1988)).  A court has no authority under the FAA to direct a party to arbitrate a dispute that it has not agreed to arbitrate. *See Williams v. E.F. Hutton & Co.*, 753 F.2d 117, 119 (D.C. Cir. 1985);

*Stromberg Sheet Metal Works, Inc. v. Washington Energy Systems, Inc.*, 448 F. Supp. 2d 64, 67

(D.D.C. 2006) (Urbina, J.).

2.    The narrow arbitration clause applies only to specifically defined categories of disputes, and disputes over tax benefit sharing are not among those subject to arbitration.

Section 6.1 of the Termination Agreement required TACG and the FDIC to arbitrate *certain* disputes. The question is whether tax benefit sharing disputes are among those subject to arbitration. TACG can answer that question affirmatively only by stretching garden variety "catch all" language included in the arbitration clause to the point that the arbitration provision would apply to *any* dispute relating to the parties' obligations under the Termination Agreement. However, the Termination Agreement makes clear that the arbitration clause was limited to narrow categories of disputes arising out of the winding up of the FDIC's obligation to make assistance payments to TACG. TACG's effort to expand the reach of the narrow agreement to encompass *any* disputes ignores the plain meaning of Section 6.1 as a whole, and renders superfluous virtually every word of the provision other than 13 words that TACG chooses to emphasize.

The language of this arbitration agreement is classic narrow language because it applies only to specified categories of contractual disputes, not to "any and all disputes." *See Dowley v. Dewey Ballantine, LLP,* No. 05-622, 2006 WL 1102768, at *7 (D.D.C. Apr. 26, 2006) ("[c]ourts have distinguished a 'narrow' arbitration clause that 'covers only specified types of disputes' from a "broad" arbitration clause that provides generally that disputes "arising under" or 'concerning' the contract are covered.") (citing *Nat'l R.R. Passenger Corp.*, 850 F.2d at 760).[3]

---

[3] *Accord The Rice Co. (Suisse), S.A. v. Precious Flowers Ltd.*, No. 07-20063, 2008 WL 861096, at *5 (5th Cir. Apr. 2, 2008), (finding that arbitration clause was not broad where it only applied

[Footnote continued on next page]

Section 6.1 lists four defined types of disputes that are subject to arbitration, including disputes relating to (1) "Covered Asset Purchase SRA Report Exceptions," (2) "Post-Closing Expense Items," (3) "Post-Closing Receipt Items," and (4) "AmWest [FAB] Dispute Items." *See* Termination Agreement § 6.1(a). Each of these types of disputes — which are defined in other portions of the Termination Agreement — relates to the process for winding up the FDIC's payment obligations. Specifically, "Covered Asset Purchase SRA Report Exceptions" involve disputes stemming from FAB's Covered Asset Purchase SRA Report, which was to be submitted 60 days after the Closing Date of the Termination Agreement. *See id.* § 4.2. "Post-Closing Expense Items" and "Post-Closing Receipt Items" refer to expenses and receipts relating to transferred assets that arise after the Closing Date. *See id.* § 4.3. Finally, "AmWest [FAB] Dispute Items" refer to disputes arising from the FDIC's Office of Inspector General's post-closing audit. *See id.* § 5.3(b). Significantly, none of these types of disputes includes post-Closing Date disputes relating to tax benefit sharing under Section 9.

When, as here, the Court confronts a narrow arbitration clause, "the court must 'consider whether the conduct in issue is on its face within the purview of the clause.'" *Wolff*, 503 F. Supp. 2d at 282 (quoting *Rochdale Village, Inc. v. Pub. Serv. Employees Union*, 605 F.2d

---

[Footnote continued from previous page]
to "any dispute [to] arise between Owners and Charterers," because it did not relate to any and all disputes arising out of the contract.); *Local 827, Intn'l. Bhd. of Elec. Workers, AFL-CIO v. Verizon N.J., Inc.*, 458 F.3d 305, 311 (3rd Cir. 2006) (finding that arbitration clause was narrow where it did "not refer expansively to 'any' disputes, but rather to disputes about issues that are specifically enumerated."); *Cummings v. FedEx Ground Package Sys., Inc.*, 404 F.3d 1258, 1262 (10th Cir. 2005); *Welborn Clinic v. Medquist, Inc.*, 301 F.3d 634, 640 (7th Cir. 2002)*; Twin City Monorail, Inc. v. Robbins & Myers, Inc.*, 728 F.2d 1069, 1073 (8th Cir. 1984).

1290, 1295 (2d Cir. 1979)).[4]  Viewed in the overall context of Section 6.1, TACG's reliance upon the "catch all" language included after the four defined types of disputes that are subject to arbitration is illogical.  TACG reads the catch-all provision to mean that the parties intended to arbitrate "any disputes . . . relating to" obligations arising out of their contractual relationship. Had the parties intended such a broad arbitration agreement, they very easily could have adopted classic broad arbitration language and agreed to arbitrate "any and all disputes arising out of or in connection with the Termination Agreement."[5]  But the parties did not agree to such a broad arbitration clause.  Instead, the parties specified narrow categories of disputes — each of which relates to the payment obligations of the FDIC that were ending as a result of the Termination Agreement — that would be subject to arbitration.  If the parties' arbitration agreement

---

[4] *Accord Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co.*, 767 F.2d 1140, 1145 n.10 (5th Cir. 1985) (quoting *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 64 (2d Cir. 1983) (stating that "arbitration should not be compelled unless the court determines that the dispute falls within the clause.").

[5]  Arbitration clauses are deemed to be "broad" when they use standard language that is universally recognized as creating a "broad" clause.  The AAA Commercial Arbitration Rules specifies the following "Standard Arbitration Clause:"

> Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules.

Countless parties have used this type of standard language to indicate their intention to enter into a broad arbitration clause.  *See, e.g., Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 448 (2003) ("[a]ll disputes . . . arising from or relating to this contract or the relationships which result . . . shall be resolved by binding arbitration by one arbitrator selected by [lender] with consent of you"); *Dowley v. Dewey Ballantine, LLP*, No. 05-622, 2006 WL 1102768, at *7 (D.D.C. Apr. 26, 2006).  Similarly, the most widely recognized treatise on arbitration instructs that "[a] clause providing for the arbitration of 'any claim or controversy arising out of or relating to the agreement'" is the paradigm of a broad arbitration clause.  Larry E. Edmonson, <u>Domke on Commercial Arbitration</u>, § 15.6 (3d ed. 2007).

encompassed any and all disputes, it would not list specific categories of disputes for which arbitration was required.

It is in this context of these narrowly defined categories of disputes that the parties included the final catch-all clause that requires arbitration of other Dispute Items "relating to . . . disputes regarding a party's obligations under this [Termination] Agreement." The fact that this catch-all language was limited to arbitration of "obligations under this [Termination] Agreement," rather than just "obligations" to one another reinforces that only the rights *created* under the Termination Agreement would be subject to arbitration. The only rights created under the Termination Agreement were those rights relating to the FDIC's termination of assistance payments to TACG and the process defined by the parties to regulate that termination.[6]

TACG suggests that there is an inconsistency between (i) the FDIC's acknowledgement that the Termination Agreement modified aspects of Section 9 of the Assistance Agreement, and (ii) the FDIC's argument that the language calling for arbitration of disputes "relating to . . . a party's obligations under this [Termination] Agreement" does not apply to disputes over a party's obligations under Section 9 of the Assistance Agreement. *See* Renewed Motion to Compel at 7-8. That is incorrect. As reflected in the list of specific "dispute items" to be arbitrated, the parties intended to arbitrate disputes arising out of winding up procedures that were actually *created*, not *modified*, by the Termination Agreement. The parties were well

---

6 This is consistent with the "established interpretative canons of *noscitur a sociis* and *ejusdem generis,* where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Wash. State Dept. of Social & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001)); *see also* Richard A. Lord, Williston on Contracts, §§ 32:6, 32:10 (4th ed. 1999) (applying these interpretative cannons to contract interpretation).

aware of the disputes that would likely arise as a result of tax benefit sharing, and those disputes had long been subject to judicial resolution mechanisms. If the parties had intended to change the understood mechanism for resolving tax benefit sharing disputes, they would have specifically said so. The parties drafted a very narrow arbitration clause that specifically defined the categories of disputes to be arbitrated. It is unreasonable to suggest, as TACG does, that by merely modifying a set of rights created in the earlier Assistance Agreement, the parties intended to change the resolution process for a set of extremely valuable rights — that all parties were aware could result in disputes — by adding garden variety catch-all language after the four specific types of arbitrable disputes.

3.   The limited scope of arbitrable disputes under Section 6.1 is confirmed by the entirety of the contract.

"[A] court construing a contract must read that contract in a manner that confers meaning to all of its terms, rendering the contract's terms consistent with one another." *Tittle v. Enron Corp.*, 463 F.3d 410, 419 (5th Cir. 2006) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)).[7] Section 6.1 and the Termination Agreement as a whole confirm that the right to arbitration was limited to narrow and specific disputes. *First*, reading Section 6.1 to apply to any disputes relating to the Termination Agreement would render superfluous the forum selection clause in Section 13.4 of the Termination Agreement, which allows claims to be brought in federal court in either the District of Columbia or Texas. *See* Termination Agreement § 13.4. *Second*, each of the provisions of the Termination Agreement that defines a "Dispute Item" contains an express reference to arbitration, while the tax benefit sharing provisions contain no

---

[7] The parties' agreement provides for the application of federal law, and, in the event that federal law does not exist, the law of the state of Texas.

such arbitration language.  *Third*, the Dispute Items subject to arbitration all related to the winding up of the FDIC's assistance payment obligations to TACG and were required to be resolved soon after the closing of the Termination Agreement.  By contrast, the tax benefit sharing obligations at issue here were expected to continue indefinitely into the future.

      a.    TACG's interpretation of the arbitration clause renders the forum selection clause meaningless.

The Court should "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Tittle*, 463 F.3d at 419(quoting *Coker*, 650 S.W.2d at 393).  If TACG's interpretation of Section 6.1 were correct, and the parties had agreed to arbitrate all disputes regarding their continuing obligations (including tax benefit sharing obligations under Section 9 of the Assistance Agreement), then there would have been no reason to select an appropriate *judicial forum* for disputes arising under the Termination Agreement.  However, the Termination Agreement does contemplate non-arbitrable disputes between TACG and the FDIC, and provides that such disputes may be pursued in "the Federal courts of the United States of America located either in the District of Columbia or the State of Texas."  *See* Termination Agreement § 13.4.  TACG's interpretation of the arbitration clause must be rejected because it would render this forum selection language in Section 13.4, in addition to the first four categories of Dispute Items defined in Section 6.1, superfluous.

Attempting to reconcile its overly broad reading of Section 6.1 with the parties' agreement on the forum selection clause, TACG has previously argued that the forum selection clause is intended to apply to suits to compel arbitration and enforce an award or to situations where both parties waive their right to arbitration.  *See* TACG's Reply in Support of Original Motion to Compel at 7, Docket No. 24, Case No. 3:07-cv-01993 (N.D. Tex Jan. 8, 2008).  TACG

is wrong on both counts. First, TACG cannot reasonably assert that the forum selection clause — which permits suits in this Court — applies to suits to compel arbitration or enforce an award because, in TACG's own Motion, TACG asserts that such an action is required to be maintained in Texas. *See* Renewed Motion to Compel at 11. Under TACG's own position, if Section 13.4 were intended to apply to a motion to compel arbitration or enforce an award, the provision would have listed Texas only. The fact that the provision lists the District of Columbia as an appropriate forum disproves TACG's argument.

Second, TACG's assertion that the forum selection clause applies where both parties have waived their right to arbitration ignores another provision upon which TACG relies. As TACG states in its Renewed Motion, the arbitration clause "provides that 'arbitration pursuant to this Article VI is the **exclusive** remedy of the parties hereto with respect to any Dispute Item.'" Renewed Motion to Compel at 2 (quoting Termination Agreement § 6.3) (emphasis supplied by TACG). Thus, the forum selection clause cannot apply, as TACG suggests, to an otherwise arbitrable dispute because arbitration is the *exclusive* remedy for such disputes. The only reasonable interpretation of the forum selection clause is that it allows suits in situations like this case, which does not involve any "Dispute Item" as defined by the Termination Agreement. TACG's contrary understanding renders the forum selection clause meaningless.

        b.    <u>Each of the provisions of the Termination Agreement that defines a "Dispute Item" contains an express reference to arbitration, while the tax benefit sharing provisions contain no such arbitration language.</u>

That the parties agreed to arbitrate only narrow categories of disputes is further reinforced by the separate provisions of the Termination Agreement that describe the arbitrable dispute items: each such provision explicitly confirms that any unresolved disputes would be subject to arbitration under Section 6.1 within a relatively short time after the Closing Date. *See*

Termination Agreement §§ 4.2 & 4.2(e) (Covered Asset Purchase SRA Report Exceptions may

be submitted to arbitration 165 days after Closing Date of Termination Agreement); *id.* § 4.3(e)

(Post-Closing Expense Items and Post-Closing Receipt Items may be submitted to arbitration 30

days after receipt if the parties cannot agree who is responsible for the item); *id.* § 5.3(e)

(allowing FAB to submit to arbitration any "Dispute Items" arising out of the FDIC's Post-

Closing Audit by the "Arbitration Deadline Date," which is no more than 120 days after the

FDIC provides the final audit report to FAB).   By expressly referencing the parties' right to

arbitrate under Section 6.1 in the provisions defining the Dispute Items, the Termination

Agreement underscores that disputes arising out of the winding up of the FDIC's payment

obligations were to be resolved in arbitration.   In contrast, the provisions of the Termination

Agreement that relate to "Tax Benefits" and maintain the previously-agreed Section 9 of the

Assistance Agreement, do not refer to arbitration even once.  *See id.* § 7.2.  For example, as

TACG notes, Section 9 allows the parties to remedy errors in the tax benefit sharing calculations.

*See* Renewed Motion to Compel at 3 (citing Assistance Agreement § 6(d)).  As TACG further

notes, that provision was "maintained" in the Termination Agreement.  *Id.* (citing Termination

Agreement § 7.2(b)).   Unlike the "Dispute Items" described in the arbitration clause of the

Termination Agreement, the provisions regarding errors in tax benefit sharing calculations say

nothing about resolving disputes through arbitration.   That omission — like the absence of *any*

reference to arbitration *anywhere* in the tax benefit provisions — was intentional.

     c.    <u>The Dispute Items subject to arbitration under Section 6.1 relate to the</u>
<u>process of winding up the FDIC's assistance payment obligations to</u>
<u>TACG and were to be (and in fact were) resolved eleven years ago.</u>

The Termination Agreement confirms that any arbitration arising from the winding up of

the FDIC's payment obligations would be completed quickly after the close of the Termination

DC01:500631.5

Agreement. As it did in its original motion to compel, TACG seeks to conceal this point in its

renewed motion by omitting language in Section 6.1 that reflects a short deadline for arbitrating

claims. The following is a complete quotation of Section 6.1, with the language omitted by

TACG underscored (note that FAB is referred to as "AmWest" in the Agreement):

> (a) In the event that any dispute arises between or among any of the parties hereto relating to any Covered Asset Purchase SRA Report Exceptions, Post-Closing Expense Items, Post-Closing Receipt Items, AmWest Dispute Items, or any disputes regarding a party's obligations under this Agreement (collectively, a "Dispute Item"), which AmWest and the FDIC Manager are unable to amicably resolve, then either party may submit each specific unresolved Dispute Item to arbitration pursuant to the provisions of this Section 6.1. (However, failure to submit any unresolved Dispute Item arising under Article V to arbitration before the expiration of the Arbitration Deadline Date shall be deemed a waiver of both parties' right to dispute such non-submitted Dispute Item.) The parties intend that to the maximum extent possible, but otherwise consistent with the provisions of this Agreement, arbitration shall be the sole dispute resolution process regarding any Dispute Item that is not amicably resolved. *Id.* § 6.1 at 18-19 (underscoring added).

In addition to the right to arbitrate Dispute Items under Article V that expired 11 years

ago pursuant to the sentence omitted by TACG,[8] the remaining defined "Dispute Items" were all

intended to be resolved relatively shortly after the Closing Date. *See, e.g.*, Termination

Agreement § 4.2 (potential disputes over "Covered Asset Purchase SRA Report Exceptions"

would stem from FAB's submission of a Covered Asset Purchase SRA Report, which was to be

submitted 60 days after the Closing Date). Thus, the arbitration provision applied only to

disputes relating to the winding up of the FDIC's assistance payment obligations to TACG, and

---

[8] The arbitration clause expressly states that the right to bring the claim is waived unless arbitration is initiated by the defined "Arbitration Deadline Date." *See id.* § 6.1 at 19. The Arbitration Deadline Date occurred roughly one year and 120 days after the July 1996 Closing Date of the Termination Agreement, or roughly eleven years ago. *See id.* § 5.1-5.3 at 16-18.

all such disputes were to be resolved within a short window after the closing of the Termination Agreement.

The short time-frame for resolving arbitrable disputes is flatly inconsistent with arbitration of disputes relating to TACG's tax benefit sharing obligations. Whereas the Dispute Items subject to arbitration under Section 6.1 were to be resolved within a short period following the closing of the Termination Agreement, Section 9 of the Assistance Agreement survived the Termination Agreement such that tax benefit sharing disputes could (and in fact did in this case) arise many years after closing of the Termination Agreement. In fact, as TACG admits in its complaint filed in the Northern District of Texas, "[a]t the time of the Termination Agreement, only minimal tax benefit sharing payments had been made." TACG Compl. ¶ 69. The fact that disputes over tax benefit sharing obligations would necessarily arise at an uncertain future date, rather than within a defined period of time after the closing of the Termination Agreement, reinforces that Section 6.1 does not provide for arbitration of disputes over tax benefit sharing.

4.    The FDIC's interpretation is based on the plain language of the contract, not parole evidence.

Seeking to deflect attention away from the FDIC's plain language interpretation of the contract, TACG resorts to rebutting a "straw-man" argument that the FDIC has never made — *i.e.*, that the contract is ambiguous and that the FDIC has relied on parole evidence. *See* Renewed Motion to Compel at 8-10. Contrary to TACG's suggestion, the FDIC's interpretation of the Termination Agreement is, and has always been, based on the plain meaning of the contractual language. In opposing TACG's original motion to compel, the FDIC expressly asserted that its interpretation is based on the plain language of the Termination Agreement. *See, e.g.,* FDIC's Opposition to Motion to Compel Arbitration at 8 (Heading A) ("Under Its *Plain Language*, The Arbitration Provision Applies Only To Disputes Over The 'True-Up' Process . .

.") (emphasis added). Moreover, as the FDIC made clear in its opposition to TACG's original motion to compel, the FDIC's plain language interpretation "is fully supported by evidence of the circumstances surrounding the execution of the Termination Agreement." *Id.* Thus, the FDIC submitted the Declaration of Charles A. Fulton ("Fulton Declaration") as evidence of the circumstances surrounding the Termination Agreement. *See* Fulton Declaration attached to FDIC's Opposition to TACG's original Motion to Compel as Exhibit D, Docket No. 18, Case No. 3:07-cv-01993 (N.D. Tex. Dec. 19, 2007). The Fulton Declaration is perfectly consistent with the FDIC's plain meaning interpretation, and TACG's assertion that the Declaration is intended to address some alleged ambiguity is wrong.

B.    There Is No Basis To Transfer This Case Back To Texas.

TACG's alternative motion to re-transfer this case back to the Northern District of Texas should also be rejected. "[T]he transfer order ... bind[s] the [transferee] court ... in the absence of clear error or manifest injustice," or where the original purpose of the transfer has been frustrated by a change in circumstances. *Scarborough v. Nat'l Ass'n of Sur. Bond Producers,* 474 F. Supp. 2d 64, 71 (D.D.C. 2007) (citations omitted). TACG has not identified any "clear error or manifest injustice" in the decision by the Northern District of Texas to transfer the TACG Action to this Court, or any change of circumstances that makes consolidated resolution of the TACG Action and the FDIC Action undesirable. Nor could it. As the Northern District of Texas recognized without needing to reach Section 1404(a), the parties agreed in the Termination Agreement that either the FDIC or TACG could file an action in this Court or the federal courts of Texas. Likewise, as the Northern District of Texas found, the "sophisticated" parties recognized in their standstill agreements that either party could file an action in this Court one hour earlier in this Court than in the Northern District of Texas. Ex. A at 24. The FDIC filed its

action in this Court in accordance with the parties' agreements.  By consenting to alternative

venue in this Court and the Northern District of Texas, and expressly waiving "any objections on

the grounds of venue, forum non conveniens, or any similar grounds," the parties' effectively

agreed to abide by a "first to file" rule.  There is no inequity in honoring the parties' *ex ante*

agreement and accomplishing a consolidated resolution of related claims.  For that reason,

TACG's application of the traditional transfer factors — which TACG *expressly waived* in the

contract — is not relevant.  At any rate, the interests of the FDIC, third parties and the public in a

consolidated resolution of these related disputes in this Court outweigh any private interest

TACG may have in avoiding its *ex ante* agreement to litigate disputes in this Court.[9]

1.    This case should proceed in this Court because the forum selection
      clause contemplates that the first-filed suit should proceed.

