# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE ADAM CORPORATION/GROUP,
 1111 Briarcrest Drive, Suite 300
 Bryan, Texas 77802,

          Petitioner/Plaintiff,

— AND —

CITIBANK, N.A.,
 399 Park Avenue
 New York, New York 10022,

     Nominal Petitioner/Nominal Plaintiff,

— AGAINST —

FEDERAL DEPOSIT INSURANCE
CORPORATION, SOLELY IN ITS CAPACITY AS
MANAGER OF THE FSLIC RESOLUTION
FUND,
 550 17th Street, N.W.
 Washington, D.C. 20429,

       Respondent/Defendant.

1:08-cv-00753 (RMU)

---

## REPLY MEMORANDUM IN FURTHER SUPPORT OF RENEWED MOTION TO COMPEL ARBITRATION, OR, IN THE ALTERNATIVE, TO RETURN THIS CASE TO THE DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS

June 3, 2008

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES. ........................................................................................ iii

I.    This Dispute Is Plainly Arbitrable Under The Parties' Agreement...................................... 1

    A.    The FDIC Cannot Run Away From Its Introduction Of Parol Evidence................ 2

    B.    The FDIC's Renewed Arguments Are Frivolous...................................................... 3

        1.    The Termination Agreement Contains A Broad Arbitration Clause .......... 3

        2.    There Is No Deadline For Disputes Arising Under Category [5] ............... 6

        3.    The Venue Clause Does Not Block Arbitration ......................................... 6

    C.    The FDIC's New Argument Cannot Be Reconciled With The Contract Or Cases ................................................................................................................ 7

II.    The FDIC's "Background" Section Deliberately Misstates The Relevant Facts .............. 11

III.    In the Alternative, the Consolidated Case Should Be Transferred To The Northern District Of Texas .......................................................................................... 13

    A.    The Transfer Order Does Not Bind this Court With Respect To TACG's Motion To Transfer Under 28 U.S.C. § 1404(a) .................................. 14

    B.    The Parties Have Not Waived Consideration Of Equitable Factors Under § 1404(a) .................................................................................................. 16

    C.    The Equitable Factors Favor Transfer.................................................................. 18

        1.    The FDIC's Choice Of Forum Is Not Entitled To Special Deference...... 18

        2.    The Private Interest Factors Favor Transfer ............................................ 20

        3.    The Public Interest Factors Favor Transfer ............................................. 21

CONCLUSION.................................................................................................................. 23

# TABLE OF AUTHORITIES

## CASES

*ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455 (10th Cir. 1995)................................9

*\*AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643 (1986) .........10

*American Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88
    (4th Cir. 1996)....................................................................................... 3-4, 9

*Avue Technologies Corp. v. DCI Group, L.L.C.*, Civ. Action No. 06-327(JDB), 2006 WL
    1147662 (D.D.C. Apr. 28, 2006) ..........................................................4

*Bouchet v. National Urban League, Inc.*, 730 F.2d 799 (D.C. Cir. 1984) .....................14

*\*Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599 (5th Cir. 1999) ......................15

*Cell Genesys, Inc. v. Applied Research Systems ARS Holdings*, Civ. Action No. 04-
    1407(JDB), 2005 WL 1041098 (D.D.C. Jan. 18, 2005) ........................................19

*Centocor, Inc. v. MedImmune, Inc.*, No. C 02-03252 CRB, 2002 WL 31465299
    (N.D. Cal. Oct. 22, 2002) ...................................................................16

*Christacos v. Blackie's House of Beef, Inc.*, 583 A.2d 191 (D.C. 1990) ........................2

*Cummings v. FedEx Ground Package System, Inc.*, 404 F.3d 1258 (10th Cir. 2005).....................5

*Greene v. Rumsfeld*, 266 F. Supp. 2d 125 (D.D.C. 2003)..............................................2

*Gundle Lining Constr. Corp. v. Fireman's Fund Ins. Co.*, 844 F. Supp. 1163
    (S.D. Tex. 1994)..............................................................................22

*Howell v. District of Columbia*, 522 F. Supp. 2d 57 (D.D.C. 2007).................................8

*Innerwireless, Inc. v. Johnson Controls, Inc.*, No. 3:07-CV-312-M, 2007 WL 2428591
    (N.D. Tex. Aug. 27, 2007) ..................................................................4

*Intervet, Inc. v. Merial Ltd.*, 553 F. Supp. 2d 112 (D.D.C. 2008)..................................18

*\*J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315 (4th Cir. 1988)...............4, 8

*Kreisner v. Hilton Hotel Corp.*, 468 F. Supp. 176 (E.D.N.Y. 1979) ...............................21

*Leroy v. Great Western United Corp.*, 443 U.S. 173 (1979) ........................................22

*Local 827, International Brotherhood of Electrical Workers v. Verizon N.J., Inc.*,
458 F.3d 305 (3d Cir. 2006)......................................................................................5

*Luckett v. Peco Foods, Inc.*, No. 3:07cv85-KS-MTP, 2008 WL 534760
(S.D. Miss. Feb. 22, 2008) ......................................................................................15

*Mann Manufacturing, Inc. v. Hortex, Inc.*, 439 F.2d 403 (5th Cir. 1971) ......................15

*Marra v. Papandreou*, 216 F.3d 1119 (D.C. Cir. 2000) ...................................................18

*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995)................................2

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1 (1983) ........4, 20

*Neal v. Hardee's Food Systems Inc.*, 918 F.2d 34 (5th Cir. 1990)....................................9

*Nelson v. Insignia/ESG, Inc.*, 215 F. Supp. 2d 143 (D.D.C. 2002)....................................1

*Northwestern National Insurance Co. v. Donovan*, 916 F.2d 372 (7th Cir. 1990)........................18

*Ontel Products, Inc. v. Project Strategies Corp.*, 899 F. Supp. 1144 (S.D.N.Y. 1995)................19

*Onyeneho v. Allstate Insurance Co.*, 466 F. Supp. 2d 1 (D.D.C. 2006) ........................................21

*Pennzoil Exploration & Production Co. v. Ramco Energy Ltd.*, 139 F.3d 1061
(5th Cir. 1998)......................................................................................................3, 8