In light of the parties' *ex ante* agreement on venue, the decision of the Northern District

of Texas to transfer the TACG Action based on the first-to-file rule was the correct and equitable

way to consolidate two related cases.  *See Marra v. Papandreou*, 216 F.3d 1119, 1123 (D.C. Cir.

2000) ("[A] forum-selection clause is best understood as a potential defendant's *ex ante*

---

[9]  Although TACG suggests that this Court may not have jurisdiction to *compel* arbitration in
Texas, *see* Renewed Motion to Compel at 10-12, it does not question that this Court has
jurisdiction to deny TACG's motion to compel arbitration.  At any rate, while the parties
disagree as to the arbitrability of their respective claims under section 6.1 of the Termination
Agreement, the FDIC agrees with TACG that "this Court has the power . . . to order arbitration
in Dallas, Texas."  *See* Renewed Motion to Compel at 11.  Section 4 of the FAA provides that a
petition to compel arbitration may be made in "any United States district court which, save for
such agreement [to arbitrate], would have jurisdiction under Title 28."  9 U.S.C. § 4.  Moreover,
the parties in this case contractually waived any basis to challenge venue, including based on
Section 4 of the FAA, in this Court.  As detailed in the FDIC's reply brief in support of its
motion to transfer, no Court has declined to compel arbitration in another district in the face of
such a valid venue selection clause.  *See* The FDIC's Reply Brief In Further Support of Its
Motion to Transfer Venue, Docket No. 26, Case No. 3:07-cv-01993 (N.D. Tex. Jan. 18 2008) at
3-7 (attached as Exhibit D).

agreement to waive venue objections to a particular forum.") (citing *Northwestern Nat'l Ins. Co. v. Donovan*, 916 F.2d 372, 375-76 (7th Cir. 1990)); *cf. Intervet, Inc. v. Merial Ltd.*, 535 F. Supp. 2d 112, 114 (D.D.C. 2008) (explaining that under Federal Circuit precedent, "[t]he first-to-file rule dictates that when two actions involving the same subject matter are pending, the first-filed action should proceed to the exclusion of the later-filed action.").[10]    In the Termination Agreement, TACG and the FDIC agreed that "[a]ny legal action or proceedings with respect to this Agreement shall be brought in the Federal courts of the United States of America located either in the District of Columbia or the State of Texas and each party hereto submits to the jurisdiction of such courts and hereby waives any objections on the grounds of venue, <u>forum non conveniens</u>, or any similar grounds." Termination Agreement § 13.4. The plain meaning of the forum selection clause is clear: neither party can object to either the Federal courts in Texas or the District of Columbia as the appropriate venue for a suit on the basis of convenience. *See* Exhibit A at 8 ("[b]oth parties consented and waived objection to jurisdiction in the federal courts of either the District of Columbia or the State of Texas for all legal actions arising from the Termination Agreement.")

Under these circumstances, there is no need to address the traditional 1404(a) transfer factors because it is established that the FDIC filed the first suit in this Court and TACG expressly agreed that it would not challenge the FDIC's choice of venue on convenience

---

[10]  In *Stewart Org., Inc. v. Ricoh Corp.*, the Supreme Court held that in actions where a party seeks to a transfer a case to the venue contractually agreed by the parties, the forum-selection clause "will be a significant factor that figures centrally" in transfer analysis under Section 1404(a), but that it should not receive "dispositive consideration." 487 U.S. 22, 29-31 (1988). TACG seeks to transfer this case *out of* a forum in which the parties had agreed to resolve their disputes. Under these circumstances, the forum selection clause weighs centrally *against* transfer.

grounds. These express waivers require the Court to begin and end the transfer inquiry with Judge Lindsay's Order establishing that the FDIC Action in this Court was the first-filed suit, there is "substantial overlap" between the FDIC Action and the TACG Action, and "TACG has not shown compelling evidence justifying an exception to the first to file rule." Ex. B at 2-3. As found by the Northern District of Texas, the "sophisticated parties" in this case were well aware of the importance of being the first to file as "both sides apparently expected litigation as early as the stroke of midnight on November 30, 2007. Indeed, the filing times provide evidence that minutes, and even seconds, mattered to the two parties." Exhibit A at 5. Accordingly, where the parties agreed to be sued in either Texas or the District of Columbia and agreed not to challenge venue, the parties effectively agreed that the winner in the race to the courthouse would prevail in deciding where a suit would proceed (as long as the winner filed in either Texas or the District of Columbia, as the FDIC has done here).

Nor do the cases on which TACG relies to minimize the effect of the first-to-file rule involve a venue provision in which the first case was filed in a jurisdiction where the parties had contractually waived any objections to venue. *See* Renewed Motion to Compel at 14-15. Here, it is not only a strict application of the first-to-file rule that compels denial of TACG's motion to re-transfer, but the fact that these sophisticated parties contractually agreed to a venue provision and standstill agreements that stressed the importance of being the first to file. The equitable result is to consolidate the TACG Action and the FDIC Action in this Court, where the FDIC — the party with the largest claim — was the first to file a lawsuit. There is certainly nothing inequitable about requiring TACG to honor its *ex ante* commitment to resolve disputes under the Termination Agreement in this Court.

2.    The Section 1404(a) factors favor suit in this District.

TACG urges this Court to engage in a Section 1404(a) analysis because "the Texas Court did not 'reach the question of whether a section 1404(a) transfer was appropriate.'" Renewed Motion to Compel at 13 (quoting Transfer Order at 2). However, the Northern District of Texas did not need to evaluate the Section 1404(a) factors because they were not relevant to its transfer decision. *See* Exhibit B at 2-3. TACG must "bear[] a heavy burden of establishing that plaintiffs' choice of forum is inappropriate.'" *Toledano v. O'Connor*, 501 F. Supp. 2d 127, 154 (D.D.C. 2007) (quoting *Thayer/Patricof Educ. Funding, L.L.C. v. Pryor Res., Inc.*, 196 F. Supp. 2d 21, 31 (D.D.C. 2002)). "A party seeking a transfer pursuant to § 1404(a) bears the burden of establishing (1) that the plaintiff initially could have brought the action in the proposed transferee district, and (2) that considerations of convenience and the interests of justice weigh in favor of transfer to that district." *Id.* TACG cannot meet this heavy burden.

a.    TACG has not shown that the private interest factors weigh in favor of transferring to the Northern District of Texas.

In order to meet its heavy burden, TACG must show that the relevant private interest factors weigh in favor of transferring the case to Texas. TACG cannot meet this burden.

The plaintiff's choice of forum is ordinarily entitled to deference in the context of a Section 1404(a) transfer analysis. *See Shapiro, Lifschitz & Schram, P.C. v. Hazard*, 24 F. Supp. 2d 66, 71 (D.D.C. 1998). In this case, however, the FDIC and TACG are both plaintiffs, and both have chosen a forum that is permitted by the Termination Agreement. In fact, the FDIC and TACG have agreed to consolidate the two cases in this Court. *See* Defendant's Response to Plaintiff's Motion to Consolidate at 1. Accordingly, in order to succeed, TACG must prove that its choice of forum should prevail over the FDIC's, when that choice would require that related cases be resolved in different fora — precisely the result that the Northern District of Texas acted

to prevent. The FDIC's choice of this forum is entitled to deference for several additional reasons.

First, as the Northern District of Texas found, the FDIC filed its original complaint in this Court before TACG filed its complaint in Texas. *See supra* 19-22. Second, in addition to being the first to file, TACG has now consented to the FDIC's motion to consolidate the two actions in this Court. *See* Defendant's Response to Plaintiff's Motion to Consolidate at 1. Third, the FDIC is the "natural plaintiff" in this dispute, and its choice of this Court is entitled to deference over TACG's purely tactical "preemptive" suit filed in the Northern District of Texas.[11]    TACG ultimately hopes that its later filing of a $41 million claim will be allowed to decide the venue for resolving the FDIC's first filed $157 million claim. The "tail" should not be allowed to "wag the dog" in this manner, particularly in light of TACG's express waiver of any objections to suit in this Court. *See, e.g., Kotan v. Pizza Outlet, Inc.*, 400 F. Supp. 2d 44, 49 (D.D.C. 2005) (noting that a party's "ex ante agreement to waive venue objections to a particular forum color's [it's] other arguments premised on the inconvenience to parties and witness, and interests of justice.")

---

[11] *See e.g. Seeberger Enters., Inc. v. Mike Thompson Recreational Vehicles, Inc.*, 502 F. Supp 2d 531, 538-39 (W.D. Tex. 2007) (transferring case to alternate venue, in part, because "the anticipatory nature of the filing of the instant suit makes the Court inclined to accord less deference to Plaintiff's choice of forum."); *cf. Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 718 (7th Cir. 2002) (explaining in the context of common law forum non conveniens analysis that a plaintiff's forum selection is not entitled to deference where a plaintiff files a preemptive declaratory judgment action in order to deprive the "'natural plaintiff'—the one who wishes to present a grievance for resolution by a court," of its choice of forum) (quoting *Tempco Elec. Heater Corp. v. Omega Eng., Inc.*, 819 F.2d 746, 749-50 (7th Cir. 1987)); *see also Piedmont Hawthorne Aviation, Inc. v. TriTech Envtl. Health & Safety, Inc.*, 402 F. Supp. 2d 609, (M.D.N.C. 2005); *Metro Optics, Inc. v. Contex Inc.*, No. 3:95-CV-2157-T, 1996 WL 302697, at *2 (N.D. Tex. Mar. 14, 1996) (declining to deprive "the true plaintiff . . . of its choice of forum" because the opposing party had filed an anticipatory action); *Serco Servs. Co. v. Kelley Co.*, No. CA 3:93-CV-1885-R., 1994 WL 715913, at *2 (N.D. Tex., May 24, 1994), *aff'd* 51 F.3d 1037 (Fed. Cir. 1995); *909 Corp. v. Bolingbrook Police Pension Fund*, 741 F. Supp. 1290 (S.D. Tex. 1990).

  b. <u>Other private interest factors do not weigh in favor of re-transferring this</u>
    <u>case back to Texas.</u>

   The private interest factors, including the convenience of the FDIC and the witnesses on

which it would rely, favor maintaining this case in this District. The parties will have easy

access to proof in the Washington, D.C. area. In this regard, the Termination Agreement was

negotiated by the FDIC in Washington, D.C. *See* Fulton Declaration at ¶10. Moreover, the

FDIC's tax unit administered the tax benefit sharing obligations arising out of the FDIC's

relationship with TACG throughout that relationship. *Id.* As a result, the bulk of the

documentary evidence relevant to the claims is located in the Washington D.C. area. The FDIC

has located already many boxes of documents relating to the negotiation and administration of

the Assistance and Termination Agreements that are potentially relevant to the issues in dispute.

All of those boxes are located in the District of Columbia. Although the FDIC maintains a

regional office in Dallas, Texas, that office has had little or no involvement in the administration

of the FDIC's relationship with TACG since the Termination Agreement was executed in 1996.

*Id.*

   Likewise, a large number of the individuals with knowledge of the FDIC's negotiation

and administration of the Assistance Agreement and Termination Agreement reside in the

Washington D.C. area. Specifically, the FDIC anticipates that Lars Viitala, Charles Fulton, John

Henry, Richard Fishman, Richard Peyster and Howard Matthews may have knowledge relevant

to this dispute. *Id.* at ¶11. Five of these six individuals reside in the Washington D.C. area, and

thus are subject to compulsory service by this Court.[12] The sixth, Mr. Viitala, resides in Maine.

---

[12] Only three of the potential witnesses are currently employees of the FDIC. *See, e.g., Gundle
Lining Constr. Corp. v. Fireman's Fund Ins. Co.*, 844 F. Supp. 1163, 1166 (S.D. Tex. 1994) ("It

[Footnote continued on next page]

*Id.* It will be easier to access Mr. Viitala's knowledge from this Court than from the Northern District of Texas. In addition to these six individuals, there are other current and former government officials working in the Washington, D.C. area who have had some involvement with the Assistance Agreement and Termination Agreement over the years, and those individuals may have knowledge relevant to this dispute.

The "cost of attendance for willing witnesses" is also a factor that the Court must weigh in the convenience analysis. *In re Volkswagen A.G.*, 371 F.3d 201, 203 (5th Cir. 2004). "When the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *Id.* at 204-05. Here, forcing the FDIC to litigate its claims in Dallas will cause witnesses located in Washington D.C. to travel to Texas. It will also cause Mr. Viitala to travel much farther than he would need to travel to reach this District. Accordingly, this factor favors deference to the FDIC's selection of this Court.

      c.    <u>TACG has not shown that the public interests weigh in favor of re-transferring this case to Texas.</u>

TACG argues that the public interest weighs in favor of re-transfer to Texas because of relative court congestion, familiarity of governing law, and Texas' interest in the dispute. Renewed Motion to Compel at 19-20. Again, TACG is wrong.

First, according to the Administrative Office of the United States Courts, fewer civil cases are filed in this District than in the Northern District of Texas. *See* James C. Duff, *Judicial Business of the United States Courts 2006, Table C* (2007), *available at*

---

[Footnote continued from previous page]
is the convenience of non-party witnesses, rather than that of employee witnesses, however, that is the more important factor and is accorded greater weight.")

http://www.uscourts.gov/judbus2007/appendices/C00Sep07.pdf (last visited May 21, 2008). In 2007, 2,415 civil cases were initiated in this District (which has 13 active judges) compared with 4,213 civil cases initiated in the Northern District of Texas (which has 12 active judges). TACG argues that congestion should be measured in terms of the number of months until cases go to trial or are decided. *See* Renewed Motion to Compel at 19-20. But court congestion can also be determined based on the number of pending cases per active judge. *See Gundle Lining Constr.*, 844 F. Supp. at 1166-67 (examining AO statistics of number of pending cases per judge to assess congestion of potential fora).[13] By that metric, the District of Columbia is less congested.

Second, the remaining public interest factors have little significance in this case. Both the District of Columbia and Dallas have equal interests in having disputes involving local entities resolved locally. Moreover, consideration of whether the transferee forum would be familiar with the governing law is not a significant element of transfer analysis when the law to be applied is neither complex, nor unsettled. *See* 15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure*, § 3854 (explaining that any argument that cases should be tried in the state whose law will govern is "given significantly less weight when the case involves basic or sufficiently well-established, as opposed to complex or unsettled, issues of state law."). Here, the Assistance Agreement and Termination Agreement are governed by federal law, and in the absence of controlling federal law, by Texas law. *See* TACG. Compl. at 8. Federal law will apply to certain aspects of this dispute, and both this Court and the courts in Texas are equally capable of applying that law. *See, e.g, Montgomery*, 532 F. Supp. 2d at 34.

---

[13]  The period of time that a case remains pending before this District may be attributable to a variety of issues, including the number of complex cases that this Court processes relative to Dallas, and the number of government cases that the Court is required to resolve.

To the extent that Texas law applies, it will apply to very straight-forward issues such as the rules for interpreting contracts. This Court will have no difficulty applying that law, which is neither complex nor unsettled. For that reason, this factor does not militate in favor of ignoring the FDIC's choice of this District. *See Seeberger*, 502 F. Supp. 2d at 541 (finding familiarity of forum with applicable law to be a neutral factor when applicable legal principles were straightforward).

        d.       <u>The public interest in a consolidated proceeding compels maintaining this case in this District.</u>

The U.S. Supreme Court has long recognized that Section 1404(a) is intended to protect the public's interest in preventing two cases involving related issues from proceeding simultaneously in two different fora, virtually doubling the energy and resources required of the parties and the judicial system to resolve a dispute. *See Ferens v. John Deere Co.*, 494 U.S. 516, 531 (1990); *Cont'l Grain Co. v. Barge FBL-585*, 364 U.S. 19, 26 (1960); *see also W. Gulf Maritime Ass'n. v. ILA Deep Sea Local 24, AFL-CIO*, 751 F.2d 721, 729 (5th Cir. 1985). TACG has agreed to consolidate this action with the action filed by the FDIC in this Court. Thus, the most efficient way to proceed would be to consolidate both cases and allow them to proceed in this Court.

## III.  CONCLUSION

For the foregoing reasons, TACG's motion to compel arbitration, or, in the alternative, to return this case to the U.S. District Court for the District of Columbia should be denied.

Dated:  May 21, 2008

Respectfully submitted,

_Kirk K. Van Tine_

Claire L. McGuire (D.C. Bar No. 247924)
Larry L. Goodman (D.C. Bar No. 421980)
Leslie A. Conover (D.C. Bar No. 366826)
Bruce C. Taylor
John A. Davidovich
FEDERAL DEPOSIT
INSURANCE CORPORATION
3501 Fairfax Drive
Arlington, VA 22226
Tel:  (703) 562-2390
Fax: (703) 562-2481

Kirk K. Van Tine (D.C. Bar No. 257139)
David A. Super (D.C. Bar No. 429359)
Samuel J. Waldon (D.C. Bar No. 441885)
Ryan E. Bull (D.C. Bar No. 481743)
Sheila J. Kadagathur (D.C. Bar No. 500647)
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Tel.:  (202) 639-7700
Fax:  (202) 639-7890

Attorneys for Defendant
Federal Deposit Insurance Corporation

DC01:500631.5

29

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 21st of May, 2008, a true and correct copy of the

foregoing Memorandum of Points and Authorities In Opposition to TACG's Renewed Motion to

Compel Arbitration, or, in the alternative, to Return this Case to the Northern District of Texas

was served by the Court's ECF system in accordance with Local Rule 5.

_/s/ David A. Super_____

DC01:500631.5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE ADAM CORPORATION/GROUP,    )
                Petitioner/Plaintiff,  )
                              )

- AND -                          )
                              )       No. 1:08-cv-0753 RMU

Citibank, N.A.,                 )
     Nominal Petitioner/Nominal Plaintiff,  )
                              )

- AGAINST -                  )
                              )

FEDERAL DEPOSIT INSURANCE       )
CORPORATION, Solely in its Capacity as  )
Manager of the FSLIC Resolution Fund,  )
                              )
          Respondent/Defendant.  )

FDIC'S EXHIBITS TO
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO TACG's
RENEWED MOTION TO COMPEL ARBITRATION,
OR, IN THE ALTERNATIVE, TO RETURN THIS CASE
TO THE DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS

| EXHIBIT | DESCRIPTION |
| --- | --- |
| A | Findings, Conclusions, and Recommendations, Case No. 07-cv-1993 |
| B | Transfer Order, Case No. 07-cv-1993 |
| C | Briefing on TACG's original motion to compel |
| D | FDIC's Reply Brief In Further Support of Its Motion to Transfer Venue, Case No. 3:07-cv-01993 |

Dated:  May 21, 2008                                    Respectfully submitted,

Claire L. McGuire (D.C. Bar No. 247924)          Kirk K. Van Tine (D.C. Bar No. 257139)
Larry L. Goodman (D.C. Bar No. 421980)           David A. Super (D.C. Bar No. 429359)
Leslie A. Conover (D.C. Bar No. 366826)          Samuel J. Waldon (D.C. Bar No. 441885)
Bruce C. Taylor                                  Ryan E. Bull (D.C. Bar No. 481743)
John A. Davidovich                               Sheila J. Kadagathur (D.C. Bar No. 500647)
FEDERAL DEPOSIT                                   BAKER BOTTS L.L.P.
INSURANCE CORPORATION                            The Warner
3501 Fairfax Drive                               1299 Pennsylvania Avenue, NW
Arlington, VA 22226                              Washington, DC 20004
Tel:  (703) 562-2390                            Tel.:  (202) 639-7700
Fax: (703) 562-2481                             Fax:  (202) 639-7890

Attorneys for Defendant
Federal Deposit Insurance Corporation


CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st of May, 2008, a true and correct copy of the
foregoing FDIC'S Exhibits to Memorandum of Points and Authorities In Opposition to TACG's
Renewed Motion to Compel Arbitration, or, in the alternative, to Return this Case to the
Northern District of Texas was served by the Court's ECF system in accordance with Local Rule
5.