*Sacks v. Rothberg*, 569 A.2d 150 (D.C. 1990)..................................................................7

*Schmidt v. American Institute of Physics*, 322 F. Supp. 2d 28 (D.D.C. 2004)............................21

*Seeberger Enterprises, Inc. v. Mike Thompson Recreational Vehicles, Inc.*, 502 F. Supp.
2d 531 (W.D. Tex. 2007) ......................................................................................22

*Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988) ...........................................17-18

*Sutter Corp. v. P & P Indus., Inc.*, 125 F.3d 914 (5th Cir. 1997) ..............................................15

*Texas Instruments Inc. v. Micron Semiconductor, Inc.*, 815 F. Supp. 994 (E.D. Tex. 1993) ........15

*The Rice Company (Suisse), S.A. v. Precious Flowers Ltd.*, 523 F.3d 528 (5th Cir. 2008).............5

*Tillery v. District of Columbia Contract Appeals Board*, 912 A.2d 1169 (D.C. 2006)...................7

*Transitional Learning Community at Galveston, Inc. v. United States Office of Personnel
Management*, 220 F.3d 427 (5th Cir. 2000)..............................................................8

*Twin City Monorail, Inc. v. Robbins & Myers, Inc.*, 728 F.2d 1069 (8th Cir. 1984)........................5

\**United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960) ........10

*Welborn Clinic v. Medquist, Inc.*, 301 F.3d 634 (7th Cir. 2002) ......................................................5

\**Wolff v. Westwood Management, LLC*, 503 F. Supp. 2d 274 (D.D.C. 2007) ..................................3

## STATUTES

9 U.S.C. § 4.................................................................................................................................7, 14

9 U.S.C. § 9....................................................................................................................................6, 7

28 U.S.C. § 1404(a) ................................................................................................................ *passim*

In Point I, below, we demonstrate that the Court should send this dispute to arbitration. Point II corrects certain factual misstatements by the FDIC. Point III demonstrates that, in the absence of an order compelling arbitration in Dallas, the Court should return this case to Texas.

## I.    This Dispute Is Plainly Arbitrable Under The Parties' Agreement

The FDIC has conceded the existence of a valid and enforceable arbitration agreement. Opp. at 3-4. Thus the only question is whether "the arbitration agreement encompasses the claims raised in the complaint." *Nelson v. Insignia/ESG, Inc.*, 215 F. Supp. 2d 143, 149-50 (D.D.C. 2002). It does.

In our opening brief, we showed that this dispute relates to Section 9 of the Assistance Agreement, *as that provision was continued and modified by the Termination Agreement. See* TACG Mem. at 7-8. We also showed that such a dispute falls within Category [5] of the Termination Agreement's arbitration clause:

> In the event that any dispute arises between or among any of the parties hereto **relating to** [1] any Covered Asset Purchase SRA Report Exceptions, [2] Post-Closing Expense Items, [3] Post-Closing Receipt Items, [4] AmWest Dispute Items, or [5] **any disputes regarding a party's obligations under this Agreement** (collectively, a "Dispute Item"), which AmWest and the FDIC Manager are unable to amicably resolve, then either party may submit each specific unresolved Dispute Item to arbitration pursuant to the provisions of this Section 6.1.

Term. Agr. § 6.1 (emphasis supplied). We showed that the contract calls for arbitration as the "exclusive remedy" and the "sole dispute resolution process." *Id.* §§ 6.1, 6.3. And we pointed out the natural and logical consequence of the FDIC's voluntary introduction in Texas of parol evidence—that the FDIC's *best case* is an argument that the contract is ambiguous, and that ambiguities are resolved in favor of arbitration.

- 1 -

The FDIC has a multitude of responses. *First*, it tries to run away from its earlier assertion of contract ambiguity. *Second*, it renews three frivolous arguments it made in Texas—that the clause here is "narrow," that the deadline for arbitration has passed, and that a venue clause blocks arbitration. *Third*, the FDIC raises a new argument—that the arbitration clause applies only to disputes relating to obligations "created by" the Termination Agreement. These arguments are all meritless.

**A.     The FDIC Cannot Run Away From Its Introduction Of Parol Evidence**

In Texas, the FDIC submitted parol evidence in the form of a declaration of its employee, Charles Fulton, to buttress its contention that Mr. Fulton's idiosyncratic understanding of the arbitration clause could trump the contract's plain language. Now, faced with the natural and logical consequences of its argument, the FDIC has changed its tune.

The FDIC argued in Texas that the Fulton Declaration illustrated its purported intent when it signed the Termination Agreement. *See* FDIC's Opposition to Motion to Compel Arbitration at 15 ("As the Fulton Declaration confirms, the arbitration provision of the Termination Agreement was not **intended** to apply to disputes over tax benefit sharing under Section 9.") (emphasis supplied). Of course, "[e]xtrinsic evidence of the parties' subjective intent may be resorted to only if the document is ambiguous." *Greene v. Rumsfeld*, 266 F. Supp. 2d 125, 136 n.9 (D.D.C. 2003) (Urbina, J.) (citing *Christacos v. Blackie's House of Beef, Inc.*, 583 A.2d 191, 194 (D.C. 1990)). Now, realizing that "ambiguities as to the scope of the arbitration clause itself [are] resolved in favor of arbitration," *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995) (citation omitted), the FDIC attempts to back-pedal from its own introduction of parol evidence.

The parol evidence is extremely damaging to the FDIC's case. It shows that the parties **began** with a draft of a contract that contained a narrow arbitration clause and that FDIC itself proposed inclusion of Category [5] in a new, stand-alone arbitration clause, which expanded the scope of arbitration to "any disputes regarding a party's obligations under this Agreement." *See* Mitchell Dec. ¶¶ 12, 18 & Ex. C. If the FDIC secretly intended to limit arbitrable disputes—as Mr. Fulton's Declaration contends—it would not have proposed and agreed to a stand-alone arbitration clause including Category [5]. *See Wolff v. Westwood Mgmt., LLC*, 503 F. Supp. 2d 274, 282-83 (D.D.C. 2007) (refusing to limit arbitration clause where "[t]he parties could have expressly limited the reach of the agreement but did not.").