 /s/ David A. Super

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE ADAM CORPORATION/GROUP, | § | |
| | § | |
| Petitioner/Plaintiff, and | § | |
| | § | |
| CITIBANK, N.A., | § | |
| | § | |
| Nominal Petitioner/Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:07-CV-1993-L (BH) |
| | § | |
| FEDERAL DEPOSIT INSURANCE | § | |
| CORPORATION, solely in its capacity as | § | |
| Manager of the FSLIC Resolution Fund, | § | |
| | § | |
| Respondent/Defendant. | § | Referred Motion |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b) and the District Court's orders of reference, filed December 3, 2007, and January 25, 2008, these matters were referred to the undersigned United States Magistrate Judge for hearing, if necessary, and for the issuance of proposed findings and recommendation to the District Court. Before the Court are the following:

(1) *Defendant FDIC's Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a)* ("Mot."), filed December 19, 2007;

(2) *FDIC's Memorandum of Law in Support of Its Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a)* ("Mot. Br."), filed December 19, 2007;

(3) *Appendix in Support of FDIC's Memorandum of Law in Support of Its Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a)* ("Mot. App."), filed December 19, 2007;

(4) *Petitioner's Brief in Opposition to FDIC's Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a)* ("Resp."), filed January 8, 2008;

(5) *Petitioner's Consolidated Appendix in Support of Its Opposition to FDIC's Motion*

- 1 -

> *to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) and Reply Brief in Support of Motion to Compel Arbitration* ("Resp. App."), filed January 8, 2008; and

(6)   *The FDIC's Reply Brief in Further Support of Its Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a)* ("Reply"), filed January 18, 2008.[1]

Having reviewed the pertinent filings above and the law applicable to the issues raised, the Court recommends that Defendant FDIC's *Motion to Transfer Venue* be **GRANTED**.

## I. BACKGROUND

This action stems from a 1998 sales transaction between Plaintiff The Adam Corporation/Group ("TACG") and the predecessor of Defendant Federal Deposit Insurance Corporation's ("FDIC"), the Federal Savings and Loan Insurance Corporation ("FSLIC"). TACG purchased the assets and assumed certain liabilities of eleven failed savings and loan associations in Texas and consolidated them into a new savings and loan association that ultimately became known as First American Bank ("FAB"). FAB then became part of an affiliated group of TACG's subsidiaries (referred to collectively herein as TACG) that filed consolidated tax returns.[2]

The terms of the 1988 sales transaction between TACG and FSLIC were set forth in the Assistance Agreement. Under the Assistance Agreement, FSLIC agreed to provide FAB with certain financial assistance to cover losses that might arise out of the assets and liabilities of the eleven failed associations. TACG also received tax benefits through special provisions of the Internal Revenue Code. In return, TACG agreed to share sixty percent of the federal and state tax

---

[1]Local Rule 7.1 provides for a motion, a response, and a reply. A party may not file supplemental pleadings, briefs, authorities, or evidence without permission of the presiding judge. Since Petitioner did not seek leave to file *Petitioner's Supplemental Memorandum in Support of Motion to Compel Arbitration and in Opposition to FDIC's Motion to Transfer Venue* filed on February 11, 2008, and the supplemental document filed by Petitioner on February 13, 2008, these documents will not be considered. Defendant FDIC's objection regarding Petitioner's *Supplemental Memorandum* is **DENIED as moot**.

[2]On March 31, 2005, TACG sold all of its shares in FAB to Plaintiff Citibank, Texas ("Citibank"), for $972 million pursuant to a contract dated August 23, 2004.

savings that it realized with FSLIC.

On July 31, 1996, TACG and the FDIC agreed to terminate the Assistance Agreement. (*See* docket #2 Ex. A; docket #18 Ex. C) (hereinafter, "Termination Agreement"). Pursuant to the Termination Agreement, the FDIC's obligation to make any further assistance payments to TACG was extinguished in return for a lump sum payment of $8 million. The Termination Agreement contained an arbitration clause which states, in part:

> [i]n the event that any dispute arises between or among any of the parties hereto relating to any Covered Asset Purchase SRA Report Exceptions, Post-Closing Expense Items, Post-Closing Receipt Items, AmWest Dispute Items, or any disputes regarding a party's obligations under this Agreement (collectively, a "Dispute Item"), which AmWest and the FDIC Manager are unable to amicably resolve, then either party may submit each specific unresolved Dispute Item to arbitration pursuant to the provisions of Section 6.1...The parties intend that to the maximum extent possible, but otherwise consistent with the provisions of this Agreement, arbitration shall be the sole dispute resolution process regarding any Dispute Item that is not amicably resolved.

Termination Agreement at § 6.1(a). The clause further states that arbitration proceedings shall take place in Dallas, Texas, or at a mutually agreeable location. (*Id.* at § 6.1(c)). In addition, the Termination Agreement contained the following forum selection clause:

> Any legal action or proceedings with respect to this Agreement shall be brought in the Federal courts of the United States of America located in either the District of Columbia or the State of Texas and each party hereto submits to the jurisdiction of such courts and hereby waives any objections on the grounds of venue, forum non conveniens, or any similar grounds.

(*Id.* at § 13.4).

The parties dispute whether, under the Assistance Agreement and Termination Agreement, TACG retained the obligation to share sixty percent of certain federal and state tax savings that it realized as a result of any tax benefit items with the FDIC. The FDIC and TACG attempted to negotiate a possible resolution of the FDIC's claims for its share of the tax benefits TACG has

received. As part of those negotiations, they entered into a standstill agreement whereby neither party would initiate litigation pending settlement discussions. (Resp. App. Ex. 1I). The original standstill agreement was extended "until and through November 29, 2007." (Resp. App. Ex. 1J). Neither the original standstill agreement nor the extension specified a time or controlling time zone. (*See* Resp. App. Exs. 1I and 1J).

At 12:01 a.m. Eastern Standard Time ("EST") on November 30, 2007, the FDIC sued in the District Court for the District of Columbia ("DC District Court") for breach of contract and declaratory judgment, alleging that it was entitled to the sixty percent of the federal and state tax savings under the Assistance Agreement. (Mot. App. Ex. C, at 26, 35-36). TACG filed a motion to compel arbitration in the Northern District of Texas at 12:00 a.m. Central Standard Time ("CST") on November 30, 2007. (Mot. Br. at 6; Resp. at 2). On December 19, 2007, the FDIC amended its complaint before the DC District Court to include a request for a declaratory judgment that the dispute is not subject to arbitration. (Mot. App. Ex. A, at 15-16).

On December 19, 2007, the FDIC filed the instant motion to transfer this case to the DC District Court based on first-to-file principles and pursuant to 28 U.S.C. § 1404(a) for the convenience of the parties and in the interest of justice.

## II. ANALYSIS

When related cases are pending before two federal courts, the first-to-file rule instructs the court with the later-filed action to transfer it to the first-filed forum. *American Bankers Life Assurance Co. of Fla. v. Overton*, 128 Fed. Appx. 399, 403 (5th Cir . 2005). Based on "principles of comity and sound judicial administration," *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997), the purpose of the rule is "to avoid the waste of duplication, to avoid rulings

- 4 -

which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result," *West Gulf Maritime Ass'n v. ILA Deep Sea Local*, 751 F.2d 721, 730 (5th Cir. 1985). The rule permits transfer between divisions in the same federal district as well as districts organized under different federal circuits. *See Firstliner Indus., Inc. v. Ground & Pipe Tech., LLC*, 2005 WL 2861002 at *2 (S.D. Tex. Oct. 31, 2005).

## A.    First-Filed Action

In the instant case, the standstill agreement, which was agreed to by sophisticated parties represented by counsel, did not specify a controlling time or time zone to mark the time of expiration. (*See* Resp. App. Exs. 1I and 1J). It merely ran "until and through November 29, 2007." (Resp. App. Ex. 1J). Based on this agreement, both sides apparently expected litigation as early as the stroke of midnight on November 30, 2007. Indeed, the filing times provide evidence that minutes, and even seconds, mattered to the two parties. The FDIC filed suit in the DC District Court at 12:01 a.m. EST on November 30, 2007, whereas TACG filed its motion to compel arbitration in this Court at 12:00 a.m CST on the same day. (Mot. App. Ex. C, at 26; Resp. at 2). TACG asserts that the Court should take into account the time zone difference, and that it filed first because its motion to compel was filed within the first minute after the expiration of the standstill agreement in CST whereas the FDIC's action was filed in the second minute in EST. (Resp. at 7).

TACG's first argument is not persuasive. The Fifth Circuit has used absolute time to determine first-to-file status without regard to time zone differences. *See e.g. Formaldehyde Inst., Inc. v. United States Consumer Prod. Safety Comm'n*, 681 F.2d 255, 262 (5th Cir. 1982) (action filed a few seconds after 11:00 a.m. CST was filed before an action filed at 12:00:10 p.m. EST); *Southland Mower Co. v. United States Consumer Prod. Safety Comm'n*, 600 F.2d 12, 14 (5th

Cir.1979) (action filed at 11:00 a.m. CST was filed before an action filed at 12:01 p.m. EST).  *See*

*also Mead Corp. v. Stuart Hall Co., Inc.*, 679 F. Supp. 1446, 1453 (S.D. Ohio 1987) (action filed

at 3:53 p.m. EDT was filed before an action filed at 3:30 p.m. CST).

TACG also asserts that a 59 minute difference is inconsequential to determining first-to-file

status and that to permit otherwise would only encourage a race to the courthouse.  (Resp. at 7-8).

Contrary to this argument, the Fifth Circuit has applied the first-to-file rule to cases filed in close

proximity.  *See Formaldehyde Inst.*, 681 F.2d at 262 (less than 10 second difference); *Southland*

*Mower*, 600 F.2d at 14 (less than one minute difference).  *See also Sabre Inc. v. Northwest Airlines,*

*Inc.*, 2004 WL 2533867 at *2 (N.D. Tex. Nov. 8, 2004) (one day difference).  In one instance where

it declined to apply the first-to-file rule, the Fifth Circuit found that two actions were filed at

substantially the same time.  *See Mobil Oil Exploration Co. v. F.E.R.C.*, 814 F.2d 998, 1000-01 (5th

Cir. 1987) (declining to split minutes to determine priority of filing and instead opting for a coin

toss).

In this case, the FDIC filed its action in the DC District Court 59 minutes prior to TACG's

motion to compel in this District.  Consequently, the FDIC's action was filed first.

**B.**    **Substantial Overlap**

When a party moves to transfer under the first-to-file rule, the Court with the second-filed

suit must examine the two pending cases to see if the subject matter "might substantially overlap."

*Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 606 (5th Cir. 1999).  The first-to-file rule

"does not, however, require that cases be identical," but merely that there is a "substantial overlap"

in issues and parties.  *Save Power*, 121 F .3d at 950.

The FDIC states that the two disputes both arise out of the Assistance and Termination

Agreements, namely whether the FDIC is entitled to sixty percent of the federal and state tax

savings. (Mot. Br. at 10). TACG does not dispute that the two actions might substantially overlap,

but it contends that the two actions did not become "mirror images" of each other until the FDIC

filed its amended complaint on December 19, 2007. (Resp. at 7).

Because the first-to-file rule does not require that the cases be identical, the fact that the

FDIC later amended its complaint to include a request for a declaratory judgment on whether the

dispute was subject to arbitration does not defeat application of the rule. There was a substantial

likelihood of overlap in issues and parties at the time the suit was filed. Additionally, as long as the

two initial disputes contain the required overlap, a subsequently amended complaint relates back to

the initial complaint. *See Sabre Inc.*, 2004 WL 2533867, at *2-3. The FDIC has therefore

demonstrated the likelihood of a substantial overlap in the two suits. *Cadle Co.*, 174 F.3d at 605-06.

**C.     Transfer to DC District Court**

"Once the likelihood of substantial overlap between the two suits has been demonstrated, it

is no longer up to the second-filed court to resolve the question of whether both should be allowed

to proceed." *Cadle Co.*, 174 F.3d at 605-06. Instead, "the proper course of action [is] for the

[second-filed] court to transfer the case" to the first-filed court. (*Id.* at 606). It is then the

responsibility of the first-filed court to decide "whether the second suit filed must be dismissed,

stayed, or transferred and consolidated." *Sutter Corp. v. P & P Indus., Inc.*, 125 F.3d 914, 920 (5th

Cir. 1997). A party can only avoid application of the first-to-file rule by demonstrating the presence

of "compelling circumstances" that caution against the transfer. *Mann Mfg.*, 439 F.2d at 407. One

example of compelling circumstances is when the first-filed suit is filed in a less favorable forum

in anticipation of the subsequent suit. *Service Corp. Inter. v. Loewen Group Inc.*, 1996 WL 756808,

at *2 (S.D. Tex. Nov. 29, 1996) (citations omitted).

Here, TACG has not shown that the first-filed suit was filed in a less favorable forum. Both parties consented and waived objection to jurisdiction in the federal courts of either the District of Columbia or the State of Texas for all legal actions arising from the Termination Agreement. *See* Termination Agreement at § 13.4. Nor has TACG otherwise presented "compelling" evidence that would justify an exception to the first-to-file rule.

In conclusion, it is within the sound discretion of the District Court to determine whether a case should be transferred under the first-to-file-rule. *Cadle*, 174 F.3d at 603. "Although the "first to file" rule is pedestrian, its simplicity furthers comity between courts and should not be casually ignored." *Eastman Med. Prods., Inc. v. E.R. Squibb & Sons, Inc.*, 199 F.Supp.2d 590, 595 (N.D. Tex. 2002) (Lynn, J.). Because the FDIC filed first, there is substantial overlap between the actions, and TACG has not shown compelling evidence justifying an exception, the Court concludes that the case should be transferred to the DC District Court under the first-to-file rule.[3] *Cadle Co.*, 174 F.3d at 606.

## III. CONCLUSION

For the reasons stated above, the Court recommends that Defendant FDIC's *Motion to Transfer Venue* be **GRANTED**, and that this action be transferred to the District Court for the District of Columbia.

---

[3]Because the Plaintiff's action should be transferred under the first-to-file rule, the Court does not address, and expresses no opinion on, whether a transfer pursuant to § 1404(a) would be proper. *See Luckett v. Peco Foods, Inc.*, 2008 WL 534760, at *3 (S.D. Miss. Feb. 22, 2008) (a motion to transfer pursuant to the first-to-file rule does not depend on the presence or absence of the § 1404(a) considerations); *02 Micro Intern. Ltd. v. Monolithic Power Sys., Inc.*, 2006 WL 887391, at *2 (E.D. Tex. Mar. 28, 2006) (considering first-to-file separately from § 1404(a) factors).

**SO RECOMMENDED** on this 24th day of March, 2008.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten (10) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Perales v. Casillas*, 950 F.2d 1066, 1070 (5th Cir. 1992). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THE ADAM CORPORATION/GROUP,     §
    §
    Petitioner/Plaintiff,     §
    §
and     §
    §
CITIBANK, N.A.,     §
    §
    Nominal Petitioner/Nominal Plaintiff,     §
    §
v.     §     Civil Action No. **3:07-CV-1993-L**
    §
FEDERAL DEPOSIT INSURANCE     §
CORPORATION, **solely in its capacity as**     §
**Manager of the FSLIC Resolution Fund,**     §
    §
    Respondent/Defendant.     §

### ORDER

Before the court are: (1) the Findings, Conclusions, and Recommendations of the United

States Magistrate Judge, filed March 24, 2008; (2) Petitioner's Objection to Magistrate Judge

Ramirez's March 24, 2008 Findings, Conclusions, and Recommendations, filed April 7, 2008; (3)

FDIC's Response to Petitioner's Objection to Magistrate Judge Ramirez's March 24, 2008 Findings,

Conclusions, and Recommendations, filed April 11, 2008; and (4) Petitioner's Reply in Support of

its Objection to Magistrate Judge Ramirez's March 24, 2008 Findings, Conclusions, and

Recommendations, filed April 14, 2008.

The magistrate judge recommended that the court grant FDIC's Motion to Transfer Venue

Pursuant to 28 U.S.C. § 1404(a), filed December 19, 2007. The magistrate judge found that because

the Federal Deposit Insurance Corporation ("FDIC") sued in the District of the District of Columbia

Order – Page 1

before this case was filed, transfer to that court is proper pursuant to the first-to-file rule, and did not reach the question of whether a section 1404(a) transfer was appropriate.[*] Petitioner The Adam Corporation/Group ("TACG") filed a document titled "objection" to the magistrate judge's Findings, Conclusions, and Recommendations (the "Report"). TACG asks the court to act quickly on the magistrate judge's recommendations and "does not object to the adoption of the Recommendation in that respect." Obj. 3. TACG does, however, ask the court to "make clear that its adoption of the Recommendation shall not be deemed to express any opinion on the correctness of the background statements in the Recommendation," arguing that the magistrate judge made certain errors and that the background contains dicta. The FDIC contends that TACG's request is unnecessary.

The court has considered the Report, the objection, response, and reply, and determines that TACG's objection is based upon a future and hypothetical concern, and that the court need not parse the Report to determine what is or is not dicta at this point. The parties do not dispute the legal analysis, conclusion, and recommendation of the magistrate judge, and if the FDIC at some point attempts to rely upon the magistrate judge's findings, then may TACG dispute the accuracy of those findings and dispute whether they are binding on the District of Columbia court.

The court **overrules** TACG's objection and **accepts** the findings and conclusions of the magistrate judge. The court **grants** FDIC's Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) because the District of Columbia action was filed first, there is substantial overlap between

---

[*]The court had also referred Petitioner's Motion to Compel Arbitration, filed November 30, 2007, to the magistrate judge. The Report does not consider the motion to compel arbitration, but quotes *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 605-06 (5th Cir. 1999), in which the court held that "[o]nce the likelihood of substantial overlap between the two suits has been demonstrated, it is no longer up to the second-filed court to resolve the question of whether both should be allowed to proceed." Because the court accepts the magistrate judge's recommendation and transfers this case to the District of Columbia, it **declines** to address Petitioner's Motion to Compel Arbitration. This motion should be addressed by the transferee court.

Order – Page 2

the two cases, and TACG has not shown compelling evidence justifying an exception to the first-to-file rule.  Accordingly, the court **transfers** this case to the District of the District of Columbia.  The clerk of the court shall effect the transfer in accordance with the usual procedure.

    **It is so ordered** this 21st day of April, 2008.

Sam A. Lindsay
United States District Judge

# EXHIBIT C

ORIGINAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS



THE ADAM CORPORATION/GROUP,

                                       Petitioner/Plaintiff,

&ndash; AND &ndash;

CITIBANK, N.A.,

                                     Nominal Petitioner/
                                     Nominal Plaintiff,

&ndash; AGAINST &ndash;

FEDERAL DEPOSIT INSURANCE CORPORATION,
SOLELY IN ITS CAPACITY AS MANAGER OF THE
FSLIC RESOLUTION FUND,

                                     Respondent/Defendant.