The FDIC's introduction of the Fulton Declaration functioned as a judicial admission. The FDIC opened the door to parol evidence because it understood that without such evidence, the plain wording of the contract requires arbitration. It turns out that the Fulton Declaration cannot be reconciled with the documentary evidence of the contract's drafting history, and that the FDIC now wishes to abandon the Fulton Declaration. But the fact remains that the FDIC's *best* argument is for contractual ambiguity. And ambiguity requires arbitration.

## B. The FDIC's Renewed Arguments Are Frivolous

The FDIC renews three arguments against arbitration that are disingenuous at best.

### 1. The Termination Agreement Contains A Broad Arbitration Clause

Disputes "related to" the Termination Agreement fall within the arbitration clause. This is language characteristic of a broad arbitration clause. *See* TACG Mem. at 7 n.5 (citing *Pennzoil Exploration & Prod. Co. v. Ramco Energy, Ltd.*, 139 F.3d 1061, 1067-68 (5th Cir. 1998) ("related to")); *accord Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96

F.3d 88, 90, 93-94 (4th Cir. 1996) ("related to"); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988) ("in connection with").

In arguing that the clause must be construed "narrowly," the FDIC proposes that if the parties had wanted a broad arbitration clause, they would have agreed on the "classic broad arbitration language . . . '[a]ny controversy or claim arising out of or relating to this contract.'" Opp. at 11 (quoting the AAA Commercial Arbitration Rules). The distinction between the FDIC's proposal and the language of Category [5] is the addition of the phrase, "arising out of." But the words "arising out of" are not needed to make an arbitration clause "broad." *See* TACG Mem. at 6 (citing cases); *accord Avue Tech. Corp. v. DCI Group, L.L.C.*, Civil Action No. 06-327(JDB), 2006 WL 1147662, *1 (D.D.C. Apr. 28, 2006) (the clause "[a]ny claim, dispute, controversy or other matter in question with regard to this Agreement shall exclusively be subject to final binding arbitration" is a "broad, but standard, arbitration clause.").[1] Moreover, any difference is immaterial given the Supreme Court's oft-repeated admonition that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

The FDIC also argues that the parties were "well aware that disputes that would likely arise as a result of the tax benefit sharing [obligations arising out of Section 9 of the Assistance Agreement] . . . were subject to judicial resolution mechanisms," and that if the parties had intended to change the dispute resolution mechanism, they would have done so. Opp. at 3. The

---

[1] As set forth at page 6 of TACG's Memorandum, there is no talismanic language that constitutes a broad, as opposed to narrow, arbitration clause. *See also Innerwireless, Inc. v. Johnson Controls, Inc.*, No. 3:07-CV-312-M, 2007 WL 2428591, *3 (N.D. Tex. Aug. 27, 2007) ("there is no 'standard language' that is required for a[n] [arbitration] clause to be interpreted as broad."). Here, the parties included the phrases "any dispute," "relating to" and "regarding a party's obligations under this Agreement," evidencing their intent to formulate a broad arbitration clause.

fact is that the parties *did* change their dispute resolution mechanism. The Assistance Agreement does not contain an arbitration clause. Only later did the parties execute the Termination Agreement, which specifically continued (and modified and clarified) the parties' obligations under Section 9 of the Assistance Agreement (Term. Agr. §§ 7.2(b) & 7.2(b)(i)-(ix)) and added an arbitration clause encompassing "any dispute . . . relating to . . . any disputes regarding a party's obligations under this Agreement" (*id.* § 6.1). Thus, a plain reading of the two contracts demonstrates that the parties changed their dispute resolution process from litigation to arbitration.

Finally, the FDIC's citation of "supporting" case law is baffling (Opp. at 9-10 and n.3), since those cases support TACG's argument. The FDIC's authorities highlight the difference between the Termination Agreement's arbitration clause and a true "narrow" arbitration clause. For instance, as the FDIC's own explication of *The Rice Co. (Suisse), S.A. v. Precious Flowers Ltd.*, 523 F.3d 528, 536 (5th Cir. 2008), concedes, that Court found the arbitration clause to be narrow because "it did not relate to any and all disputes arising out of the contract." Opp. at 9-10 n.3 (emphasis supplied). Likewise, *Local 827, Int'l Bhd. of Elec. Workers v. Verizon N.J., Inc.*, 458 F.3d 305, 311 (3d Cir. 2006), held that the arbitration clause was narrow because it provided "[o]nly matters specifically subject to arbitration in [specific provisions of the Agreement] *shall be arbitrated*." *Id.* at 307, 311 (emphasis by court). Similarly, the clause in *Cummings v. FedEx Ground Package Sys., Inc.*, 404 F.3d 1258, 1260 (10th Cir. 2005), reads "each such disagreement (but no others) shall be settled by arbitration." Likewise, the clauses at issue in *Welborn Clinic v. Medquist, Inc.*, 301 F.3d 634, 639-40 (7th Cir. 2002), and *Twin City Monorail, Inc. v. Robbins & Myers, Inc.*, 728 F.2d 1069, 1073 (8th Cir. 1984), by their terms apply only to specific categories of disputes. Thus, the FDIC's cases merely support the inapposite proposition that

- 5 -

arbitration clauses limited to specific dispute items are narrow. Since the Termination

Agreement's Category [5] contains no limiting language, it is a broad arbitration clause

applicable to this dispute.

### 2.    There Is No Deadline For Disputes Arising Under Category [5]

The FDIC attempts to mislead the Court by raising the specter of an "Arbitration

Deadline Date." The operative language states, "failure to submit any unresolved Dispute Item

**arising under Article V** to arbitration before the expiration of the Arbitration Deadline Date

shall be deemed a waiver of both parties' right to dispute such non-submitted Dispute Item."

Term. Agr. § 6.1 (emphasis supplied).

As the Termination Agreement's terms make clear (and as the FDIC is well aware),

TACG's claim does not arise under Article V of the Termination Agreement, so the Arbitration

Deadline Date does not apply. Indeed, the FDIC neglects to advise the Court that only Category

[4] claims are subject to the Arbitration Deadline Date. The parties' election to impose a

deadline on disputes arising under Article V only demonstrates that they did not intend to impose

such a deadline on disputes arising under other Articles.