3-07 CV 1993-L

## PETITIONER'S MOTION TO COMPEL ARBITRATION

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

FACTS ............................................................................................................................... 2

ARGUMENT ...................................................................................................................... 7

    A.   The Federal Arbitration Act Applies To This Contract ...................................... 7

    B.   This Dispute Is Subject To Arbitration ............................................................. 8

         1.   A Valid, Mandatory Agreement to Arbitrate Exists ................................. 8

         2.   The Dispute Falls Within the Scope of the Arbitration Clause .................... 10

         3.   No Legal Constraints Foreclose Arbitration ............................................. 12

CONCLUSION ................................................................................................................... 13

CERTIFICATION OF CONFERENCE ................................................................................. 14

## TABLE OF AUTHORITIES

Page(s)

**CASES**

Brown v. Pacific Life Insurance Co.,
    462 F.3d 384 (5th Cir. 2006) ................................................................8

Dean Witter Reynolds, Inc. v. Byrd,
    470 U.S. 213 (1985).................................................................................7

Fleetwood Enterprises, Inc. v. Gaskamp,
    280 F.3d 1069 (5th Cir. 2002) .......................................................... 7-8, 9

Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,
    460 U.S. 1 (1983)..............................................................................8, 10

Neal v. Hardee's Food System, Inc.,
    918 F.2d 34 (5th Cir. 1990) ..............................................................10, 12

Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.,
    139 F.3d 1061 (5th Cir. 1998) .....................................................8, 10, 11

Personal Sec. & Safety System Inc. v. Motorola Inc.,
    297 F.3d 388 (5th Cir. 2002) ................................................................7

Primerica Life Insurance Co. v. Brown,
    304 F.3d 469 (5th Cir. 2002) ................................................................8

Reliant Energy, Inc.,
    349 F.3d 816 (5th Cir. 2003) ................................................................9

Shearson/America Express, Inc. v. McMahon,
    482 U.S. 220 (1987)............................................................................12

Smith v. United States,
    328 F.3d 760 (5th Cir. 2003) ................................................................8

Tenaska Washington Partners II, L.P. v. United States,
    34 Fed. Cl. 434 (1995)........................................................................12

Third Party Advantage Administrators, Inc. v. J.P. Farley Corp.,
    2006 WL. 3445216 (N.D. Tex. Nov. 27, 2006) (Fish, C.J.)........................10

Petitioner The Adam Corporation/Group ("TAC") respectfully moves this Court for an order compelling Respondent to arbitrate pursuant to a contractual arbitration clause.

## INTRODUCTION

TAC and the Respondent's predecessor entered into two contracts. The parties executed the first contract, referred to as the "Assistance Agreement," in 1988, signed contemporaneously with the acquisition by TAC's recently formed savings and loan institution of substantially all the assets and liabilities of eleven insolvent thrifts from the Federal Savings & Loan Insurance Corporation ("FSLIC").[1]  (That savings and loan subsidiary went through several name changes, *see* Pet. ¶ 5, and we refer to it here as "First American Bank."[2])  The Assistance Agreement[3] included a provision in which First American Bank promised to share certain specified tax benefits arising out of the transaction. This provision, set forth in Section 9 of the Assistance Agreement, required a yearly computation involving hypothetical tax liability under *pro forma* tax returns reflecting the inclusion and exclusion of certain tax benefit items and tax detriment items that arose from special tax statutes that applied to the acquisition of insolvent savings and loan institutions.

The parties executed the second contract, referred to as the "Termination Agreement" (*see* Exhibit A to Pet. Appx.) in 1996. It terminated the first contract in most respects, continued

---

[1] In 1989, the Federal Deposit Insurance Corporation ("FDIC") became the successor-in-interest to the FSLIC. (Petiton to Compel Arbitration, or, in the Alternative, Complaint for Declaratory Judgment that Dispute is Arbitrable, or, in the Alternative, Complaint for Money Damages (Nov. 30, 2007) ("Pet.") at ¶ 11.)

[2] In 2005, TAC sold the stock of First American Bank to Citigroup Inc.  Under the 2005 contract, TAC retains the benefits and burdens of pre-closing tax-benefit obligations owed to or by the FDIC.  That thrift has now been merged into Citibank, N.A., which is a nominal petitioner and nominal plaintiff here.

[3] The Assistance Agreement is included as Exhibit B in Petitioners'/Plaintiffs' Appendix in Support of Petition and Complaint (filed Nov. 30, 2007) ("Pet. Appx.").

1

the tax-benefit-sharing obligations set forth in the first contract, modified the tax-benefit-sharing

provisions of the first contract in material respects that are relevant to the parties' current dispute,

and contained an arbitration clause.  The arbitration clause reads, in part:

> **In the event that any dispute arises** between or among any of the
> parties hereto **relating to** any Covered Asset Purchase SRA Report
> Exceptions, Post-Closing Expense Items, Post-Closing Receipt
> Items, AmWest Dispute Items, or **any disputes regarding a
> party's obligations under this Agreement** (collectively, a
> "Dispute Item"), which AmWest and the FDIC Manager are
> unable to amicably resolve, then either party may submit each
> specific unresolved Dispute Item to arbitration pursuant to the
> provisions of this Section 6.1. . . . **The parties intend that to the
> maximum extent possible,** but otherwise consistent with the
> provisions of this Agreement, **arbitration shall be the sole
> dispute resolution process regarding any Dispute Item** that is
> not amicably resolved.

(Termination Agreement at § 6.1(a) (Pet. Appx. at 28-29) (emphasis added).)

## FACTS

Resolution of this dispute ultimately will require evaluation of a highly technical set of

contracts relating to the federal income taxation of savings and loan institutions within the

federal taxation regime as it evolved from the 1980s to the present.  Petitioner's Petition to

Compel Arbitration sets forth some of the relevant history and law of taxation.  These facts are

abridged here, because the Court need not delve into the merits of the dispute to determine the

threshold question of arbitrability.

In the Assistance Agreement, FSLIC promised to give First American Bank various

forms of financial assistance.  (Pet. ¶¶ 43, 50-61.)  For example, FSLIC agreed to reimburse First

American Bank for its losses on assets acquired from the insolvent thrifts.  (Pet. ¶ 43.)  Under

then-applicable tax law, the TAC Consolidated Group, of which First American Bank was a

member, was entitled to claim such losses as a federal income tax deduction, notwithstanding the receipt of FSLIC reimbursement on account of such loss.[4]  (Pet. ¶ 43.)

The contract provided that FSLIC would receive 60 percent of any "Net Tax Benefits" realized by the Consolidated Group.  (Pet. ¶ 54.)  In Section 9 of the Assistance Agreement, the parties agreed that the Federal and State Net Tax Benefits would be determined in two steps. (Pet. ¶¶ 50-61.)  *First*, the actual federal and state income tax liability of the Consolidated Group would be set forth based on returns as filed.  *Second*, a hypothetical, *pro forma* tax liability would be computed, making specified adjustments arising out of a series of defined "Tax Benefit Items" and "Tax Detriment Items."  To the extent that the *pro forma* hypothetical federal income tax liability and *pro forma* hypothetical state tax liability exceeded the Consolidated Group's actual tax liability, First American Bank was required to pay to FSLIC 60 percent of the excess. (Pet. ¶¶ 54-57.)

One "Tax Detriment Item" was defined to include any deductions disallowed by operation of section 265 of the Internal Revenue Code or any similar provision, on account of First American Bank's receipt of the FSLIC assistance payments.  This disallowed amount (set forth in section 9(b)(4) of the Assistance Agreement) was to be subtracted from the Consolidated Group's hypothetical income in making the hypothetical *pro forma* computation.  As a result, to the extent the tax deductions acquired through the Assistance Agreement were disallowed under section 265 of the Internal Revenue Code or a similar provision on account of the receipt of

---

[4] A "consolidated group" of corporations may file a consolidated return, subject to regulations promulgated under Internal Revenue Code § 1502.  TAC was the parent corporation of an affiliated group of corporations eligible to file such a return.  We refer to this group as the "TAC Consolidated Group," or simply the "Consolidated Group."

3

FSLIC assistance, the Net Tax Benefits—and thus First American Bank's tax-benefit sharing obligation—would be reduced.  (Pet. ¶¶ 55-60.)

In 1993, Congress enacted a statute known as the Guarini Amendment, Pub. L. No. 100-66, § 13324, 107 Stat. 312, 485-86.  The Guarini Amendment had the effect of prohibiting taxpayers from claiming, as a tax deduction, losses reimbursed with FSLIC-assistance payments. (Pet. ¶¶ 62-63.)  For the TAC Consolidated Group, the Guarini Amendment produced the same tax consequence as disallowance under section 265:  the Consolidated Group was prevented from taking tax deductions because losses were reimbursed by tax-exempt FSLIC assistance payments.  (Pet. ¶¶ 67-68.)

Due to error in the computations required by the contract, First American Bank did not immediately recognize that, under Section 9(b)(4), the Guarini Amendment's disallowances were properly classified as Tax Detriment Items.  (Pet. ¶¶ 73-75.)  As a result, from 1996 to 2004, First American Bank overpaid its tax benefit sharing obligations by $40,987,638.  (Pet. ¶ 75.)

The parties foresaw the possibility of such error because of the detailed and highly technical computations required to calculate Net Tax Benefits.  Thus, the parties included a provision in the Assistance Agreement to allow them to remedy such errors.  (Pet. ¶¶ 76-77; Assistance Agreement at § 6(d) (Pet. Appx. at 119-20).)

The 1996 Termination Agreement terminated the Assistance Agreement, except insofar as it concerned, *inter alia*, "payments for tax benefits and detriments relating to Indemnification Net Tax Benefits, Federal Net Tax Benefits and State Net Tax Benefits under Section 9 of the Assistance Agreement (collectively, 'Tax Benefits')."  (Pet. Appx. at 12-13.)  The Termination Agreement further provided:

4

> The FDIC Manager and [First American Bank] agree that Section
> 9 of the Assistance Agreement is not terminated by this Agreement
> and that their respective obligations thereunder survive without
> change or alteration as set forth in the Assistance Agreement,
> including but not limited to, . . . the ability of both parties to make
> subsequent adjustments pursuant to Section 6(d) . . . . The parties
> further agree to the following clarifications of Section 9 issues . . . .

(Pet. Appx. at 22-23). Following this recital, the 1996 contract contains six single-spaced pages

of clarifications and amendments to the computation of Tax Benefits, including "Cable Gain,"

the "Bad Debt Reserve," "Goodwill Asset Amount," "State Income Tax," "Timing of Payment,"

"Disallowed Tax Benefits," "Indemnification Net Tax Benefits," "Carryover Items," and

"Federal Net Tax Detriments."  (Pet. Ex. A, § 7.2(b)(i)-(ix); (Pet. Appx. at 32-39).)  These

clarifications and amendments alter the required computations each year.  Following the parties'

entry into the 1996 Agreement, the computation of any given year's tax-sharing liability required

application of the terms of *both* the 1988 Assistance Agreement *and* the 1996 Termination

Agreement.

About the time it agreed to sell First American Bank to Citigroup, TAC discovered that it

had erroneously overlooked the application of the Tax Detriment Item set forth in Section 9(b)(4)

of the Assistance Agreement to the Guarini Amendment.  In due course, following negotiations,

TAC made demand on the FDIC for reimbursement of the tax benefit payments made in error.

The FDIC has refused this demand.  (Pet. ¶ 78.)

Indeed, the FDIC has made additional demands on TAC in the amount of approximately

$165 million.  In correspondence dating to at least 2006, the FDIC admitted that its demand was

based on calculations it performed using "the Assistance Agreement, as adjusted by the

Termination Agreement."  On November 30, 2007, the FDIC filed a plenary action in the United

States District Court for the District of the District of Columbia demanding money damages of

$165 million and other relief. In its Complaint, the FDIC admitted that "the Termination

Agreement expressly provided that Section 9 of the Assistance Agreement, and certain other

specified provisions, survived the termination and remained binding on the parties."[5] (Mot.

Appx. at 3.) The FDIC Complaint then contains the following definition: "For purposes of this

Complaint, the surviving Section 9, *__as modified by the Termination Agreement__*, shall be

referred to as Section 9." *Id.* (emphasis supplied). The FDIC Complaint then refers to "Section

9" as so defined (that is, "as modified by the Termination Agreement") in 23 of the next 31

paragraphs. In addition, The FDIC invoked venue in the District of Columbia based on a

provision of the Termination Agreement. (Mot. Appx. at 2.) That provision relates *__only__* to

"legal action or proceedings *__with respect to this Agreement__*." (Termination Agreement § 13.4

(Pet. Appx. at 66).) Thus, the FDIC admits in at least 24 paragraphs of its Complaint that the

present dispute relates to the Termination Agreement.

By its terms, the Termination Agreement's arbitration provision covers the dispute

between TAC and the FDIC concerning the proper calculation of the Net Tax Benefit payments.

Section 6.1(a) provides that "in the event that any dispute arises between or among any of the

parties hereto *relating to . . .* any disputes regarding a party's obligations under this Agreement . .

. either party may submit each specific unresolved Dispute Item to arbitration . . . ." (Pet. Appx.

at 28-29 (emphasis added).) The FDIC, however, takes the position that this dispute is not

subject to arbitration.

---

[5] The FDIC's Complaint is Exhibit A to Petitioners' Appendix in Support of Motion to Compel
Arbitration (Nov. 30, 2007) ("Mot. Appx.").

## ARGUMENT

### A.    The Federal Arbitration Act Applies To This Contract

The Federal Arbitration Act (the "FAA") provides that arbitration provisions are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  Section 4 of the FAA provides, in part:

> A party aggrieved by the alleged failure, neglect or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement. * * * The court . . . upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

9 U.S.C. § 4.  The FAA reflects a "liberal policy favoring arbitration and a strong federal policy in favor of enforcing arbitration agreements." *Personal Sec. & Safety Sys. Inc. v. Motorola Inc.*, 297 F.3d 388, 392 (5th Cir. 2002) (quotations omitted).  The statute "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original).  Federal agencies, when entering into private contracts requiring arbitration, are subject to the FAA.  *See, e.g., United States v. Bankers Insurance Co.*, 245 F.3d 315 (4th Cir. 2001) (remanding case to district court to issue stay of litigation under FAA § 3 against federal agency pending submission of disputed claims to arbitration).

The Termination Agreement falls squarely within the scope of the FAA.  The FAA applies to any transaction in interstate commerce and "creates a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses*

*H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983). The Termination Agreement provides that it and the parties' rights and obligations are "governed by and construed in accordance with" federal law. (Pet. Appx. at 66.)

**B.    This Dispute Is Subject To Arbitration**

"In adjudicating a motion to compel arbitration under the [FAA], courts generally conduct a two-step inquiry. The court must first determine whether the parties agreed to arbitrate the dispute. This determination involves two considerations: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement. The court then must determine if any legal constraints foreclose arbitration of those claims." *Brown v. Pacific Life Ins. Co.*, 462 F.3d 384, 396 (5th Cir. 2006) (citations and quotations omitted). If this test is met, then the Court refers the matter to arbitration without "'delv[ing] further into the merits of the dispute.'" *Primerica Life Ins. Co. v. Brown*, 304 F.3d 469, 471 (5th Cir. 2002) (citation omitted).

1.    A Valid, Mandatory Agreement to Arbitrate Exists

"Arbitration is a matter of contract between the parties." *Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1064 (5th Cir. 1998). Thus, "in determining whether the parties agreed to arbitrate a certain matter, courts apply the contract law . . . govern[ing] the agreement." In a contract between a private party and an agency of the United States, the federal common law of contracts generally supplies the rule of decision. *Washington Mutual Fin. Group, LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004); *see* Termination Agreement § 13.4 (Pet. Appx. at 66) (choice of law provision). The federal common law ordinarily includes "the core principles of the common law of contract[s] that are in force in most states." *Smith v. United States*, 328 F.3d 760, 767 n.8 (5th Cir. 2003). Under these core principles, when

8

interpreting an arbitration agreement, the issue is "'what was the parties' intent [because] courts are compelled to give effect to the parties' intentions.'" *Reliant Energy, Inc.*, 349 F.3d 816, 821 (5th Cir. 2003) (citation omitted). The parties' intent is foremost determined by the plain language of the agreement "such that the language is given its generally accepted meaning if there is one." *Transitional Learning Comm. at Galveston, Inc. v. United States Office of Pers. Mgmt.*, 220 F.3d 427, 431 (5th Cir. 2000).

There can be no dispute that a valid agreement to arbitrate exists. The Termination Agreement expressly provides for arbitration. Section 6.1(a) of the Termination Agreement defines "Dispute Item" to include "any disputes regarding a party's obligations under this Agreement." (Pet. Appx. at 28.) It then provides: "The parties intend that to the maximum extent possible, but otherwise consistent with the provisions of this Agreement, arbitration shall be the sole dispute resolution process regarding any Dispute Item that is not amicably resolved." (Pet. Appx. at 29.)

To be sure, the arbitration clause uses the term "may" in describing a party's decision to resolve an issue that is not resolved amicably. But in arbitration agreements, the word "may" gives "'the aggrieved party the choice between arbitration and abandonment of his claim, [*i.e.,*] he "may" either arbitrate or abandon the claim.'" *Bankers Ins. Co.*, 245 F.3d at 321 (collecting cases construing "may" as mandatory arbitration option). This interpretation reflects the Supreme Court's instruction that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract itself or an allegation of waiver, delay or a like defense to arbitrability." *Moses H. Cone Mem. Hosp.*, 460 U.S. at 24-25.

9

### 2.    The Dispute Falls Within the Scope of the Arbitration Clause

"In determining whether the dispute falls within the scope of the arbitration agreement, 'ambiguities . . . [are] resolved in favor of arbitration.'" *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002). In that regard, the "courts distinguish 'narrow' arbitration clauses that only require arbitration of disputes 'arising out of' the contract from broad arbitration clauses governing disputes that 'relate to' or 'are connected with' the contract." *Pennzoil*, 139 F.2d at 1067. A demand to arbitrate an issue cannot be denied "unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue." *Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 37 (5th Cir. 1990) (citation omitted).

Here, the arbitration provision at issue is a broad one, not a narrow one. It applies to "any dispute . . . ***relating to*** . . . any disputes regarding a party's obligations under this Agreement." (Termination Agreement at § 6.1(a) (Pet. Appx. at 28) (emphasis added).) *See Third Party Advantage Administrators, Inc. v. J.P. Farley Corp.*, 2006 WL 3445216, at *5 (N.D. Tex. Nov. 27, 2006) (Fish, C.J.) ("[L]anguage within the arbitration clause stating that the clause governs all disputes 'related to' the agreement are interpreted as broad provisions covering almost all disputes arising between the parties to the contract.").

This dispute plainly "relates to" a dispute regarding the parties' obligations under the Termination Agreement. The Termination Agreement clarified and amended Section 9 of the Assistance Agreement in many ways. It is impossible now to compute the parties' tax-sharing rights and responsibilities without reference to *both* contracts. For that reason, the FDIC admits that its own (erroneous) computations are based on "the Assistance Agreement, as adjusted by the Termination Agreement." That is why in the FDIC's own plenary action, it relies on Section

10

13.4 of the Termination Agreement, which relates *only* to a "legal action or proceeding with respect to this [Termination] Agreement." *See* Pet. Appx. at 66; FDIC Complaint ¶ 2 (Mot. Appx. at 1). That is why the FDIC admitted that "the Termination Agreement expressly provided that that Section 9 of the Assistance Agreement, and certain other specified provisions, survived the termination and remained binding on the parties." (Mot. Appx. at 3.) That is why the FDIC defines "Section 9" in its Complaint as having been "modified by the Termination Agreement." *Id.*

In any event, arbitration clauses in related agreements are broad enough to require arbitration even of a controversy arising *exclusively* from an agreement with no arbitration clause (which is not the case here). *See Pennzoil*, 139 F.3d at 1067-68 (citing cases). In *Pennzoil*, the parties had a series of agreements—some with arbitration clauses, some without. The particular dispute between the parties centered on an agreement with no arbitration clause. Nonetheless, the Court held in favor of arbitration:

> The dispute flows from a series of interrelated agreements, all of which center around the overriding goal of acquiring development rights from the Azerbaijan government. . . . In addition to being related to the same overriding goal, the agreements themselves evidence their interrelationship.

139 F.3d at 1068.

Those forms of interrelationship are present here, as well. The overriding goal of both Section 9 of the Assistance Agreement and the Termination Agreement was to provide for the continuing sharing of tax benefits in accordance with the parties' agreement. And the Termination Agreement plainly references the Assistance Agreement, continues it, clarifies it, and amends it. As in *Pennzoil*, the interrelationship is evidenced by the overarching goals and the text of the Termination Agreement. In short, any dispute about the computation of Net Tax

11

Benefit and Net Tax Detriment obligations requires reference to the parties obligations under the Termination Agreement and therefore "relate[s] to . . . [a] dispute regarding [the] part[ies'] obligations under" the Termination Agreement and so is covered by the arbitration provision. (Pet. Appx. at 28.)  Even if the scope of the clause were ambiguous, arbitration must be compelled "unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue." *Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 37 (5th Cir. 1990).