### 3.    The Venue Clause Does Not Block Arbitration

The FDIC suggests that the Termination Agreement's arbitration clause is at odds with its

venue clause, Section 13.4. Section 13.4 applies to actions to compel arbitration and to confirm

the arbitration award. *See* 9 U.S.C. § 9 (actions to confirm arbitration award may be commenced

in a court "specified" in the contract).[2] The FDIC contends that TACG cannot reasonably

---

[2] It would also apply if the parties chose to waive their arbitral rights and seek adjudication of their dispute in federal court. The FDIC counters that such a waiver is precluded by the "exclusive remedy" provision prohibiting the parties from litigating otherwise arbitrable disputes. Opp. at 15. It goes without saying that the parties' waiver of arbitral rights would necessarily waive their rights under the "exclusive remedy" provision, as well.

believe that Section 13.4 applies to TACG's filing its Petition to Compel Arbitration in the

Northern District of Texas because Section 13.4 allows for such a suit to proceed in the District

of Columbia, as well as Texas. Opp. 14-15. The FDIC's opposition simply ignores the statutory

text (9 U.S.C. § 9) allowing the parties to "specify" a court for an action to confirm an award.

Moreover, the FDIC's premise is flawed. TACG recognized that—notwithstanding the venue

clause permitting litigation in the District of Columbia—cases interpreting Section 4 of the FAA

have limited parties' ability to choose venue outside the district in which the arbitration is to take

place. *See* TACG Mem. 10-12. TACG chose the Northern District of Texas to be safe, because

there is absolutely no doubt that that Court has jurisdiction to order the parties to participate in

arbitration in Dallas, Texas—the location required by the contract. The venue clause does not

conflict with arbitration—it complements it.

### C.    The FDIC's New Argument Cannot Be Reconciled With The Contract Or Cases

The FDIC argues that Category [5] is limited to disputes relating to obligations "created

by" the Termination Agreement. This new argument, not made in opposition to arbitration in

Texas, is meritless.

The word "created" is not used in Category [5]. The arbitration clause nowhere indicates

that it should be understood to be limited such that arbitration is available only for disputes

arising out of obligations "created" by the Termination Agreement. Even Mr. Fulton made no

such argument in his parol evidence Declaration. The FDIC is therefore asking the Court to

invent a limitation for the arbitration clause, rather than interpret the contract by "giving the

language used its plain meaning." *See Tillery v. Dist. of Columbia Contract Appeals Bd.*, 912

A.2d 1169, 1176 (D.C. 2006) (citing *Sacks v. Rothberg*, 569 A.2d 150, 154 (D.C. 1990); *accord*

*Transitional Learning Comm. at Galveston, Inc. v. United States Office of Pers. Mgmt.*, 220 F.3d 427, 431 (5th Cir. 2000) (Parties' intent is foremost determined by plain language of agreement "such that the language is given its generally accepted meaning if there is one."). As this Court has stated, "[a] court must honor the intentions of the parties as reflected in the settled usage of the terms they accepted in the contract . . . and will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." *Howell v. Dist. of Columbia*, 522 F. Supp. 2d 57, 63 (D.D.C. 2007) (Urbina, J.) (quotation omitted) (ellipses supplied by Court); *Tillery*, 912 A.2d at 1177 ("[A] contract is not ambiguous merely because the parties disagree over its meaning, and courts are enjoined not to create an ambiguity where none exists.") (quotation omitted).

Where parties enter into multiple agreements only one of which contains an arbitration provision, the language "relating to" encompasses disputes arising out of any aspect of the parties' entire contractual relationship, including the agreements without arbitration provisions. For instance, when faced with a distribution agreement containing an arbitration clause similar to the Termination Agreement's ("[a]ll disputes arising in connection with the present contract"), the Fourth Circuit found that language "[did] not limit arbitration to the literal interpretation or performance of the [distribution agreement]." *J.J. Ryan & Sons, Inc.*, 863 F.2d at 321. Rather, the arbitration clause "embrace[d] every dispute between the parties having a significant relationship to the contract regardless of the label attached to the dispute," including disputes arising out of the parties' other contracts without arbitration provisions. *Id.*

Similarly, in *Pennzoil*, the parties had a series of related contracts—some with arbitration clauses, some without. The disputed contract did not contain an arbitration clause, but the parties' joint operating agreement ("JOA") did, covering "'any' dispute arising out of 'or in

relation to' or 'in connection with' the JOA." *Pennzoil*, 139 F.3d at 1068. The Court held that the dispute was arbitrable, stating, "it is not necessary that the dispute arise out of the JOA to be arbitrable—but only that the dispute 'relate to' or be 'connected with' the JOA . . . . With such a broad arbitration clause, it is only necessary that the dispute 'touch' matters covered by the JOA to be arbitrable." *Id.* (citations omitted). *Accord ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1461-62 (10th Cir. 1995); *Neal v. Hardee's Food Sys. Inc.*, 918 F.2d 34, 37-38 (5th Cir. 1990); *Am. Recovery Corp.*, 96 F.3d at 90, 93-94.

The FDIC ignores these cases. Indeed, the FDIC has conceded that the Assistance Agreement and Termination Agreement are interrelated and **together** govern the dispute. *See* TACG Mem. at 7-8; Opp. at 3 ("The Termination Agreement provided that the tax benefit sharing obligations defined in Section 9 of the Assistance Agreement, and certain other provisions, survived termination and remained binding on the parties."); FDIC Motion to Consolidate at 4 ("Both this action and the transferred case relate to a dispute over the proper interpretation of one provision of the Assistance Agreement, as well as provisions of another contract, called the 'Termination Agreement,' entered between TACG and the FDIC in 1996."); Opp. at 2 ("Both the FDIC Action and the TACG Action relate to a dispute over the proper interpretation of one provision of the Assistance Agreement, as well as provisions of the 1996 Termination Agreement between the FDIC and TACG.").

And, even if the arbitration clause were limited to disputes arising out of obligations "created by" the Termination Agreement (which it is not), this dispute *does* arise out of obligations "created by" the Termination Agreement. Section 2.2 of the Termination Agreement

provides: "All obligations of the parties under the Acquisition Agreements[3] with respect to . . . Tax Benefits . . . shall survive ***as provided in this Agreement***." Term. Agr. § 2.2 (emphasis supplied). The emphasized phrase highlights that the Tax Benefits (*i.e.* the subject of this dispute) survive "as provided in" the Termination Agreement—that is, they are different than they were under the old contract. The Termination Agreement has seven single-spaced pages of "clarifications" of Tax Benefit issues. *Id.* § 7.2. The obligations at issue in this case cannot be resolved without reference to the Termination Agreement and were thus "created" by that agreement.