### 3.    No Legal Constraints Foreclose Arbitration

The FAA's "mandate [to enforce arbitration agreements] may be overridden by a contrary congressional command." *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987).  The party opposing arbitration must "show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue." *Id.*  In this case, Congress has indicated no such intention.  The FDIC, acting in its corporate capacity, has the power "to sue and be sued" in federal court. 28 U.S.C. §§ 1819(a) (Fourth), 1819(b)(2)(A).  As the Supreme Court explained in *United States v. Winstar Corp.*, addressing agreements made by the FSLIC, "when the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." 518 U.S. 839, 895 (1996) (citation omitted).  This principle confirms that the Federal Arbitration Act applies to federal agencies that contract to arbitrate. *See, e.g., Bankers Ins. Co.*, 245 F.3d at 321 (ordering federal agency to participate in arbitration, citing *Winstar*); *accord Tenaska Washington Partners II, L.P. v. United States*, 34 Fed. Cl. 434, 446 (1995) (applying "strong policy favoring arbitration" to grant federal agency motion to compel arbitration over contract dispute).

12

## CONCLUSION

Petitioner respectfully requests that this Court issue an order compelling the respondent to submit the present dispute to arbitration.

Dated: November 30, 2007
        Dallas, Texas

Respectfully submitted,

**DIAMOND MCCARTHY LLP**

By: _____

J. Benjamin King
    (Texas Bar No. 24046217)
Renaissance Tower
1201 Elm Street, 34th Floor
Dallas, TX  75270
(214) 389-5300
Fax: (214) 389-5399
email: bking@diamondmccarthy.com

**ARNOLD & PORTER LLP**

Kent A. Yalowitz
    (*Pro Hac Vice* motion pending)
399 Park Avenue
New York, NY  10022
(212) 715-1000
Fax: (212) 715-1399
email: kent.yalowitz@aporter.com

*Attorneys for Petitioner The Adam
Corporation/Group*

13

## CERTIFICATION OF CONFERENCE

I, Kent A. Yalowitz, counsel for The Adam Corporation/Group, certify that I spoke with

David A. Super, counsel for the Federal Deposit Insurance Corporation, to confer regarding the

foregoing Motion.  Mr. Super confirmed that the Federal Deposit Insurance Corporation will not

consent to the relief sought in the foregoing motion.

*Kent A. Yalowitz* by J. Benjamin King
_____  & Brian Li
Kent A. Yalowitz  with permission

14

## CERTIFICATE OF SERVICE

I, J. Benjamin King, certify that I caused the foregoing **Petitioner's Motion to Compel Arbitration** and **Petitioner's Appendix in Support of Motion to Compel Arbitration** to be served on November 30, 2007, via Federal Express on the Federal Deposit Insurance Corporation, 801 17th Street, N.W., Washington, DC, 20429, and to be served on December 3, 2007, via hand on Brian Morris, Winstead PC, 5400 Renaissance Tower, 1201 Elm Street, Dallas, Texas, 75270.

J. Benjamin King

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| THE ADAM CORPORATION/GROUP, | § |
| | § |
| Petitioner/Plaintiff, | § |
| | § |
| AND | § |
| | § |
| CITIBANK, N.A., | § |
| | § |
| Nominal Petitioner/Nominal Plaintiff, | § |
| | § |
| v. | § CIVIL ACTION NO. 3-07-CV-1993-L-(BH) |
| | § Referred to the U.S. Magistrate Judge |
| FEDERAL DEPOSIT INSURANCE | § |
| CORPORATION, | § |
| SOLELY IN ITS CAPACITY AS MANAGER | § |
| OF THE | § |
| FSLIC RESOLUTION FUND, | § |
| | § |
| Respondent/Defendant. | § |

## FDIC'S OPPOSITION TO MOTION TO COMPEL ARBITRATION

Timothy S. Durst
State Bar No. 00786924
Email:  tim.durst@bakerbotts.com
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, TX  75201-2980
Tel:  (214) 953-6500
Fax:  (214) 953-6503

Claire L. McGuire
Larry L. Goodman
Leslie A. Conover
Bruce C. Taylor
John A. Davidovich
Shane C. Kiernan
FEDERAL DEPOSIT
INSURANCE CORPORATION
3501 Fairfax Drive
Arlington, VA 22226
Tel:  (703) 562-2390
Fax: (703) 562-2481

Kirk K. Van Tine
David A. Super
Samuel J. Waldon
Sheila J. Kadagathur
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Tel.:  (202) 639-7700
Fax: (202) 639-7890

Attorneys for Federal Deposit Insurance Corporation

# **TABLE OF CONTENTS**

I.  FACTUAL AND PROCEDURAL BACKGROUND..........................................................2

   A.  The Assistance Agreement. ....................................................................................3

   B.  The Termination Agreement....................................................................................4

   C.  The District of Columbia Action. ...........................................................................5

   D.  TAC's Claim In This Case.......................................................................................6

II.  ARGUMENT ....................................................................................................................7

   A.  Under Its Plain Language, The Arbitration Provision Applies Only To
       Disputes Over The "True-Up" Process And The Parties' Right To Pursue
       Such Arbitration Expired Ten Years Ago.................................................................8

   B.  If The Court Finds The Arbitration Provision To Be Ambiguous, The
       Evidence Of The Parties' Intent And The Circumstances Surrounding The
       Agreement Support The FDIC's Interpretation. ...................................................15

III.  CONCLUSION................................................................................................................18

## <u>TABLE OF AUTHORITIES</u>

### CASES

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643 (1986) .........................................7

*Cummings v. FedEx Ground Package System, Inc.*, 404 F.3d 1258 (10th Cir. 2005)....................9

*Gonzalez v. Denning*, 394 F.3d 388 (5th Cir. 2004) .................................................................8, 11

*Hartford Ins. Co. v. Commerce & Indus. Ins. Co.*, 864 S.W.2d 648 (Tex. Ct. App. 1993)...........15

*Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494 (5th Cir. 2002) ...................12

*Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34 (5th Cir. 1990) ......................................................9

*Pennzoil Co. v. FERC*, 645 F.2d 360 (5th Cir. 1981) ....................................................................8

*Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59 (2d Cir. 1983)...........................................9, 10

*R & P Enter. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517 (Tex. 1980)............................15

*Reliant Energy Servs., Inc. v. Enron Canada Corp.*, 349 F.3d 816 (5th Cir. 2003) .......................9

*Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l. Oil Co.*, 767 F.2d 1140 (5th Cir.
1985) ...........................................................................................................................9

*Tittle v. Enron Corp.*, 463 F.3d 410 (5th Cir. 2006) ...........................................................7, 11, 15

*Twin City Monorail, Inc. v. Robbins & Myers, Inc.*, 728 F.2d 1069 (8th Cir. 1984) .....................9

*United Steel Workers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960) .............................7

*Welborn Clinic v. Medquist, Inc.*, 301 F.3d 634 (7th Cir. 2002) ...................................................9

### STATUTES

Administrative Dispute Resolution Act, 5 U.S.C. § 572(b).........................................................17

On November 30, The Adam Corporation/Group ("TAC") filed its complaint ("TAC Complaint") in this action, as well as a motion to compel arbitration ("Motion to Compel"). TAC is demanding arbitration pursuant to an arbitration provision contained in a contract called the "Termination Agreement," which TAC and the Federal Deposit Insurance Corporation ("FDIC") entered into in 1996. The FDIC files this opposition to the Motion to Compel.

The black letter law of contract interpretation requires that the terms of a contract be read as a whole, giving meaning to the entire contract. TAC would have the Court ignore this fundamental principle and construe the arbitration provision in a way that makes a forum selection clause in the Termination Agreement surplusage and renders other parts of the Termination Agreement non-sensical. As made clear by the context of other provisions of the Termination Agreement, the arbitration provision, was narrowly drawn to apply solely to specific types of disputes arising out of the closing of the Termination Agreement and was not intended to apply to the type of tax benefit sharing dispute for which TAC demands arbitration. Moreover, as provided in key contractual language that TAC omitted from its citation of the arbitration provision, the right to bring claims in arbitration expired over ten years ago. Given that the deadline for bringing claims in arbitration has long since passed, TAC's interpretation leads to the nonsensical result that the parties today have *no forum* in which to resolve their disputes. Belying TAC's position is a forum selection clause in the Termination Agreement, which provides that disputes like this case are to be litigated in the federal courts of either the District of Columbia or Texas. TAC's interpretation of the arbitration provision—that *all* disputes are subject to arbitration—simply cannot be reconciled with the longstanding legal imperative that all of terms of the Termination Agreement should be given meaning.

1

## I.  FACTUAL AND PROCEDURAL BACKGROUND

For over 15 months now, the FDIC has demanded that TAC pay the FDIC more than $157 million in tax benefit sharing payments that TAC owes to the FDIC.  TAC owes the FDIC that money under Section 9 of the Assistance Agreement that was entered into in 1988 by TAC and the FDIC's predecessor, the Federal Savings and Loan Insurance Corporation (the "FSLIC").[1]  As the natural plaintiff in this dispute, with claims exceeding $157 million, the FDIC filed a complaint against TAC in the U.S. District Court for the District of Columbia on November 30, 2007 (the "District of Columbia Action")  The District of Columbia Action is pending before Judge Ricardo Urbina.  A copy of the FDIC's original Complaint in the District of Columbia Action is attached hereto.  *See* Exhibit A to Appendix in Support of FDIC's Opposition to Motion to Compel Arbitration ("Opposition Appendix") at 1-13.  Concurrently with this opposition brief, the FDIC has filed a motion to transfer this action—including TAC's motion to compel arbitration—to the U.S. District Court for the District of Columbia where it can be consolidated with the pending District of Columbia Action.

One hour *after* the FDIC filed its Complaint in the District of Columbia Action, TAC filed its own Complaint in this Court.  TAC's claim purports to be based on the same contract provision as the FDIC's claim, Section 9 of the Assistance Agreement.  However, instead of pursuing its $41 million claim as a counterclaim to the FDIC's $157.3 million claim in the District of Columbia Action, TAC is attempting to let the "tail wag the dog," by filing its own preemptive action and simultaneously demanding that the parties arbitrate a dispute that was never intended to be arbitrated.  For the reasons set forth below, TAC's efforts to force

---

[1]  In 1989, Congress created the FSLIC Resolution Fund, which succeeded to FSLIC's rights under the Assistance Agreement, and designated the FDIC as "Manager" of the Fund. Hereinafter "FDIC" shall refer to the FDIC as Manager of the FSLIC Resolution Fund as well as its predecessor, FSLIC.

arbitration should be rejected.  To place TAC's demand for arbitration in its proper context, it is helpful to briefly review the contracts at issue in this matter, the FDIC's allegations in the District of Columbia Action, and the allegations of TAC's own claim in this Court.

A.    The Assistance Agreement.

On October 14, 1988, TAC entered into a transaction with FSLIC whereby TAC purchased the assets and assumed certain liabilities of eleven failed savings and loan associations in Texas ("Acquired Associations").  The assets from the Acquired Associations were consolidated into a new savings and loan association, which, after a series of name changes, became known as First American Bank ("FAB").  TAC owned all of FAB's stock.  TAC was also the parent corporation of an affiliated group of corporations (referred to collectively herein as TAC), including FAB, that filed consolidated tax returns.

The terms of the 1988 transaction between TAC and FSLIC were set forth in the Assistance Agreement.  In general, under the Assistance Agreement, FSLIC agreed to provide FAB with certain financial assistance to cover losses that might arise out of the assets and liabilities of the Acquired Associations.  In addition to receiving financial assistance from FSLIC, TAC received tax benefits through special provisions of the Internal Revenue Code ("I.R.C.").  Section 9 of the Assistance Agreement required TAC to share with FSLIC 60 percent of the federal and state tax savings that TAC and its subsidiaries realized as a result of certain types of tax deductions or exclusions that generated tax benefits, described in Section 9(a) as "Tax Benefit Items."  *See* Exhibit B to Opposition Appendix at 15-30 (Assistance Agreement § 9 at 47-62).  Section 9(b), in turn, describes types of tax detriment items that may offset tax benefits.  Section 9(d) sets forth the formula used to calculate the net tax benefit savings— defined as the "Federal Net Tax Benefits"—that TAC is required to share with the FDIC.  Under Section 9(d), to determine the amount of Federal Net Tax Benefits, one calculates the difference

3

between TAC's actual tax liability, and the "hypothetical" tax liability that TAC would have had if the Tax Benefit Items had not been afforded special tax treatment under the I.R.C. From 1988 until July 1996, the FDIC and FAB made payments to each other under the Assistance Agreement.

B.     The Termination Agreement.

On July 31, 1996, TAC and the FDIC terminated the Assistance Agreement by entering into the Termination Agreement. Under the Termination Agreement, the FDIC made a lump sum payment to TAC in the amount of $8 million and, in return, the FDIC's obligation to make any further assistance payments to TAC was extinguished. However, the Termination Agreement expressly provided that Section 9 of the Assistance Agreement, and certain other specified provisions, survived the termination and remained binding on the parties. *See* Exhibit C to Opposition Appendix at 43-44, 63-64 (Termination Agreement §§ 2.2 at 2-3, 7.2(b) at 22-23). As TAC explains in its Complaint, "[t]he purpose of the Termination Agreement was to resolve all payments due on FAB's covered asset losses, to terminate the Assistance Agreement, and to preserve the parties' tax benefit sharing payment arrangement."[2]

As for the FDIC's assistance payment obligations that were terminated, the Termination Agreement also set up an elaborate system for resolving any items of assistance that were outstanding at the time of the 1996 Termination Agreement or that arose shortly after the termination. In essence, the Termination Agreement established a "true-up" process to resolve these outstanding assistance payment issues. Significantly, as explained in detail below (*infra* at 10), this true-up process, and any resulting arbitration, was designed to be concluded relatively

---

[2] Petition To Compel Arbitration, Or, In The Alternative, Complaint For Declaratory Judgment That Dispute Is Arbitrable, Or, In The Alternative, Complaint For Money Damages ¶68, Adam Corp./Group v. Fed. Deposit Ins. Corp., NO. 3-07-CV-1993-L-(BH) (N.D. Tex Nov. 30, 2007) (hereinafter referred to as "TAC Compl.").

4

quickly after the July 1996 closing of the Termination Agreement, by a defined "Arbitration Deadline Date," which occurred within a little more than one year following the closing.

Section 6.1 of the Termination Agreement, the provision that TAC is relying upon to urge arbitration in this case, permitted TAC and the FDIC to resolve only certain, limited disputes through arbitration. However, as explained fully in Part II.A below, that arbitration provision does not now, nor did it ever, apply to disputes over tax benefit sharing under Section 9. As the Termination Agreement makes clear, the right to arbitration was limited solely to disputes arising out of the true-up process under the Termination Agreement. In contrast, disputes over the parties' continuing obligations, including tax benefit sharing obligations under Section 9, are governed by the venue provision in Section 13.4 of the Termination Agreement:

> This Agreement and the rights and obligations hereunder shall be governed by and construed in accordance with the Federal law of the United States of America and, in the absence of controlling Federal law, in accordance with the law of the State of Texas. <u>Any legal action or proceedings with respect to this Agreement shall be brought in the Federal courts of the United States of America located in either the District of Columbia or the State of Texas</u> and each party hereto submits to the jurisdiction of such courts and hereby waives any objections on the grounds of venue, forum non conveniens, or any similar grounds.

Exhibit C to Opposition Appendix at 97 (Termination Agreement § 13.4 at 56) (emphasis added).

C.    <u>The District of Columbia Action.</u>

The FDIC filed the District of Columbia Action against TAC on November 30, 2007. In its Complaint, the FDIC alleges that TAC owes the FDIC $157.3 million for tax savings that TAC realized as a result of Tax Benefit Items under Section 9. The bulk of those tax savings ($154.7 million) resulted from TAC's sale of its stock in FAB to Citibank, Texas ("Citibank") on March 31, 2005, for a purchase price of $972 million (the "Sale"). As part of the Sale, TAC

retained the obligation to share with the FDIC 60 percent of certain federal and state tax savings that TAC realized as a result of any Tax Benefit Items under Section 9.

On its 2004 federal tax return covering the period from October 1, 2004, through September 30, 2005, TAC reported a capital loss of approximately $314 million as a result of the Sale. TAC generated this $314 million capital loss—instead of incurring a taxable gain— because TAC's basis in the stock of FAB was approximately $1 billion higher than it would have been without the special tax treatment afforded the Tax Benefit Items. As a direct result of the special tax treatment afforded the Tax Benefit Items, TAC saved $257.8 million in tax payments, which is the amount TAC would otherwise have had to pay as a result of the Sale. Under Section 9, TAC owes the FDIC $154.7 million as a result of the Sale due to the $257.8 million in tax savings. The amount due to the FDIC is calculated as follows: ($257.8 million in tax savings) x (60 percent share to the FDIC) = $154.7 million. Because TAC has refused to pay the FDIC the $154.7 million in tax savings from the Sale, as well as $2.6 million in additional tax savings, the FDIC initiated the District of Columbia Action to recover those funds from TAC.

D.     TAC's Claim In This Case.

TAC's claim in this action is based on a statute enacted by Congress in 1993 known as the Guarini Amendment. *See* Motion to Compel at 4, Adam Corp./Group v. Fed. Deposit Ins. Corp., NO. 3-07-CV-1993-L-(BH) (N.D. Tex Nov. 30, 2007). TAC alleges that "[t]he Guarini Amendment had the effect of prohibiting taxpayers from claiming, as a tax deduction, losses reimbursed with FSLIC-assistance payments." *Id.* Although TAC was well aware of the Guarini Amendment 15 years ago when it was enacted, TAC now asserts that it was not aware until relatively recently that, as a result of the Guarini Amendment, TAC allegedly "overpaid its tax benefit sharing obligations" to the FDIC. *Id.* In its Complaint, TAC seeks to characterize the Guarini Amendment as creating a Tax Detriment Item under Section 9(b)(4), which would

6

reduce the amount of tax benefits to be shared with the FDIC.  TAC alleges that, as a result of

the Guarini Amendment, TAC overpaid its tax sharing obligations to the FDIC in the amount of

approximately $41 million.  *See id.*

For purposes of deciding TAC's Motion to Compel, as explained below, TAC's $41

million "Guarini" claim is not covered by the arbitration provision of the Termination

Agreement, and TAC's Motion should be denied.  Further, as set forth in the FDIC's Motion to

Transfer, this action should be transferred to the U.S. District Court for the District of Columbia

where it can be consolidated with the District of Columbia Action.

## II.  ARGUMENT

"[A]rbitration is a matter of contract and a party cannot be required to submit to

arbitration any dispute which he has not agreed to submit."  *Tittle v. Enron Corp.*, 463 F.3d 410,

418 (5th Cir. 2006) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648,

(1986)).  TAC is correct that the Federal Arbitration Act (the "FAA") reflects a policy that favors

enforcing arbitration agreements where two parties have agreed to arbitrate a dispute.  *See*

Motion to Compel at 7.  However, a court has no authority under the FAA to direct a party to

arbitrate a dispute that it has not agreed to arbitrate.  *See Tittle*, 463 F.3d at 418.[3]  "When

considering a motion to compel arbitration under the FAA, a court employs a two-step analysis.

First, a court must determine whether the parties agreed to arbitrate the dispute in question.

Second, a court must determine whether legal constraints external to the parties' agreement

foreclosed the arbitration" of the dispute.  *Id.* (citations omitted).  To determine whether the

parties have agreed to arbitrate a dispute, a court will look to "(1) whether there is a valid

---

[3]  The issue of whether a dispute is subject to arbitration is one for the Court to decide.  *See AT & T Techs.*, 475 U.S. at 649 (quoting *United Steel Workers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960) ("[T]he question of arbitrability . . . is undeniably an issue for judicial determination")).  TAC does not dispute this point.

agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that agreement." *Id.* (citations omitted).