Finally, the FDIC suggests that the breadth of Category [5] makes Categories [1] through [4] superfluous. That is not correct. Each of those categories relates specifically to particular kinds of disputes, with particular (and unique) procedural and substantive requirements. To take one obvious example, a "Category [4]" dispute had to be commenced before the expiration of the Arbitration Deadline Date. The fact that the parties had special procedures for various Categories means that the Categories were not superfluous.

*   *   *

Even reading the FDIC's arguments in the most generous light, the FDIC has not established and cannot establish "that it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Tech., Inc. v. Comm. Workers of Am.*, 475 U.S. 643, 650 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)).

---

[3] The term "Acquisition Agreements" is a defined term, which includes the Assistance Agreement. Term. Agr. p. 1

## II.    The FDIC's "Background" Section Deliberately Misstates The Relevant Facts

This case is technical, both factually and legally.  The ultimate decision-maker will have to apply a very technical set of tax laws and contract provisions in the context of a financial institution's federal income tax liabilities as they unfolded over nearly two decades.  The parties' legitimate interests are not served by introducing unnecessary confusion into an already dense set of facts.  Yet the "Background" section of the FDIC's papers misstates the fundamental and incontestable facts alleged in TACG's Petition to Compel Arbitration ("Petition") and documented in the contracts attached to the Petition.

This is not the first time the FDIC has done this.  The FDIC's papers in the Northern District of Texas—like the FDIC's papers here—misstated such basic facts as which parties entered into which agreements, the obligations of the parties under those agreements, and the positions of the parties in this dispute.  This has already caused confusion.  Magistrate Judge Ramirez in the Northern District of Texas, not realizing the disparity between the allegations in TACG's Petition to Compel Arbitration and the erroneous recitation in the FDIC's motion to transfer, incorporated into her March 24, 2008 "Findings, Conclusions, and Recommendations" inaccurate statements of fact unrelated to her limited decision regarding which party was the "first to file."  TACG alerted the District Court to these inaccuracies by objecting to the Magistrate's recommendation only to the extent that it adopted the FDIC's errors.  The FDIC responded not by arguing that its errors were not errors, but rather by arguing that the court should ignore the FDIC's misstatements, adopt the entire recommendation, and put off the errors someone else to sort out.  Thus, it is now particularly troubling that the FDIC would seek to likewise infect this Court's decision with similar errors.

Apparently, the FDIC hopes to gain some tactical advantage by misleading the Court in the following respects:

- First, the FDIC incorrectly contends that "both the TACG Action and the FDIC Action arise from a 1988 transaction between TACG and the FDIC's predecessor, [FSLIC]." Opp at 2. In fact, as TACG alleged in the Petition, there were <u>three</u> parties, not two: "[t]he Assisted Acquisition to which *TAC, FAB and FSLIC were a party* occurred on October 14, 1988." Petition ¶ 50 (*see* Asst. Agr. p. 1).

- Second, the FDIC incorrectly contends that "TACG purchased the assets and assumed certain liabilities of eleven failed" Texas thrifts. Opp. at 2. In fact, "*NuOlney* Savings Association, Olney, Texas [*i.e.*, FAB] . . . acquired substantially all the assets and liabilities of eleven failed Texas savings and loan associations." Petition ¶ 5 (*see* Asst. Agr. p. 2).

- Third, the FDIC incorrectly contends that "Section 9 of the Assistance Agreeement—the provision at issue in both actions—required TACG to share with FSLIC" certain tax benefits. Opp. at 2. In fact, "[p]ursuant to the Assistance Agreement, TAC and FAB agreed that *FAB* would pay to FSLIC 60 percent of any '*Net Tax Benefits*' realized by FAB or the TAC Consolidated Group of which FAB was a member." Petition ¶ 54 (*see* Asst. Agr. p. 47; Term. Agr., Art. VII (referring to continuing obligations of AmWest [*i.e.*, FAB])).

- Fourth, the FDIC incorrectly contends that "*TACG and the FDIC* terminated the Assistance Agreement by entering into the Termination Agreement." Opp. at 3. In fact, "[o]n July 31, 1996, *TAC, FAB, and the FDIC* . . . entered into a Termination Agreement." Petition ¶ 67 (*see* Term. Agr. p. 1).

- Fifth, the FDIC incorrectly contends that TACG has alleged that "TACG overpaid tax benefit sharing obligations to the FDIC by approximately $41 million . . . nearly *all* of the tax benefit sharing amounts that TACG has *ever* paid the FDIC." Opp. at 5. In fact, TACG has explicitly alleged that "FAB did not correctly compute its tax sharing obligations in the years 1995 to 2005 . . . . _FAB_ therefore erroneously overpaid its tax benefit sharing obligations." Petition ¶ 74.

- Sixth, the FDIC describes its position that "TACG's basis in the stock of FAB was approximately $1 billion higher than it would have been without Section 9 tax benefits." Opp. at 4-5. In fact, "stock basis" was not a Tax Benefit Item at all under the contract and the FDIC did not claim otherwise until *after* TACG requested reimbursement of overpayments due to the Section 9(b)(4) dispute. Mitchell Dec. Exs. E-H.

This case is complicated enough without the FDIC twisting the well-pled and incontestable allegations of TACG's Petition. Under other circumstances, the FDIC's errors might be attributed to sloppy editing and dismissed as immaterial; here, these facts will ultimately determine the parties' tax sharing rights and obligations under the Assistance Agreement and Termination Agreement. The Court should not trust the FDIC's statement of facts.

**III.    In the Alternative, the Consolidated Case Should Be Transferred To The Northern District Of Texas**

Should this Court not compel arbitration, it should return the case to the Northern District of Texas.