Here, it is true that Section 6.1 of the Termination Agreement, at one time many years ago, allowed TAC and the FDIC to resolve certain disputes through arbitration. However, that arbitration provision does not now, nor did it ever, apply to disputes over tax benefit sharing under Section 9. As the Termination Agreement makes clear, before the right to submit a claim to arbitration expired altogether over ten years ago, it was limited to disputes arising out of a "true-up" process provided for under the Termination Agreement. The true-up process was intended to resolve any lingering issues concerning FDIC assistance payments to TAC. The true-up process, and any resulting arbitration, was required to be completed within a little more than one year after the Closing Date of the Termination Agreement, which was 11 years ago in 1996. The now-expired right to arbitration never applied to disputes over tax benefit sharing under Section 9 of the Assistance Agreement, which expressly survived the termination and from which disputes could arise many years into the future (as they have in this case). Disputes over tax benefit sharing under Section 9 are governed by the forum selection clause in Section 13.4 of the Termination Agreement, which allows a claim to be brought in federal court in either the District of Columbia or Texas. *See* Exhibit C to Opposition Appendix at 97 (Termination Agreement § 13.4 at 56).

A.    Under Its Plain Language, The Arbitration Provision Applies Only To Disputes Over The "True-Up" Process And The Parties' Right To Pursue Such Arbitration Expired Ten Years Ago.

"[T]he primary concern of a court construing a written contract is to ascertain the true intent of the parties as expressed in the instrument." *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004); *see Pennzoil Co. v. FERC*, 645 F.2d 360, 388 (5th Cir. 1981) ("When interpreting a contract, the question is what was the parties' intent, [because] courts are

8

compelled to give effect to the parties' intentions."). To determine intent, courts "look to the plain language of the contract, its commercial context, and its purposes." *Reliant Energy Servs., Inc. v. Enron Canada Corp.*, 349 F.3d 816, 822 (5th Cir. 2003).

TAC argues that its claim is arbitrable under Section 6.1 because it "relates to a dispute regarding the parties' obligations under the Termination Agreement." Motion to Compel at 10. However, the plain language of Section 6.1, particularly when understood in the overall context of the Termination Agreement, limits the parties' right to pursue a claim in arbitration to disputes concerning the true-up process. Moreover, the right to pursue disputes concerning the true-up process expired ten years ago at which time the parties waived any further right to arbitration.

TAC's assertion that the arbitration provision in Section 6.1 is "broad" is wrong because it fails to account for the express limitations on the parties' right to submit disputes to arbitration. The classic "broad" arbitration agreement provides for arbitration of any and all disputes arising out of a relationship between the parties to the agreement. *See, e.g., Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 37 (5th Cir. 1990) (describing as "broad" an arbitration clause calling for arbitration of "any and all disputes between [the parties]"). By contrast, the arbitration provision in the Termination Agreement is a classic narrow provision because it applies only to specified categories of contractual disputes, not to "any and all disputes." *See, e.g., Cummings v. FedEx Ground Package System, Inc.*, 404 F.3d 1258, 1262 (10th Cir. 2005); *Welborn Clinic v. Medquist, Inc.*, 301 F.3d 634, 640 (7th Cir. 2002); *Twin City Monorail, Inc. v. Robbins & Myers, Inc.*, 728 F.2d 1069, 1073 (8th Cir. 1984). When, as here, the Court confronts a narrow arbitration clause, "arbitration should not be compelled unless the court determines that the dispute falls within the clause." *Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l. Oil Co.*, 767 F.2d 1140, 1145 n.10 (5th Cir. 1985) (quoting *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d

9

59, 64 (2d Cir. 1983)).    In this inquiry, "[s]pecific words or phrases alone may not be determinative although words of limitations would indicate a narrower clause." *Id*.    Rather "[t]he tone of the clause as a whole must be considered." *Id*.

Section 6.1 lists four defined types of disputes that are subject to arbitration, including disputes relating to (1) "Covered Asset Purchase SRA Report Exceptions," (2) "Post-Closing Expense Items," (3) "Post-Closing Receipt Items," and (4) "AmWest [FAB] Dispute Items." *See* Exhibit C to Opposition Appendix at 59 (Termination Agreement § 6.1 at 18).    Each of these types of disputes—which are defined in other portions of the Termination Agreement—is part of the true-up process.    Specifically, "Covered Asset Purchase SRA Report Exceptions" involve disputes stemming from FAB's Covered Asset Purchase SRA Report, which was to be submitted 60 days after the Closing Date of the Termination Agreement.    *See id*. at 52-53 (Termination Agreement § 4.2 at 11-12).    "Post-Closing Expense Items" and "Post-Closing Receipt Items" refer to expenses and receipts relating to transferred assets that arise after the Closing Date.    *See id*. at 55-56 (Termination Agreement, § 4.3 at 14-15).    Finally, "AmWest [FAB] Dispute Items" refer to disputes arising from the FDIC's Office of Inspector General's post-closing audit.    *See id*. at 58 (Termination Agreement, § 5.3(b) at 17).    Significantly, none of these types of disputes includes post-Closing Date disputes relating to tax benefit sharing under Section 9.

Viewed in the overall context of Section 6.1, TAC's contention that the parties intended to arbitrate "any disputes . . . relating to" obligations arising out of their contractual relationship becomes illogical.    Had the parties intended such a broad arbitration agreement, they very easily could have adopted classic broad arbitration language and agreed to arbitrate "any and all disputes arising out of or in connection with the Termination Agreement."    If they intended to arbitrate any and all disputes, there would have been no need to specifically list the four types of

true-up disputes for which arbitration was permitted. That the parties *did* list specific categories of disputes, and *did not* simply adopt classic broad arbitration language, speaks volumes about their intent. It is in this context that the parties included a clause to require arbitration of any other Dispute Items "relating to . . . disputes regarding a party's obligations under this [Termination] Agreement." The fact that this provision was limited to arbitration of "obligations under this [Termination] Agreement," rather than just "obligations" to one another reflects the parties' belief that this provision only applied to the true-up process otherwise covered by the provision.

TAC suggests that there is an inconsistency between (i) the FDIC's acknowledgement that the Termination Agreement modified aspects of Section 9 of the Assistance Agreement, and (ii) the FDIC's argument that the language calling for arbitration of disputes "relating to . . . a party's obligations under this [Termination] Agreement" does not apply to disputes over a party's obligations under Section 9 of the Assistance Agreement. *See* Motion to Compel at 10-11. That is incorrect. As reflected in the Termination Agreement, the parties intended to arbitrate true-up disputes arising out of true-up procedures that were actually *created* by the Termination Agreement. In contrast, the parties intended for the forum selection clause to govern litigation of any disputes over the obligations that *continued* forward from the Assistance Agreement, even if those continuing obligations had been modified by the Termination Agreement.

The express limitations on the parties' right to seek arbitration are confirmed by the rest of the Termination Agreement. "A court construing a contract must read that contract in a manner that confers meaning to all of its terms, rendering the contract's terms consistent with one another." *Tittle*, 463 F.3d at 418; *see Gonzalez*, 394 F.3d at 392 ("In construing a contract under

11

Texas law, courts must examine and consider the entire writing and give effect to all provisions such that none are rendered meaningless.") (quoting *Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 497 (5th Cir. 2002)). First, the parties intended that the any arbitration arising from the true-up process would be completed quickly after the close of the Termination Agreement, but Article VII of the Termination Agreement shows that the parties understood that certain obligations, including tax benefit sharing obligations, would continue far into the future. *See* Exhibit C to Opposition Appendix at 63-70 (Termination Agreement §§ 7.1-7.3 at 22-29). TAC seeks to conceal this issue in its Motion to Compel. In quoting Section 6.1 in its Motion, TAC omitted (and replaced with an ellipsis) crucial language in Section 6.1 that shows that the right to arbitrate any true-up disputes expired ten years ago. The following is a complete quotation of Section 6.1, with the language omitted by TAC underscored (note that FAB is referred to as "AmWest" in the Agreement):

> (a)    In the event that any dispute arises between or among any of the parties hereto relating to any Covered Asset Purchase SRA Report Exceptions, Post-Closing Expense Items, Post-Closing Receipt Items, AmWest Dispute Items, or any disputes regarding a party's obligations under this Agreement (collectively, a "Dispute Item"), which AmWest and the FDIC Manager are unable to amicably resolve, then either party may submit each specific unresolved Dispute Item to arbitration pursuant to the provisions of this Section 6.1. <u>(However, failure to submit any unresolved Dispute Item arising under Article V to arbitration before the expiration of the Arbitration Deadline Date shall be deemed a waiver of both parties' right to dispute such non-submitted Dispute Item.)</u> The parties intend that to the maximum extent possible, but otherwise consistent with the provisions of this Agreement, arbitration shall be the sole dispute resolution process regarding any Dispute Item that is not amicably resolved.

*Id.* at 59-60 (Termination Agreement, § 6.1 at 18-19) (underscoring added).. Under the only reasonable interpretation of this provision, the right to pursue arbitration expired roughly ten years ago and cannot apply to disputes over tax benefit sharing under Section 9, which continue to this day.

The arbitration provision expressly states that the right to bring the claim is waived unless arbitration is initiated by the defined "Arbitration Deadline Date." *See id.* at 60 (Termination Agreement, § 6.1 at 19). The Arbitration Deadline Date occurred roughly one year and 120 days after the July 1996 Closing Date of the Termination Agreement, or roughly ten years ago. *See id.* at 57-59 (Termination Agreement § 5.1-5.3 at 16-18). Thus, if, as TAC suggests, disputes over tax benefit sharing under Section 9 are governed by the arbitration provision, then any right to arbitrate those disputes expired ten years ago. Given that Section 9 expressly survives the Termination Agreement, and is intended to address tax benefit sharing disputes that may arise for years into the future, it would be nonsensical if the alleged exclusive method to resolve those disputes—arbitration—was rendered completely unavailable only a little over one year after the closing of the Termination Agreement. In fact, as TAC admits in its Complaint, "[a]t the time of the Termination Agreement, only minimal tax benefit sharing payments had been made." TAC Compl. ¶ 69. Thus, both TAC and the FDIC fully understood that any disputes over tax benefit sharing would arise years after the closing date of the Termination Agreement, and could not be resolved through an arbitration mechanism that expired, by its terms, only a little more than one year after the termination. For that reason, TAC and the FDIC included a Governing Law provision in the Termination Agreement that requires disputes over tax benefit sharing to be brought in federal court. *See* Exhibit C at Opposition Appendix at 97 (Termination Agreement § 13.4 at 56).

Second, the language in the provisions describing the true-up items and the tax benefits confirm that the FDIC's interpretation of Section 6.1 is the only reasonable interpretation. *See id.* at 55, 63-70 (Termination Agreement § 4.2 at 14, § 7.2 at 22-29). Specifically, the provisions defining each of the specific true-up items that is subject to arbitration under Section 6.1,

expressly reference the fact that any unresolved disputes were to be handled under the arbitration provision within a short time after the Closing Date. *See id.* at 55 (Termination Agreement § 4.2 & 4.2(e) at 14) (Covered Asset Purchase SRA Report Exceptions may be submitted to arbitration 165 days after Closing Date of Termination Agreement); *id.* at 56-57 (§ 4.3(e) at 15-16) (Post - Closing Expense Items and Post-Closing Receipt Items may be submitted to arbitration 30 days after receipt if the parties cannot agree who is responsible for the item); *id.* at 59 (§ 5.3(e) at 18) (allowing FAB to submit to arbitration any "Dispute Items" arising out of the FDIC's Post-Closing Audit by the "Arbitration Deadline Date," which is no more than 120 days after the FDIC provides the final audit report to FAB). Thus, by expressly referencing the parties' right to arbitrate under Section 6.1 in the provisions defining the true-up items, the Termination Agreement made it perfectly clear that disputes arising out of the true-up process were to be resolved in arbitration. In contrast, in the eight pages of the Termination Agreement relating to "Tax Benefits" and clarifying Section 9, there is not a single reference to arbitration. *See id.* at 63-70 (§ 7.2 at 22-29).

Third, if TAC's interpretation of Section 6.1 were accurate, and the parties had intended to arbitrate "any disputes" relating to their continuing obligations to one another, then there would have been no reason to include a forum selection clause in the Termination Agreement. Instead, the parties did include a forum selection clause, which contemplates that there will be non-arbitrable disputes between TAC and the FDIC, and that such disputes may be pursued in "the Federal courts of the United States of America located either in the District of Columbia or the State of Texas." *See id.* at 97 (Termination Agreement § 13.4 at 56). If the arbitration provision were intended to apply to all disputes regarding the parties' continuing obligations to one another (including tax sharing disputes under Section 9), then there would have been no

14

reason to select an appropriate judicial forum for disputes arising under the Termination Agreement because there would have been no basis to file a lawsuit. The Court should "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Tittle*, 463 F.3d at 418 (quoting *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983)).[4] TAC's interpretation of the arbitration provision must be rejected because it would render other language of the Agreement—the forum selection language in Section 13.4 and the provisions describing the true-up items—completely meaningless.

B.    Evidence Of Circumstances Surrounding The Termination Agreement Supports The FDIC's Interpretation.

As discussed above, the language of Section 6.1 and the remainder of the Termination Agreement shows that the right of arbitration did not apply to disputes under Section 9. Moreover, the FDIC's interpretation is fully supported by evidence of the circumstances surrounding the execution of the Termination Agreement.

The FDIC submits as part of this Opposition the Declaration of Charles A. Fulton ("Fulton Decl."). *See* Exhibit D to Opposition Appendix at 101-106 (Fulton Decl.). Mr. Fulton is the FDIC attorney who negotiated and drafted the Termination Agreement on behalf of the FDIC in 1996. As the Fulton Declaration confirms, the arbitration provision of the Termination Agreement was not intended to apply to disputes over tax benefit sharing under Section 9. *See id.* at 103 (Fulton Decl., ¶ 5). Disputes regarding tax benefit sharing were intended to be covered by the forum selection clause set forth in the Governing Law provision of the Agreement, allowing such disputes to be resolved in federal court in the District of Columbia or Texas. *See*

---

[4] *Accord R & P Enter. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 519 (Tex. 1980); *Hartford Ins. Co. v. Commerce & Indus. Ins. Co.*, 864 S.W.2d 648, 650 (Tex. Ct. App. 1993).

*id.* at 105 (Fulton Decl., ¶ 9 (citing Termination Agreement § 13.4 at 56)). In contrast, the arbitration provision was intended to apply solely to disputes arising out of the true-up process. *See id.* at 104-105 (Fulton Decl., ¶ 8). As the structure of the true-up process set forth in the Termination Agreement makes clear, any arbitration arising out of true-up disputes was required to be completed within a little over one year following the Closing Date of the Termination Agreement. *See id.* That is why Section 6.1 carefully lists the four specific types of true-up items that might arise and be submitted to arbitration. *See id.* Despite TAC's contention to the contrary, the phrase in Section 6.1 "any disputes regarding a party's obligations under this Agreement" refers solely to disputes arising out of the true-up process that are spelled out in Section 6.1 and addressed in other provisions of the Agreement. *See* Motion to Compel at 10-11; *see* Exhibit D to Opposition Appendix at 104-105 (Fulton Decl., ¶ 8). This intent is corroborated by the fact that each of the separate contract provisions that discusses the four types of true-up disputes independently references the parties' right to arbitrate the dispute. *See id.* at 104-105 (Fulton Decl., ¶8). In contrast, Section 7.2 of the Termination Agreement, which references and clarifies Section 9, says nothing about a right to arbitrate disputes over tax benefit sharing. That omission was intentional. *See id.*

As the Fulton Declaration explains, at the time the parties negotiated and entered into the Termination Agreement, it was the FDIC's policy to not agree to resolve disputes through arbitration, particularly disputes as important and potentially substantial as the sharing of tax benefits under Section 9. *See id.* at 103 (Fulton Decl., ¶¶ 4-5). At the time he negotiated the Termination Agreement, Mr. Fulton believed that, under the then existing law, the FDIC could not be bound by an arbitration award even if it agreed to submit to arbitration, because the Chairman of the Board of Directors of the FDIC had the statutory authority to vacate arbitration

16

awards. *See id.* at 103 (Fulton Decl., ¶4). This understanding is reflected in Section 6.1(f) of the Termination Agreement, which contemplates the Chairman of the FDIC setting aside arbitration awards. *See id.* However, as Mr. Fulton confirms, the FDIC was willing to agree to arbitrate the types of minor disputes that would arise out of the true-up process (even if the results of such arbitration could be set aside), because, in comparison to litigation, it was cost-effective to do so. *See id.* at 103-104 (Fulton Decl., ¶7).

Further, the FDIC's intent to limit the arbitration provision to the type of minor disputes arising out of the true-up process is fully supported by the guidelines set forth in the Administrative Dispute Resolution Act ("ADR"). 5 U.S.C. § 572(b). The ADR makes it clear that agencies should be hesitant to use binding arbitration where "(1) a definitive or authoritative resolution of the matter is required for precedential value [or] . . . (3) maintaining established policies is of special importance, so that variations among individual decisions are not increased and such a proceeding would not likely reach consistent results among decisions." *Id.* Disputes over tax benefit sharing fall squarely into both of these categories. In the late 1980s the FDIC entered into dozens of similar assistance agreements that contained similar provisions regarding the sharing of tax benefits. At the time the Termination Agreement was entered into in 1996, the FDIC was still a party to the tax benefit sharing provisions of many of those agreements. Allowing a dispute over tax benefit sharing—such as this one—to be resolved through arbitration would fail to create authoritative precedent or an established policy for tax benefit sharing disputes arising out of similar agreements. In turn, contrary to the ADR, this could result in inconsistencies and unfairness in disputes arising out of the series of highly-specialized tax benefit sharing agreements that the FDIC entered into in the late 1980s.

17

In sum, based on the plain language of the Termination Agreement, as well as the circumstances surrounding the negotiation and execution of the Termination Agreement, the only reasonable interpretation of Section 6.1 is that it does not apply to disputes over tax benefit sharing under Section 9.

## III.  CONCLUSION

For the foregoing reasons, the FDIC requests that TAC's Motion to Compel be denied.

Dated:  December 19, 2007

Respectfully submitted,


    /s/ Timothy S. Durst
Timothy S. Durst
State Bar No. 00786924
Email:  tim.durst@bakerbotts.com
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, TX  75201-2980
Tel:  (214) 953-6500
Fax:  (214) 953-6503

Claire L. McGuire
Larry L. Goodman
Leslie A. Conover
Bruce C. Taylor
John A. Davidovich
Shane C. Kiernan
FEDERAL DEPOSIT
INSURANCE CORPORATION
3501 Fairfax Drive
Arlington, VA 22226
Tel: (703) 562-2390
Fax: (703) 562-2481

Kirk K. Van Tine
David A. Super
Samuel J. Waldon
Sheila J. Kadagathur
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Tel.: (202) 639-7700
Fax: (202) 639-7890

Attorneys for Federal Deposit Insurance Corporation

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule 5.1(e) on December 19, 2007. As such, this brief was served on all counsel who are deemed to have consented to electronic service pursuant to Local Rule 5.1(d). All other counsel of record not deemed to have consented to electronic service will be served by facsimile transmission and/or U.S. First Class mail.

          /s/ Timothy S. Durst
         Timothy S. Durst

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

THE ADAM CORPORATION/GROUP,

Petitioner/Plaintiff,

— AND —

CITIBANK, N.A.,

Nominal Petitioner/Nominal Plaintiff,

— AGAINST —

FEDERAL DEPOSIT INSURANCE CORPORATION,
SOLELY IN ITS CAPACITY AS MANAGER OF THE
FSLIC RESOLUTION FUND,

Respondent.

CIVIL NO. 07-1993 L (BH)
Referred to U.S. Magistrate
Judge

**PETITIONER'S REPLY BRIEF**
**IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION**

The FDIC concedes that this case is controlled by the Federal Arbitration Act. *See* FDIC Opp. at 7. It concedes that the Termination Agreement contains "a valid agreement to arbitrate." *Id.* at 8. And it does not contend that any "legal constraints foreclose arbitration." *See Brown v. Pacific Life Ins. Co.*, 462 F.3d 384, 396 (5th Cir. 2006). Thus, the only question for the Court is "whether the dispute in question falls within the scope of [the] arbitration agreement." *Id.*

The arbitration clause covers five categories:

> In the event that any dispute arises between or among any of the parties hereto **relating to** [1] any Covered Asset Purchase SRA Report Exceptions, [2] Post-Closing Expense Items, [3] Post-Closing Receipt Items, [4] AmWest Dispute Items, or [5] **any disputes regarding a party's obligations under this Agreement** (collectively, a "Dispute Item"), which AmWest and the FDIC Manager are unable to amicably resolve, then either party may submit each specific unresolved Dispute Item to arbitration pursuant to the provisions of this Section 6.1.