The FDIC does not dispute that this case should be transferred to the Northern District of Texas if 9 U.S.C. § 4 does not permit this Court to compel arbitration in Dallas, Texas. Nor does the FDIC challenge TACG's showing that the existence of a "real question" as to whether this is a District in which the Petition "might have been brought" makes it an improper transferee court under the "threshold question" required for a transfer under 28 U.S.C. § 1404(a). TACG Mem. 11-12, 13 & n.10. For that reason alone, a re-transfer to the Northern District of Texas is required absent an order compelling arbitration.

The FDIC does dispute the equitable factors under section 1404(a). But contrary to the FDIC's arguments, the venue issue has not been decided, and the public and private considerations under 28 U.S.C. § 1404(a) demonstrate that this case should return to Texas.

**A.    The Transfer Order Does Not Bind this Court With Respect To TACG's Motion To Transfer Under 28 U.S.C. § 1404(a)**

The FDIC argues that because Judge Lindsay's April 21, 2008 Order transferring the Texas Action (the "Transfer Order") is "binding" law of the case, this Court may retransfer this action only upon a finding of clear error, manifest injustice or changed circumstances. Opp. at 19. This argument hinges on the FDIC's mischaracterization of the Transfer Order and the Fifth Circuit's first-to-file rule.

Like any order, the Transfer Order is law of the case only with respect to the issues it resolves expressly or by necessary implication. *Bouchet v. National Urban League, Inc.*, 730 F.2d 799, 806 (D.C. Cir. 1984). The Northern District of Texas transferred this action solely on the ground that the FDIC's action "was filed first, there is substantial overlap between the two cases, and TACG has not shown compelling evidence justifying an exception to the first-to-file rule." Transfer Order at 2-3. Magistrate Judge Ramirez's Findings, Conclusions and

- 14 -

Recommendations ("Recommendation") stated that "[b]ecause [TACG's] action should be transferred under the first-to-file rule, the Court **does not address, and expresses no opinion on**, whether a transfer pursuant to § 1404(a) would be proper. . . . A motion to transfer pursuant to the first-to-file rule does not depend on the presence or absence of the § 1404(a) considerations." Recommendation at 8 n.3 (emphasis supplied) (citing *Luckett v. Peco Foods, Inc.*, No. 3:07cv85-KS-MTP, 2008 WL 534760, at *3 (S.D. Miss. Feb. 22, 2008)). Judge Lindsay's Transfer Order, adopting the Recommendation, acknowledged this limitation as well. Transfer Order at 2. Moreover, the Recommendation explained that following transfer pursuant the Fifth Circuit's first-to-file rule, it is "**the responsibility of the first-filed court to decide 'whether the second suit filed must be** dismissed, stayed or **transferred** and consolidated.'" Recommendation at 7 (quoting *Sutter Corp. v. P & P Indus., Inc.*, 125 F.3d 914, 920 (5th Cir. 1997)) (emphasis supplied).

It is well established that a transfer pursuant to the Fifth Circuit's first-to-file rule is not a determination of where the action should ultimately proceed, but an act of comity and deference between sister courts intended to avoid conflict by having a single court determine where the two actions should proceed. *See, e.g., Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603-604, 606 (5th Cir. 1999) (holding that the second-filed court should not determine whether the first-filed court has jurisdiction before transferring under the first-to-file rule); *Sutter Corp.*, 125 F.3d at 920 n.7 (5th Cir. 1997) (Where a case is to be transferred under the first-to-file rule, "[t]he determination of [the substantive] questions will depend on the [first-filed] court's conclusion as to which court should decide them."); *Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 407 (5th Cir. 1971) ("[T]he court initially seized of a controversy should be the one to decide whether it will try the case."); *Texas Instruments Inc. v. Micron Semiconductor, Inc.*, 815

F. Supp. 994, 999 (E.D. Tex. 1993) (Following a decision to transfer under the first-to-file rule, a motion to transfer in the first-filed court, rather than a motion for reconsideration in the second-filed court, "is the proper vehicle to resolve the issue of which court should proceed."); *see also Centocor, Inc. v. MedImmune, Inc.*, No. C 02-03252 CRB, 2002 WL 31465299, at *4 (N.D. Cal. Oct. 22, 2002) ("[T]he issue of forum properly belongs before the [first-filed] court. If the second-filed court is demonstrably more convenient for the parties and witnesses, a motion to transfer under Section 1404(a) should be addressed to the *first-filed* court.") (emphasis in original) (internal quotation omitted).

Thus, the Northern District of Texas made no determination as to whether a transfer would serve the interests of justice and the convenience of the witnesses or the parties in accordance with 28 U.S.C. § 1404(a). There is no applicable law of the case, and this Court should address that issue for the first time applying the normal standard. The FDIC's proposed heightened standard would frustrate the purpose of § 1404(a) and ignore the rationale for the Northern District of Texas's transfer.

In addition, the "real question" as to the suitability of this District as a place where the case "might have been commenced" (*see* TACG Mem. 13 n.10)—and the heavy balance of the equitable factors favoring Texas—would indeed have made a transfer under section 1404(a) "clear error."

### B.    The Parties Have Not Waived Consideration Of Equitable Factors Under § 1404(a)

The FDIC contends that, by consenting to venue in both the District of Columbia and the Northern District of Texas in Section 13.4 of the Termination Agreement, TACG "expressly waived" application of the "traditional transfer factors" and that instead the proper venue should

- 16 -

be settled solely by application of the first-to-file rule. Opp. at 20-22. This argument has no basis in the parties' agreement or in law.

The text of Termination Agreement Section 13.4 provides that the parties consent to venue in the District of Columbia and the Northern District of Texas. It does not suggest how the parties intended to settle disputes about where litigation should proceed as between those two forums. Indeed, based on its own conduct in the Northern District of Texas, the FDIC cannot now argue that the parties intended to waive application of § 1404(a). Contrary to its present argument, in that court, the FDIC filed a Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a). In its supporting papers, the FDIC argued for application of the "traditional transfer factors," *i.e.*, § 1404(a)'s public and private interest factors. The FDIC also treated its first-filed action as merely one factor among others weighing in favor of its choice of forum. FDIC's Memorandum in Support of its Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) at 9-10. If the parties' agreement precluded application of the equitable factors, transfer to this District would have been clear error.