Ex. A to Petitioner's Appendix in Support of Petition and Complaint ("Pet. App.") at 28-29 (Termination Agreement, § 6.1(a)) (emphasis supplied). For the five categories, arbitration is the "exclusive remedy." Section 6.3 of the Termination Agreement reads:

> **Other Remedies.** Except as otherwise provided in this Article VI, arbitration pursuant to this Article VI is the exclusive remedy of the parties hereto with respect to any Dispute Item.

*Id.* at 31-32 (Termination Agreement, § 6.3). And Section 6.1 of the Termination Agreement confirms:

> The parties intend that to the maximum extent possible, but otherwise consistent with the provisions of this Agreement, arbitration shall be the sole dispute resolution process regarding any Dispute Item that is not amicably resolved.

*Id.* at 29 (Termination Agreement, § 6.1(a)).

The FDIC's own Complaint in the District of Columbia reflects the undeniable fact that this dispute falls within Category [5] because it relates to a dispute regarding a party's

obligations under the Termination Agreement. TACG Mot. at 10-11. In this Court, the FDIC

concedes that "Article VII of the Termination Agreement shows that the parties understood that

certain obligations, including tax benefit sharing obligations, would continue far into the future."

FDIC Opp. at 12. The FDIC also concedes that Section 13.4 of the Termination Agreement

covers this dispute. FDIC Opp. at 8. That provision requires submission to jurisdiction and

waiver of objections to venue—in both Texas and the District of Columbia—in "[a]ny legal

action or proceedings with respect to this Agreement . . . ." Ex. A to Pet. App. at 66

(Termination Agreement, § 13.4). If (as the FDIC concedes) the dispute is one "with respect to"

the Termination Agreement then surely the dispute is also one "relating to . . . any dispute

regarding a party's obligations under" the Termination Agreement. *Compare* Termination

Agreement § 13.4 (Ex. A to Pet. App. at 66) *with* § 6.1(a) (Ex. A to Pet. App. at 28-29).

    In addition, under *Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d

1061, 1067-68 (5th Cir. 1998), the Termination Agreement and the Assistance Agreement are

interrelated and therefore require arbitration. The FDIC simply ignores the Fifth Circuit's

decision in *Pennzoil v. Ramco*, not even citing the case. Instead, the FDIC offers up a series of

meritless arguments that need not detain the Court from "a summary and speedy disposition of

motions or petitions to enforce [the] arbitration clause[] . . . in order to facilitate the prompt

arbitration that Congress envisaged." *See Moses H. Cone Mem'l Hosp. v. Mercury Constr.

Corp.*, 460 U.S. 1, 29 (1983).[1]

---

[1] The FDIC also makes a number of factual misstatements that although not material to the
motion, should not go uncorrected in the record. Its incorrect recitation of the procedural posture
(pp. 2-3) is addressed in TACG's Opposition to the FDIC's Motion to Transfer. The FDIC also
contends that "TAC purchased the assets and assumed certain liabilities" of eleven insolvent
Texas thrifts (p. 3). In fact it was FAB that purchased the assets, not TACG. *See* Ex. 1 to
Petitioner's Consolidated Appendix in Support of its Opposition to FDIC's Motion to Transfer
Venue Pursuant to 28 U.S.C. § 1404(a) and Reply Brief in Support of Motion to Compel.

*First*, the FDIC says that the wording of Category [5] "reflects the parties' belief that this provision only applied to the true up process otherwise covered by the provision." FDIC Opp. at 11. That is nonsense. Category [5] covers matters "relating to . . . **any** disputes regarding a party's obligations under" the Termination Agreement. It has no limiting language. It covers any dispute regarding a party's obligations under the contract. If the parties intended to limit "Dispute Items" to Categories [1] through [4], the contract would not have included Category [5] at all.

In this regard, the FDIC's contention (FDIC Opp. at 9) that Category [5] reflects a "narrow" arbitration clause cannot be squared with the case law. There is "no 'standard language' that is required for a clause to be broad." *Innerwireless, Inc. v. Johnson Controls, Inc.*, No. 3:07-CV-312-M, 2007 WL 2428591, at *3 (N.D. Tex. Aug. 27, 2007) (Lynn, J.). However, as we pointed out in our moving brief, "broad arbitration clauses govern[] disputes that 'relate to' or 'are connected with' the contract." TACG Mot. at 10 (citing *Pennzoil*, 139 F.2d at 1067); *accord Mar-Len of Louisiana, Inc. v. Parsons-Gilbane*, 773 F.2d 633, 636 (5th Cir. 1985)

---

Arbitration ("Consol. App.") at 0001 (Mitchell Dec. ¶ 1). FAB was a party to the transaction documents, but the FDIC does not mention FAB as such in its factual statement. (*See* FDIC Opp. at 3). The FDIC contends that "TAC is required to share" tax benefits, but that is not correct either. Both the Assistance Agreement and the Termination Agreement limit that obligation to being one of FAB. *See* Ex. A to Pet. App. at 32-39 (Termination Agreement, Art. VII) (referring to continuing obligations of AmWest). The FDIC contends that it had obligations to make assistance payments to TACG (FDIC Opp. at 4), but the Assistance Agreement specified that the payee was FAB, not TACG. FAB was a party to the Termination Agreement, but it is not mentioned as such in the FDIC's factual statement (p. 4), and the FDIC misdescribes (p. 4) the wording of the Termination Agreement's continuation of the tax-benefit sharing obligations, which were expressly limited to FAB. The FDIC glibly describes its position (p. 6) that TACG's stock basis was higher than it would have been without "special tax treatment," but nowhere mentions that "stock basis" was not a Tax Benefit Item at all under the contract and also neglects to mention that it dreamed up that position *after* TACG requested reimbursement of overpayments due to the Section 9(b)(4) dispute. *See* Mitchell Dec. Exs. E-H (Consol. App. at 0260-0321).

(clause covering "any dispute 'with respect to the interpretation or performance' of [the contract]" held to be broad). The FDIC ignores this controlling precedent, which fits Category [5] to a tee.[2]

    *Second*, the FDIC argues that the so-called "Arbitration Deadline Date" has passed. The FDIC misreads the contract. Section 6.2 requires arbitration of Dispute Items "arising under Article V" to be commenced by the "Arbitration Deadline Date." But not all Dispute Items arise under Article V. Categories [1] through [3], for example, arise under Article IV. The FDIC admits that disputes within those categories are arbitrable, and it is beyond doubt that they do not arise under Article V. Similarly, disputes within Category [5] may arise under any other Article. In contrast, Article V relates exclusively to a post-closing audit by the FDIC's Office of Inspector General ("OIG"). *See* Mitchell Dec. ¶¶ 20-22 (Consol. App. at 0007-0008). The FDIC had a special desire to resolve issues raised by the OIG with expedition. For that reason, Article V, unlike any other article, contained a provision requiring any unresolved "AmWest Dispute Item" arising under Article V (that is, the Article covering an OIG Post-Closing Audit) to be submitted to arbitration within a specified time schedule. *Id.* ¶ 21 (Consol. App. at 0007).

    *Third*, the FDIC contends that its inside counsel privately understood that the so-called "true up" subject matter of Categories [1] through [4] meant that the broader wording of Category [5] should be ignored. This contention conflicts with the plain wording of Category [5], which has no limiting language.

---

[2] The FDIC's cases (FDIC Opp. at 9) highlight the difference between this case and cases with "narrow" clauses. The clause in *Cummings v. FedEx Ground Package Systems, Inc.*, 404 F.3d 1258, 1260 (10th Cir. 2005), reads "each such disagreement (but no others) shall be settled by arbitration . . . ." The clauses in *Welborn Clinic v. Medquist, Inc.*, 301 F.3d 634, 639-40 (7th Cir. 2002), and *Twin City Monorail, Inc. v. Robbins & Myers, Inc.*, 728 F.2d 1069, 1073 (8th Cir. 1984), by their terms apply only to specific categories.

The FDIC's offer of parol evidence hurts its position.  Parol evidence is admissible only to resolve a contractual ambiguity,[3] but under the FAA, "ambiguities . . . [are] resolved in favor of arbitration." *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002) (ellipses in original); *see also In re Hornbeck Offshore (1984) Corp.*, 981 F.2d 752, 755 (5th Cir. 1993) ("'[W]henever the scope of an arbitration clause is fairly debatable or reasonably in doubt, the court should decide the question of construction in favor of arbitration.'  Moreover, '[t]he weight of this presumption is heavy.'") (citations omitted); *Neal v. Hardee's Food Sys. Inc.*, 918 F.2d 34, 37 (5th Cir. 1990) (arbitration must be compelled "unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue") (citations omitted).

In any case, parol evidence or not, the FDIC is bound by the contract's ordinary meaning, and cannot prevail on the basis of Mr. Fulton's private, contrary interpretation.  "A signatory to a contract is bound by its ordinary meaning even if he gave it an idiosyncratic one; private intent counts only if it is conveyed to the other party and shared.  You can't escape contractual obligation by signing with your fingers crossed behind your back, even if that clearly shows your intent *not* to be bound." *Robbins v. Lynch*, 836 F.2d 330, 332 (7th Cir. 1988) (internal citations omitted) (emphasis in original).

In addition, the FDIC's parol-evidence Declaration is undocumented.  The documents tell a different story from the parol-evidence Declaration.  To begin, the parol-evidence Declaration

---

[3] *Charlton v. Evanston Ins. Co.*, 502 F. Supp. 2d 553, 558 (W.D. Tex. 2007) (courts will not look to parol evidence to determine meaning of contract unless the contract is ambiguous); *see also Phoenix Network Tech. (Europe) Ltd. v. Neon Sys. Inc.*, 177 S.W. 3d 605, 615 (Tex. App. - Houston 2005) (citing *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W. 2d 154, 157 (1951) (when a contract is unambiguous, parol evidence not considered)).

ignores the way in which Category [5] entered the contract. The FDIC proposed Category [5] in

a draft dated February 8, 1996. Mitchell Dec. ¶ 18 & Ex. C (Consol. App. at 0006-0007, 0074-

0162). Category [5] was the only Category of "Dispute Items" that did not have an antecedent in

the earlier drafts. *Id.* Categories [1] through [3] arose from the arbitration clause proposed in an

October 17, 1994 draft. *Id.* Category [4] arose from the arbitration clause proposed in a

September 29, 1994 draft. *Id.* Each of these clauses covered only the specific Articles in which

they were proposed. But, in its February 8, 1996 draft, the FDIC proposed a stand-alone

Arbitration Clause, shifted the prior Dispute Items into the new stand-alone clause, and added

Category [5] to the list of "Dispute Items." *Id.* ¶¶ 12, 18 (Consol. App. at 0004, 0006-0008). If

the FDIC had wanted to limit arbitrable disputes to disputes arising under Categories [1] through

[4] (what Mr. Fulton now calls "true up" disputes), it would not have proposed an arbitration

clause that included Category [5]. The FDIC's inclusion of Category [5] in the contract

expanded the previously narrow proposed clauses to cover "any disputes regarding a party's

obligations under this Agreement."

   The FDIC's contention that it reserved rights to bring a lawsuit for disputes relating to the

parties' obligations under the Termination Agreement also runs counter to the exclusive remedy

clause, Section 6.3. This exclusive remedy clause entered the contract as a material departure

from an earlier provision that would have expressly *preserved* the parties' rights to go to court.

*See* Mitchell Dec. ¶¶ 9-15 (Consol. App. at 0003-0005). By omitting the earlier lawsuit-

preserving language and adding an exclusive remedy clause, the parties confirmed that

arbitration was the "exclusive remedy" for *any* Dispute Item, including one covered by Category

[5].

*Fourth*, the FDIC argues that the jurisdiction and venue provision, Section 13.4, would be meaningless if the Arbitration Clause were enforced as written. That, too, is nonsense. The jurisdiction and venue provision applies to lawsuits (like this one) to compel arbitration, it applies to lawsuits to confirm or vacate arbitration awards, and it would apply if the parties *both* agreed to forego their arbitral rights and seek plenary adjudication in the federal courts.

*Finally*, the FDIC argues that it had an unstated policy against arbitration and suggests that the Administrative Dispute Resolution Act of 1990 (the "ADR Act"), then codified at 5 U.S.C. § 572 *et seq.* (1990), supported that secret policy.[4] The FDIC misstates the law. The ADR Act *expanded*, rather than *limited*, the power of the FDIC to enter into arbitration clauses. Unlike many agencies, the FDIC's organic statute permits it to enter into contracts and to sue and be sued. 12 U.S.C. §§ 1819(a) (Third) and (Fourth). Even before 1990, the FDIC had used this power to enter into and enforce binding contracts, including contracts to arbitrate. *See FDIC v. Air Florida Sys., Inc.*, 822 F.2d 833 (9th Cir. 1987). In *College Boulevard National Bank v. Credit Systems Inc.*, No. 92-2051-EEO, 1994 WL 242670 (D. Kan., May 18, 1994), the FDIC made the same argument it makes here, contending that it was restricted to nonbinding arbitration under the 1990 ADR Act. *Id.* at *1. The Court disagreed. It held that the FDIC's arbitration contract did not relate to "administrative programs" covered by the ADR Act. *Id.* The Court further explained that it did "not know of any case holding that the FDIC is *only*

---

[4] The ADR Act of 1990 expired in 1995. Congress reinstituted the ADR Act in 1996 (calling it the Administrative Dispute Resolution Act of 1996), but did not include the provision allowing agency heads to vacate arbitration awards. 5 U.S.C.A. § 580 (1996); *see also* S. REP. NO. 104-245, at 2, 5-6 (1996).

authorized to arbitrate as provided in [The ADR Act of 1990]." *Id.* (emphasis in original). Our

research has found no such case either.[5]

---

[5] In addition, Congress passed the ADR Act as part of the Administrative Procedure Act, to "authorize and encourage Federal agencies to use alternative methods for the resolution of disputes regarding agency programs or requirements." H.R. REP. NO. 101-513, at 14 (1990). In other words, the ADR Act permitted agencies that perform adjudicative functions (for example the Social Security Administration) to make use of ADR procedures in performing that function. In that context, the ADR Act of 1990 authorized an agency head to vacate an arbitration award, just as agency heads exercise supervisory and appellate authority over agency ALJs. This authority was available only for the 30 days before the arbitration award became final, (5 U.S.C. § 580(c) (expired 1995); H.R. REP. NO 101-513, at 9, 17 (1990)), and did not apply to contracts entered into outside the ADR Act. *See Coll. Blvd Nat'l Bank,* 1994 WL 242670, at *1.

## CONCLUSION

Petitioner respectfully requests that this Court issue an order compelling the Respondent to submit the present dispute to arbitration.

Dated: January 8, 2008
　　　 Dallas, Texas

Respectfully submitted,

**DIAMOND MCCARTHY LLP**

By: _____
　　　 J. Benjamin King
　　　　 (Texas Bar No. 24046217)
　　　 Renaissance Tower
　　　 1201 Elm Street, 34th Floor
　　　 Dallas, TX 75270
　　　 (214) 389-5300
　　　 Fax: (214) 389-5399
　　　 Email: bking@diamondmccarthy.com

– and –

**ARNOLD & PORTER LLP**

By: _____
　　　 Kent A. Yalowitz
　　　　 (*Pro hac vice*)
　　　 399 Park Avenue
　　　 New York, NY 10022
　　　 (212) 715-1000

*Attorneys for Petitioner, The Adam*
*Corporation/Group*

- 9 -

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule 5.1(e) on January 8, 2008.  As such, this brief was served on all counsel who are deemed to have consented to electronic service pursuant to Local Rule 5.1(d).  All other counsel of record, if any, not deemed to have consented to electronic service will be served by facsimile transmission and/or U.S. First Class mail.

Andy Ryan

# EXHIBIT D

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE ADAM CORPORATION/GROUP, | § | |
| | § | |
| Petitioner/Plaintiff, | § | |
| | § | |
| AND | § | |
| | § | |
| CITIBANK, N.A., | § | |
| | § | |
| Nominal Petitioner/Nominal Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3-07-CV-1993-L |
| | § | |
| FEDERAL DEPOSIT INSURANCE | § | |
| CORPORATION, | § | |
| SOLELY IN ITS CAPACITY AS MANAGER | § | |
| OF THE | § | |
| FSLIC RESOLUTION FUND, | § | |
| | § | |
| Respondent/Defendant. | § | |

## THE FDIC'S REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404(a)

Timothy S. Durst
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, TX 75201-2980
Tel: (214) 953-6500
Fax: (214) 953-6503

Claire L. McGuire
Larry L. Goodman
Leslie A. Conover
Bruce C. Taylor
John A. Davidovich
Shane C. Kiernan
FEDERAL DEPOSIT
INSURANCE CORPORATION
3501 Fairfax Drive
Arlington, VA 22226

Kirk K. Van Tine
David A. Super
Samuel J. Waldon
Sheila J. Kadagathur
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Tel.: (202) 639-7700
Fax: (202) 639-7890

Attorneys for Federal Deposit Insurance Corporation

*In re Fireman's Fund Ins. Cos.*,
    588 F.2d 93 (5th Cir. 1979) ................................................................................5, 6

*Inland Bulk Transfer Co. v. Cummins Engine Co.*,
    332 F.3d 1007 (6th Cir. 2003) ...............................................................................5

*Liaw Su Teng v. Skaarup Shipping Corp.*,
    743 F.2d 1140 (5th Cir. 1984 ...............................................................................5, 6

*Mattel, Inc. v. Louis Marx & Co.*,
    353 F.2d 421 (2d Cir. 1965)....................................................................................9

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*,
    49 F.3d 323 (7th Cir. 1995) ....................................................................................5

*National Equipment Rental, Ltd. v. Szukhent*,
    375 U.S. 311 (1964)................................................................................................3

*Radzanower v. Touche Ross & Co*,
    426 U.S. 148 (1976)................................................................................................3

*Sea Spray Holdings, Ltd. v. Pali Financial Group, Inc.*,
    269 F. Supp. 2d 356 (S.D.N.Y. 2003)....................................................................5

*Shutte v. Armco Steel Corp.*,
    431 F.2d 22 (3d Cir. 1971)......................................................................................6

*Southland Mower Co., v. U.S. Consumer Product Safety Comm'n*,
    600 F.2d 12 (5th Cir. 1979) .................................................................................8, 9

*Stewart Org. Inc. v. Ricoh Corp.*,
    487 U.S. 22 (1988)..................................................................................................7

*Textile Unlimited, Inc. v. A.BMH and Co., Inc.*,
    240 F.3d 781 (9th Cir. 2001) ..................................................................................4

*Wolf Designs, Inc. v. Donald McEvoy Ltd., No. Civ. A.3:03-CV-2837-G*,
    2005 WL 827076 (N.D. Tex. April 6, 2005) .........................................................6

## STATUTES

Fed. R. Civ. P. 12(h) ........................................................................................................3

9 U.S.C. § 4 .............................................................................................................1, 3, 7

28 U.S.C. § 1404(a) .................................................................................................1, 2, 6, 7

The Federal Deposit Insurance Corporation, in its capacity as manager of the FSLIC Resolution Fund (the "FDIC"), respectfully submits this reply brief in further support of its motion to transfer this case to the U.S. District Court for the District of Columbia (the "DC District Court") pursuant to 28 U.S.C. § 1404(a).

## I. INTRODUCTION

As detailed in the FDIC's motion — and ignored by The Adam Corporation/Group ("TAC") — the parties and the federal judiciary are best served if only one Court, not two, addresses in a consolidated proceeding the arbitrability and merits of the respective claims by TAC and the FDIC under the Assistance Agreement and Termination Agreement. A consolidated proceeding would also ensure that related claims at issue are resolved consistently. The DC District Court, where *all* of the relevant claims are now pending, is the only judicial forum able to provide the desired efficiency and consistency. For that reason, this case should be transferred to the DC District Court pursuant to 28 U.S.C. § 1404(a).

TAC's efforts to construct barriers to achieving an efficient outcome through transfer are unavailing. TAC's claims — including its petition to compel arbitration — "might have been brought" in the DC District Court because the parties each expressly waived venue and jurisdictional objections to that Court prior to the commencement of litigation. The Fifth Circuit has expressly held that the venue language in Section 4 of the Federal Arbitration Act ("FAA") on which TAC relies can be waived or modified by contract, as it has been by the parties to this case. In any event, no court has held that the FAA venue language cannot be modified or waived by contract, as was done in the Termination Agreement.