What is more, the FDIC's suggestion that this Court may disregard the traditional § 1404(a) factors is contrary to controlling authority holding that venue must be settled by balancing all of the relevant equitable factors. As the Supreme Court held in *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988), even in cases involving a forum selection clause, § 1404(a) is "intended to place discretion in the district court to adjudicate motions for transfer according to an individualized case-by-case consideration of convenience and fairness." *Id.* at 29. Moreover, the Court held that forum selection clauses cannot be treated as dispositive. *Id.* at 30-31 ("Section 1404(a) directs a district court to take account of factors other than those that bear solely on the parties' private ordering of their affairs. The district court must also

- 17 -

weigh in the balance the convenience of the witnesses and those public-interest factors of systemic integrity and fairness that, in addition to private concerns, come under the heading of 'the interest of justice.'"). Here, where the parties' agreement does not identify a unique forum for litigation, it is even clearer that the Court must consider the full range of equitable considerations. In addition, the courts of the D.C. Circuit have repeatedly held that the first-to-file rule is not an adequate basis for choosing among permissible forums. *See* TACG Mem. at 14-15.[4]

### C.     The Equitable Factors Favor Transfer

#### 1.     The FDIC's Choice Of Forum Is Not Entitled To Special Deference

As the FDIC acknowledges, each party is a plaintiff in this dispute. Nonetheless, the FDIC contends that its choice of forum is entitled to greater deference than TACG's. None of its purported reasons has any merit.

First, the FDIC asserts that TACG's choice of forum "would require that related cases be resolved in different fora." Opp. at 23, 28. There is no scenario under which the two actions would not be transferred together. The FDIC's Motion to Consolidate its action with this one is pending unopposed before this Court, and the FDIC has failed to identify any reason why the Court's analysis of the § 1404(a) factors should not apply equally to both actions. Thus, either both cases will be transferred or both cases will remain with this Court.

---

[4] The authorities on which the FDIC relies do not hold otherwise, nor can they be stretched to fit this case. Section 1404(a) was not relevant to the holding of *Marra v. Papandreou*, 216 F.3d 1119 (D.C. Cir. 2000), which decided a motion to dismiss based on the parties' agreement to litigate in Greece. *Northwestern National Insurance Co. v. Donovan*, 916 F.2d 372, 378 (7th Cir. 1990), explicitly recognized that even a party to an agreement establishing a single forum for litigation could seek transfer based on the interests of third parties, such as witnesses, and the interests of justice. And *Intervet, Inc. v. Merial Ltd.*, 553 F. Supp. 2d 112, 114-15 (D.D.C. 2008), did not involve § 1404(a), but application of Federal Circuit law to a motion to dismiss in a case where two patent actions were filed in the same district.

Second, in spite of overwhelming authority to the contrary, the FDIC asserts *ipse dixit* that its choice of forum is entitled to greater deference because it filed its action 59 minutes before TACG filed this action. Opp. at 24. TACG anticipated this specious argument in its moving papers. The D.C. Circuit has repeatedly held that the proper venue for a dispute should not be determined by which action was filed first. *See* TACG Mem. at 14-15. Moreover, the small difference in filing time here is entitled to no weight under 28 U.S.C. § 1404(a). *Cell Genesys, Inc. v. Applied Research Systems ARS Holdings*, Civ. Action No. 04-1407(JDB), 2005 WL 1041098, at *3 (D.D.C. Jan. 18, 2005) ("The one-day difference in filing between this Court and the District of Massachusetts is insignificant under the circumstances presented here."); *accord Ontel Prods., Inc. v. Project Strategies Corp.*, 899 F. Supp. 1144, 1153 (S.D.N.Y. 1995) ("days apart").

Third, the FDIC asserts that the parties' agreement that the cases should be consolidated favors its choice of forum. Opp. at 24. TACG has not opposed consolidation because the cases should be resolved together. It is an open question whether that resolution should take place in this Court, in the Northern District of Texas, or, indeed, in arbitration.

Finally, the FDIC misstates the facts and law in claiming to be the "natural plaintiff."[5] In an attempt to make it appear that TACG's action was a strategic response to the FDIC's claim, the FDIC implies that its claim originated first. However, the documentary record shows that TACG demanded a $40 million refund on June 18, 2006, whereas the FDIC did not make its demand for $165 million until October 27, 2007. Mitchell Decl. ¶¶ 25, 26, Exs. F, H, J.

---

[5] The FDIC also misleadingly suggests that the Northern District of Texas transferred this action in part because the FDIC is "the natural plaintiff with the largest monetary claim." Opp. at 1. The Transfer Order and the Magistrate's Recommendation do not support this suggestion.

Likewise, although the FDIC cites cases holding that a "natural plaintiff" is entitled to greater deference in the venue analysis, these cases are inapposite. In those cases, the natural plaintiff sought money damages while the other party commenced an anticipatory action seeking declaratory judgment. Opp. at 24 n.11. Here, TACG seeks more than $40 million from the FDIC. A party for whom a successful net result will be recovery of $40 million plus interest can surely be thought of as a "natural" plaintiff, even if the defendant comes up with a larger, tenuous counterclaim. (The FDIC cites no authority, and we have found none, holding that the "natural plaintiff" can be determined by merely comparing the dollar value of damages sought.) Moreover, TACG's request for an order compelling arbitration is a request for affirmative relief under the FAA and is not analogous to a preemptive declaratory judgment action. *See Moses H. Cone*, 460 U.S. at 24-25.

### 2.    The Private Interest Factors Favor Transfer

The FDIC's analysis of the private interests ignores the legitimate private interests favoring litigation in Texas and fails to present any significant interest in litigating in the District of Columbia.

The FDIC asserts that the Termination Agreement was "negotiated by the FDIC in Washington, D.C." The FDIC does not mention that TACG negotiated the Termination Agreement in Texas. TACG Mem. at 16. Moreover, the FDIC does not dispute that its Dallas office was involved in conduct pertinent to this dispute. *Id.* And the FDIC does not contest that the bulk of the events relevant to this dispute occurred in Texas and stem from the FDIC's decision to engage in commercial transactions in Texas with a Texas financial institution to which it sold the assets of eleven insolvent financial institutions based in Texas. It then

- 20 -

administered the ongoing relationship from its Dallas, Texas office for many years. This dispute
is focused on Texas, not D.C. *Id.*

The FDIC contends that it has "many boxes" of relevant documents in the District of
Columbia. Once again, the FDIC ignores the location of the documents held by TACG, TACG's
advisors, and Citibank. Those documents are located in the Northern District of Texas and in
various other states. Therefore, as TACG argued, documentary evidence is equally available in
either district. *See id.* at 18.