Moreover, the FDIC's choice of the DC District Court is entitled to deference. Notwithstanding TAC's effort to avoid the "first-to-file" rule, the Fifth Circuit and this Court have applied the rule rigidly to cases submitted within minutes of one another. And, the

1

application of that rule is perfectly fair under the circumstances of this case — TAC agreed to a standstill agreement that, by definition, allowed *either party* to file suit in the Eastern time zone one hour earlier than they could file in the Central time zone. If TAC wanted to avoid that result, it could have insisted that the parties agree to a standstill to a particular time, *e.g.* 12:00 a.m. EST, rather than a particular day, such that filings could have been made in Dallas at precisely the same time (*e.g.*, 11:00 p.m. CST) as filings in the District of Columbia. Instead, the parties agreed to a standstill that allowed suit to be filed in the District of Columbia one hour earlier than it could be filed in Texas. Having struck that bargain, TAC should not be allowed to prejudice the FDIC by rewriting the agreement.

Finally, TAC's approach to this dispute requires the parties, witnesses and the judiciary to litigate related arbitrability and contract disputes in different forums simultaneously, when a single forum — the DC District Court — is able to decide all these issues efficiently and consistently in a single proceeding. TAC points to no legal authority that would support such an inefficient outcome, and common sense counsels that the parties and witnesses will be unduly inconvenienced if forced to double their efforts by litigating related claims in different forums. Because the DC District Court can address all of the pending disputes, and because the FDIC's choice of that forum is entitled to deference, this case, and the pending motion to compel arbitration, should be transferred to the DC District Court.

## II.  ARGUMENT AND AUTHORITIES

A.  TAC's Claims "Might Have Been Brought" In The DC District Court.

Although TAC did not rely on section 4 of the FAA to establish venue for its petition to compel arbitration or complaint in this matter, *see* Complaint ¶ 12 (alleging venue based on 28 U.S.C. §§1391(b) and (e)), it now contends that "a party commencing a proceeding in a federal court to compel arbitration must file its petition in the district where the arbitration is to be held."

2

TAC's Opposition to the FDIC's Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a)

("Opp.") at 3.  The Fifth Circuit and other courts, however, have recognized that the venue

provisions of section 4 of the FAA are not jurisdictional, and may be waived.  There is no

dispute that TAC and the FDIC waived any objections to venue in the DC District Court.

Accordingly, TAC's claims "might have been brought" in the DC District Court.

      1.     <u>Section 4 of the FAA does not establish a jurisdictional venue requirement.</u>

TAC relies on language in section 4 of the FAA — providing that "[t]he hearing and

proceedings, under such agreement [to arbitrate], shall be within the district in which the petition

for an order directing such arbitration is filed" — to argue that its petition to compel arbitration

could not have been filed in the DC District Court, and therefore this case cannot be transferred

to the DC District Court.[1]  However, TAC points to no authority suggesting that parties are

barred from contractually agreeing to a particular venue for resolving disputes as to the scope of

their arbitration agreement.  Any such holding would run counter to the well-settled rule that

venue provisions, even restrictive, statutory venue provisions, may be waived, *Radzanower v.*

*Touche Ross & Co.*, 426 U.S. 148, 149-50 (1976); Fed. R. Civ. P. 12(h), or modified in advance

by contract.  *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311 (1964).  *Cf. Carnival Cruise*

*Lines, Inc. v. Shute*, 499 U.S. 585, 593-94 (1991) ("[A] clause establishing ex ante the forum for

dispute resolution has the salutary effect of dispelling any confusion about where suits arising

from the contract must be brought and defended, sparing litigants the time and expense of

pretrial motions to determine the correct forum and conserving judicial resources that otherwise

would be devoted to deciding those motions.").

---

[1]  In fact, section 4 contains conflicting venue language, since it also provides that a petition to
compel arbitration may be made in "any United States district court which, save for such
agreement [to arbitrate], would have jurisdiction under Title 28."  9 U.S.C. § 4.

Consistent with these basic principles, the Fifth Circuit, and other circuit courts, have recognized that the venue provisions of section 4 of the FAA are not jurisdictional, and can be waived or modified through consent. *See Dupuy-Busching Gen. Agency, Inc. v. Ambassador Ins. Co.*, 524 F.2d 1275, 1276, 1278 (5th Cir. 1975); *City of Naples v. Prepakt Concrete Co.*, 490 F.2d 182 (5th Cir. 1974), *abrogated on other grounds by Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co.*, 529 U.S. 193 (2000); *see also Image Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044, 1054-55 (10th Cir. 2006); *Textile Unlimited, Inc. v. A..BMH & Co., Inc.*, 240 F.3d 781, 784 (9th Cir. 2001). In *Dupuy Busching*, the Fifth Circuit held that a district court may compel arbitration in the venue specified in the arbitration agreement, even though that venue is outside its own district. In that case, a defendant sought to compel arbitration in New Jersey of claims brought in a Mississippi court. According to the Fifth Circuit, the Mississippi district court had authority to compel arbitration in New Jersey in accordance with the parties' agreement because the plaintiff had waived any venue protections in section 4 by initiating suit in Mississippi. *Dupuy Busching*, 524 F.2d at 1277; *see also Image Software*, 459 F.3d at 1054-55 (holding that district court has authority to compel arbitration outside of its district where the parties have waived venue objections). Similarly, in *City of Naples*, the Fifth Circuit recognized that "Section 4's statement about the proper locale for an arbitration hearing compelled by a federal court is analogous to a venue provision, and thus is waivable." 490 F.2d at 184 (footnote omitted). The Court then held that a party had waived any section 4 venue protections by agreeing in "an arm's length commercial contract" to an arbitral process that allowed the AAA to specify the location of an arbitration hearing.

Whereas the Fifth Circuit has specifically held that the section 4 venue language is waivable, the cases cited by TAC do *not* hold that the venue provisions of section 4 are

4

jurisdictional, and thus not subject to contractual modification.[2] Quite the contrary, the Tenth

Circuit in *Image Software* expressly limited its decision in *Ansari* on the ground that the parties

in that case had not waived or modified venue. *Image Software*, 459 F.3d at 1054-55.

In sum, to the extent that section 4 of the FAA establishes a venue default rule requiring

that a petition to compel arbitration be filed in the district in which arbitration is sought, that

default rule has no application in this case because the FDIC and TAC agreed in "an arm's

length commercial contract" that the DC District Court could decide disputes over the scope of

their arbitration agreement, and compel arbitration in accordance with the parties' agreement.

2.   The parties have consented to venue for all disputes, including disputes as to
     the scope of their arbitration agreement, in the DC District Court.

When parties have agreed to resolve disputes in a specific venue (or venues), an action

"might have been brought" in that venue for purposes of a section 1404(a) transfer, even if a

specific statutory venue provision would otherwise preclude transfer. *In re Fireman's Fund Ins.*

*Cos.*, 588 F.2d 93, 94-95 (5th Cir. 1979); *see also Liaw Su Teng v. Skaarup Shipping Corp.*, 743

F.2d 1140, 1150 (5th Cir. 1984) (holding the Southern District of New York was a transferee

forum in which personal injury action might have been brought because the foreign defendant

"effectively consented to jurisdiction and venue in the transferee forum"), *overruled on other*

*grounds by In re Air Crash Disaster Near New Orleans, La. on July 9, 1982*, 821 F.2d 1147 (5th

---

[2]   *See Ansari v. Qwest Commc'ns Corp.*, 414 F.3d 1214, 1219 (10th Cir. 2005) (holding that
district court in Colorado lacked authority to compel arbitration in Colorado when parties'
agreement called for arbitration in Washington D.C., and did not specify venues for resolving
disputes as to arbitrability); *Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007,
1018 (6th Cir. 2003) (acknowledging in dicta, with no dispute from the parties, that a U.S. court
lacked power to compel arbitration between two U.S. parties in France); *Merrill Lynch, Pierce,*
*Fenner & Smith, Inc. v. Lauer*, 49 F.3d 323, 327-28 (7th Cir. 1995) (construing section 4 of the
FAA as preventing parties from obtaining an order for arbitration *in a location different than the*
*one agreed in an arbitration agreement*); *Sea Spray Holdings, Ltd. v. Pali Fin. Group, Inc.*, 269
F. Supp. 2d 356, 363 (S.D.N.Y. 2003) (staying litigation in New York after concluding that it
raised issues subject to an arbitration already pending in Utah).

Cir. 1987) (en banc).[3] Thus, in *Fireman's Fund*, the Fifth Circuit affirmed transfer of a case

pursuant to 28 U.S.C. § 1404(a) to a forum designated in a forum selection clause,

notwithstanding that a statutory venue provision in the Miller Act established exclusive venue in

the transferring court. *Fireman's Fund*, 588 F.2d at 95. According to the Court, the exclusive

venue provision "exists for the convenience of the parties," and "is subject to variation by their

agreement." *Id.* Because the parties had contractually agreed that a particular forum could hear

a class of disputes, that forum was one "where the action 'might have been brought' under 28

U.S.C. § 1404(a)." *Id.*[4]

The FDIC and TAC agreed in the Termination Agreement that the DC District Court was

available to resolve all disputes arising out of the Termination Agreement, including disputes as

to the scope of the arbitration provision. *See* Opp. at 5-6 (quoting Termination Agreement, §

13.4). And TAC acknowledges that section 13.4 "applies to lawsuits (like this one) to compel

arbitration . . . ." Petitioner's Reply Brief In Support of Its Motion to Compel Arbitration, at 8.

Just as the forum selection clause in *Fireman's Fund* modified the special venue provision of the

---

[3] To be sure, the plaintiff must have had the right to bring its original claim in the transferee forum *at the time of the commencement of the case*. *See* Opp. at 2-3 (citing *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 24 (3d Cir. 1971); *Ill. Union Ins. Co. v. Tri Core Inc.*, 191 F. Supp. 2d 794, 797 (N.D. Tex. 2002); *Wolf Designs, Inc. v. Donald McEvoy Ltd.*, No. Civ. A.3:03-CV-2837-G, 2005 WL 827076, at *2 (N.D. Tex. Apr. 6, 2005)). This rule was developed by the Supreme Court in *Hoffman v. Blaski*, 363 U.S. 335, 342-44 (1960), where the Court expressed concern that defendants could force litigation in forums not available to plaintiffs at the time a suit is commenced by consenting to transfers after suit was filed. *Id.* at 343. But that concern is not present when, as in this case, the parties consented to jurisdiction and venue in the transferee court *prior to the commencement of litigation*. *See Liaw Su Teng*, 643 F.2d at 1150.

[4] Contrary to TAC's suggestion, the Fifth Circuit's decision in *Harris County, Tex. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 319-320 (5th Cir. 1999), does not hold otherwise. In that case, CarMax appealed from a preliminary injunction granted in favor of Harris County. CarMax argued, among other issues, that the district court should not have exercised jurisdiction over the case because of related litigation pending in another federal court. Unlike this case, however, Harris County and CarMax had not agreed contractually that the transferee forum was appropriate for resolving their disputes.

Miller Act, the parties' selection of the DC District Court as a permissible forum for deciding disputes under the Termination Agreement modified the venue language in Section 4. *See id.* Accordingly, TAC's action "might have been brought" in the DC District Court.

Ironically, TAC argues that the venue provision in the Termination Agreement precludes the FDIC from seeking a transfer. Opp. at 5-6. TAC is wrong. The authorities on which it relies do not involve (i) a forum selection clause that *permits venue in two federal courts*, and (ii) a motion to consolidate related proceedings in one of the contractually agreed-upon forums.[5] TAC's reading of the venue provision to bar any motions to transfer effectively requires piecemeal litigation of related claims filed by TAC and the FDIC. That reasoning lacks both logic and legal footing, and does not reflect the parties' intent. Because the law favors consolidation of related cases, this case should be transferred to the DC District Court.

B.    The FDIC's Choice Of The DC District Court Is Entitled To Deference.

TAC argues that the FDIC's application of the first-to-file rule is "misplaced" and "meritless" because (i) the FDIC allegedly "does not mention" that TAC and the FDIC had executed a written standstill agreement which stipulated that neither party would commence legal proceedings through and including November 29, 2007, and (ii) the first-to-file rule does not apply when two cases are filed as closely in time as the filings in this case. Opp. at 6. TAC is wrong on both counts.

---

[5]  *See, e.g., Boccard USA Corp. v. TigPro, Inc.*, No. H-07-0177, 2007 WL 1894154, at *5-8 (S.D. Tex. July 2, 2007) (recognizing in the context of a motion to exercise Colorado River abstention in favor of a pending state court proceeding that party seeking abstention had waived challenge to the inconvenience of the federal forum by contractually selecting the federal forum); *Am. Airlines, Inc. v. Rogerson ATS*, 952 F. Supp 377, 384 n.11 (N.D. Tex. 1996) (refusing to allow party to seek transfer to a forum not permitted by forum selection clause). At any rate, the Supreme Court has held that even when a requested transfer is inconsistent with a valid forum selection clause (which the transfer sought by the FDIC is not), the forum-selection clause should not receive "dispositive consideration" under Section 1404(a). *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29-31 (1988).

1.   The negotiated standstill agreement permitted the FDIC to file in the DC District Court before TAC could file in this Court.

TAC accuses the FDIC of "omit[ing] a critical fact" that the standstill agreement prevented the parties from filing suit prior to November 29, 2007. Opp. at 6. That is false. The FDIC's motion describes fully the circumstances that led to the FDIC's filing on November 30, 2007, including reference to the standstill agreement between the parties. *See* Memorandum of Law in Support of the FDIC's Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) ("Transfer Memo"), at 6.

More importantly, by its terms, the standstill agreement expressly permitted the FDIC (or TAC for that matter) to file suit in the DC District Court one hour before a suit could be filed by either party in this Court. Had TAC wanted the right to file suit in this Court at the same time that a filing was permitted in the DC District Court, then TAC could have attempted to negotiate for that right, by providing that the standstill agreement expired at 12:00 am Eastern standard time on November 30, 2007.[6] Such language would have permitted simultaneous filings in both this Court and the District of Columbia. However, TAC did not request such language, the FDIC certainly did not agree to it, and no such language is contained in the standstill agreement. Rather, the FDIC and TAC agreed to standstill terms that allowed either party to file in the DC District Court one hour before any filings were permissible in this district.

2.   The first- to-file rule applies to cases filed in close proximity to one another.

Contrary to TAC's assertions, the Fifth Circuit and this Court apply the first-to-file rule even when the two cases at issue were filed almost simultaneously. *See, e.g., Southland Mower*

---

[6] For example, federal agencies promulgate regulations at 12:00 p.m. Eastern standard time so that petitions for review of the regulations, which may be filed 60 days from promulgation, may be filed simultaneously in courts of appeal in different time zones. *See, e.g., Formaldehyde Inst., Inc. v. U.S. Consumer Safety Comm'n,* 681 F.2d 255 (5th Cir. 1982); *Southland Mower Co., v. U.S. Consumer Prod. Safety Comm'n,* 600 F.2d 12, 13-14 (5th Cir. 1979).

*Co.*, 600 F.2d at 13-14; *Eastman Med. Prods., Inc. v. E.R. Squibb & Sons, Inc.*, 199 F. Supp. 2d 590, 595 (N.D. Tex 2002) (Lynn, J.). In fact, this Court has explicitly rejected TAC's argument, stressing that a mechanical application of the first-to-file rule furthers comity between courts:

> Squibb tacitly argues that, because the two cases were filed "almost simultaneously," the "first to file" rule is less important. The case law does not support this view. This Court, because it sits within the "first filed" venue, denies Respondent's Motion to stay or dismiss the action in deference to the New Jersey action. There must be uniformity in actions involving equivalent counterparts. Although the "first to file" rule is pedestrian, its simplicity furthers comity between courts and should not be casually ignored.

*Eastman*, 199 F. Supp. 2d at 595 (footnote omitted). Thus, in *Southland Mower*, the Fifth Circuit treated a petition filed in New Orleans at 11:00 a.m. Central standard time as first filed over a petition filed in the District of Columbia at 12:01 Eastern standard time because it "was time stamped one minute before" the D.C. filing. *Southland Mower Co.*, 600 F.2d at 13-14. The FDIC filed its complaint in the DC District Court 59 minutes before TAC filed its complaint in this Court.

Moreover, TAC does not dispute that the FDIC's action in the DC District Court is the only one that permits a consolidated, consistent resolution of all claims between the FDIC and TAC arising out of the Assistance and Termination Agreements. *See Mattel, Inc. v. Louis Marx & Co.*, 353 F.2d 421, 424 (2d Cir. 1965) (directing transfer of second proceedings to court in which dispute was first filed, and "which, by amendment of the complaint did raise all the substantial issues between the parties."). Instead, TAC insists, without legal authority, that the two related cases should proceed independently of one another.

Finally, TAC describes the notion that the FDIC is the "natural plaintiff" in this dispute as "frivolous," asserting that TAC brought this action to enforce rights under the FAA to compel arbitration. Opp. at 16. However, the "dispute" is broader than the claims TAC brought in this

Court. In the context of the *overall* dispute, TAC concedes that the value of the FDIC's claim exceeds TAC's claim by a factor of four. Nor is it true, as TAC states conclusorily, that if TAC prevails on its claims under the Assistance Agreement, "it will also prevail on the FDIC's $165 million claim." Opp. at 17. The contract claims are related, but independent.[7]

**C.**    The Private And Public Interests Favor A Single Proceeding in the DC District Court.

TAC's approach to resolving the parties' respective claims under the Termination and Assistance Agreements would require the parties, witnesses and judiciary to duplicate their efforts in different courts and different jurisdictions. The bifurcated process demanded by TAC will be more burdensome on the parties, judiciary and witnesses alike than a consolidated proceeding because it will virtually double the efforts of all concerned. TAC points to no authority that calls for, or would support, bifurcation of related claims. Nor, for that matter, does TAC offer any response to the authorities cited by the FDIC that consistently call for consolidation of related cases in a single forum. *See* Transfer Memo at 15-16. Because the DC District Court is the only court currently able to resolve all claims arising between the FDIC and TAC, the private and public interests favor transfer of this case to that forum.[8]

### III.    CONCLUSION

For the foregoing reasons, the FDIC's motion to transfer should be granted.

---

[7] Nor is it true that "there will be nothing for either this Court or the District of Columbia Court to do" if this Court grants the petition to compel arbitration. This Court has not been asked to determine the arbitrability of the FDIC's claims pending in the DC District Court, and that Court will need to address the arbitrability of those claims independently.

[8] Even if the resolution of this motion presented a choice between consolidated proceedings in this Court or the DC District Court (which it does not), the DC District Court is more convenient to the parties and witnesses for all the reasons stated in the Transfer Memo. But the choice TAC presents is between bifurcated proceedings and consolidated proceedings. There can be no doubt that the parties, witnesses and public will benefit from consolidation. Nor do any of the case statistics cited by either party suggest that a consolidated resolution of the related claims in the DC District Court would be inconvenient. Certainly, a consolidated case in the DC District Court would be more efficient than piecemeal proceedings.

Dated:  January 18, 2008

Respectfully submitted,


/s/ Timothy S. Durst
Timothy S. Durst
State Bar No. 00786924
Email:  tim.durst@bakerbotts.com
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, TX  75201-2980
Tel:  (214) 953-6500
Fax:  (214) 953-6503

Claire L. McGuire
Larry L. Goodman
Leslie A. Conover
Bruce C. Taylor
John A. Davidovich
Shane C. Kiernan
FEDERAL DEPOSIT
INSURANCE CORPORATION
3501 Fairfax Drive
Arlington, VA 22226
Tel:  (703) 562-2390
Fax: (703) 562-2481

Kirk K. Van Tine
David A. Super
Samuel J. Waldon
Sheila J. Kadagathur
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Tel.:  (202) 639-7700
Fax:  (202) 639-7890

Attorneys for Federal Deposit Insurance Corporation

## CERTIFICATE OF SERVICE

The undersigned certifies that the FDIC's Reply Brief in Further Support of Its Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) was filed electronically in compliance with Local Rule 5.1(e) on January 18, 2008. As such, the brief was served on all counsel who are deemed to have consented to electronic service pursuant to Local Rule 5.1(d). All other counsel of record not deemed to have consented to electronic service will be served by facsimile transmission and/or U.S. First Class mail.

                        /s/ Timothy S. Durst

                        Timothy S. Durst