The FDIC identifies six potential witnesses, including three of its employees, for whom
this district is more convenient. This is an odd argument coming from a party that has agreed to
arbitration in Dallas, Texas. Nonetheless, the FDIC's argument borders on specious. Three of
the six potential FDIC witnesses, including Mr. Viitala, were previously identified by TACG.
*Id.* at 17-18. The FDIC ignores the 22 other witnesses identified by TACG. Eighteen of those
witnesses are located in Texas, and two are located in Utah and Nevada, substantially closer to
Texas than this district. *Id.* Thus, as TACG pointed out, the convenience of the witnesses
weighs heavily in favor of transfer.

### 3.    The Public Interest Factors Favor Transfer

The FDIC's argument that either court could apply Texas law is true, but non-responsive
to the point that the Texas court's familiarity with Texas law weighs in favor of transfer.
*Onyeneho v. Allstate Ins. Co.*, 466 F. Supp. 2d 1, 4 (D.D.C. 2006) (Though plaintiff's federal
claims may be the "main issue" in the case, "the presence of Maryland state law claims weighs in
favor of transfer."); *Schmidt v. Am. Inst. of Physics*, 322 F. Supp. 2d 28, 35 (D.D.C. 2004);
*Kreisner v. Hilton Hotel Corp.*, 468 F. Supp. 176, 179 (E.D.N.Y. 1979) ("While there may not be
novel or complex issues of State law to be resolved, construction of State law is best left to

courts most familiar with it."); *cf. Leroy v. Great Western United Corp.*, 443 U.S. 173, 186 (1979) ("federal judges sitting in Idaho are better qualified to construe Idaho law").[6]

The FDIC declares that both forums have an equal local interest in the dispute. That is nonsense. This dispute concerns a major Texas financial institutions. The dispute stems from the FSLIC's decision to inject itself into Texas affairs and pursue a business relationship with a Texas financial institution, FAB. And the majority of the conduct at issue occurred in Texas. *See* TACG Mem. at 15-16, 20. The FDIC employees involved in this dispute do not even work in the District of Columbia. They work in Virginia. The local interest factor strongly supports transfer.

The FDIC does not contest the time to trial and time to resolution statistics presented by TACG or their relevance; indeed, the FDIC cites a case providing additional support for the proposition that median time from filing to trial is the proper measure of court congestion. *Seeberger Enterprises, Inc. v. Mike Thompson Recreational Vehicles, Inc.*, 502 F. Supp. 2d 531, 540-41 (W.D. Tex. 2007).[7] This factor, too, weighs heavily in favor of transfer.

---

[6] In the one case cited by the FDIC on this point, the district court discounted this factor because it was unclear which state's substantive law would apply in the dispute. *Seeberger Enterprises, Inc. v. Mike Thompson Recreational Vehicles, Inc.*, 502 F. Supp. 2d 531, 541 (W.D. Tex. 2007).

[7] To argue that this District is less congested than the Northern District of Texas, the FDIC purports to employ a different metric, endorsed fifteen years ago by a court in another district. *Gundle Lining Construction Corp. v. Fireman's Fund Ins. Co.*, 844 F. Supp. 1163, 1166-67 (S.D. Tex. 1994). The more recent cases confirm that the best and most reliable measure of court congestion is the median time to trial and time to resolution. These statistics accurately reflect the speed with which cases move through the courts, they are calculated by the Administrative Office rather than by the parties, and they are not subject to statistical manipulation, such as that used by the FDIC to improve its results. The *Gundle* court actually compared the total number of <u>pending civil and criminal cases</u> per active judge, *id.*, whereas the FDIC compared only the number of <u>civil cases initiated in a single year</u> per active judge. Opp. at 21. Moreover, the FDIC's calculations do not account for the fact that the Northern District of Texas has five more magistrate judges and two more senior judges than the District of Columbia. These judges surely help to ease court congestion. Accounting for all pending cases and all judicial officers produces averages of 222 pending cases per judicial officer in the District of Columbia and 165 pending cases per judicial officer in the Northern District of Texas. *See* James C. Duff, *Judicial Business of the United States Courts 2007*, Table C: U.S. District Courts-Civil Cases Commenced, Terminated and Pending, *available at* http://www.uscourts.gov/judbus2007/appendices/C00Sep07.pdf; *id.*, Table D: U.S. District Courts-Criminal Cases Commenced, Terminated

Footnote continued on next page

## CONCLUSION

For the reasons set forth above and in TACG's Memorandum in support of its Renewed Motion, TACG respectfully requests that this Court compel the parties to arbitrate in the pending arbitration in Dallas, Texas pursuant to the Federal Arbitration Act, or, in the alternative, transfer this case to the Northern District of Texas.

Dated: June 3, 2008

                                    Respectfully submitted,

                                    **ARNOLD & PORTER, LLP**


                                    By:___ /s/  Kent A. Yalowitz_____
                                         Kent A. Yalowitz
                                           (admitted *pro hac vice*)
                                         Erik Walsh
                                           (admitted *pro hac vice*)
                                         399 Park Avenue
                                         New York, NY  10022
                                         (212) 715-1000
                                         Email:  Kent.Yalowitz@aporter.com

                                         Michael A. Johnson
                                         D.C. Bar # 460879
                                         555 12th Street, N.W.
                                         Washington, DC  20007
                                         (202) 942-5000
                                         Email:  Michael.Johnson@aporter.com

                                         *Attorneys for Petitioner/Plaintiff The Adam
                                         Corporation/Group*

---

and Pending, *available at* http://www.uscourts.gov/judbus2007/appendices/D00Sep07.pdf (Administrative Office statistics showing that, for the 12 months ending Sept. 30, 2007, the Northern District of Texas had 972 pending criminal cases and 2,979 pending civil cases, for a total of 3,951 pending cases, while the District of Columbia had 1,240 pending criminal cases and 2,762 pending civil cases, for a total of 4,002 pending cases).